**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STRATESPHERE LLC, *et al*, | : | |
| | : | |
| Plaintiffs/Counterclaim Defendants, | : | Case No. 2:20-CV-02972-MHW-CMV |
| | : | |
| v. | : | |
| | : | Judge Michael H. Watson |
| KOGNETICS INC, | : | |
| | : | Magistrate Judge Chelsey M. Vascura |
| Defendant/Counterclaim Plaintiff, | : | |

## PLAINTIFFS/COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs/Counterclaim Defendants Stratesphere LLC ("Stratesphere"), Kognetics Holding Company LLC ("KHC"), Kognetics LLC ("KLLC"), and Tariq Farwana ("Farwana") (collectively "Plaintiffs"), move for partial summary judgment against Defendants/Counterclaim Plaintiffs Kognetics, Inc. ("INC"), Inderpreet Thukral ("Thukral"), and Rajeev Vaid ("Vaid") (collectively "Defendants"), as to Counts I-III, VI, VII, and X of INC's Second Amended Counterclaim (ECF No. 32), the Counterclaims of Thukral and Vaid (ECF Nos. 45, 46), and as to liability on Counts I-VI and IX of Plaintiffs' Second Amended Complaint (ECF No. 31), as Supplemented (ECF No. 79).  For the reasons set forth in the attached Memorandum in Support, there are no genuine issues of material fact, and Plaintiffs are entitled to judgment as a matter of law as to each of these claims.

Respectfully submitted,

*/s/ Jonathan P. Corwin*
James E. Arnold (0037721)
Jonathan P. Corwin (0075056)
Tiffany L. Carwile (0082522)

ARNOLD & CLIFFORD LLP
115 W. Main Street, 4th Floor
Columbus, Ohio 43215
Tel:(614) 460-1600
Fax:        (614) 469-1066
Email:      jarnold@arnlaw.com
            jcorwin@arnlaw.com
            tcarwile@arnlaw.com

*Counsel for Plaintiffs/Counterclaim Defendants*

<u>**MEMORANDUM IN SUPPORT**</u>

## I.  INTRODUCTION

Discovery in this case has now confirmed that Defendants' prior dealings with Plaintiffs, and indeed their entire case, is based on a false premise.[1]  As it turns out, Defendants had no intention of actually providing the artificial intelligence platform (the "Software") or other assets they sold to Plaintiffs in August 2018.  Defendants' deceptive plan was always to retain full control over the Software and other assets.  That is why, when they were desperately in need of cash to save their failing business in early 2018, Defendants were seeking investors like Stratesphere.  However, due to significant financial baggage carried by Defendants, Stratesphere opted not to invest but instead proposed, and Defendant ultimately accepted, an asset purchase agreement (the "APA") whereby Defendants would sell the Software along with numerous other assets including all intellectual property, all marketing materials, existing customers, the "Kognetics" name, and other intangible assets.

Despite receiving the full purchase price for the Software and other assets, Defendants disregarded the APA from day one, and instead treated Stratesphere as merely an "investor."[2]  Indeed, Defendants told employees that Stratesphere was an investor.  Defendants' treatment of Stratesphere as an "investor" is also evident from the fact that they: (1) never delivered a fully-functional version of the Software (and did not even have all the assets they promised to sell); (2) continued to use the "Kognetics" name for their own purposes; (3) disregarded their obligations under the Master Service Agreement (the "MSA") and never sought input or approval from

---

[1] Defendants are Kognetics, Inc. ("INC"), Inderpreet Thukral ("Thukral"), and Rajeev Vaid ("Vaid").  Plaintiffs are Stratesphere LLC ("Stratesphere"), Kognetics Holding Company LLC ("KHC"), Kognetics LLC ("KLLC"), and Tariq Farwana ("Farwana").

[2] The transaction was structured as an asset purchase not a stock purchase; accordingly, Stratesphere did not "invest" in Kognetics Inc. ("INC").

Stratesphere with respect to further development of the Software; (4) secretly engaged in self-dealing with a potential purchaser of the Software; and (5) continued to use the Software after the MSA was terminated, even going so far as to improperly tell customers that Stratesphere was merely an investor, that INC would continue to operate, and that "all technology and service assets are available with [INC]."

Regrettably, once Plaintiffs discovered Defendants' devious plan, it was too late. Defendants had (1) fleeced Plaintiffs for over $2 million in funding and other payments, (2) had supplied only a partially functional version of the Software and had made off with a fully functional copy of the Software, and (3) had reached out to customers telling them that all payments should be directed to INC. Not coincidentally, this is similar to how Defendants' own CFO previously described the conduct of Thukral and Vaid relative to their own companies—alleging that they had acted in a "fraudulent/unethical manner with an intention to divert the business of the group and cheat the people to whom the group owe money."

As they set out to do in April 2020 by properly initiating a lawsuit against Defendants, Plaintiffs now respectfully request that this Court right this egregious wrong. To that end, and for the reasons set forth herein, Plaintiffs respectfully request that the Court grant partial summary judgment in their favor.

## II.    BACKGROUND

### A.    Pre-Deal Negotiations—Stratesphere Provides Funding to Save Defendants Failing Business.

Stratesphere provides data-driven business development and acquisition services, working with multi-national companies to create business relationships and expansion opportunities in countries around the world. Declaration of Tariq Farwana ¶¶ 2-3; Deposition of Tariq Farwana

(30(b)(6)) at 33-35, 37.[3]   In Spring 2017, Stratesphere engaged Boston Analytics to provide consulting services.[4] Deposition of Inderpreet Thukral (30(b)(6)) at 80; Deposition of Damon Caiazza (Ind.) at 34.[5]   Through this relationship, Defendants introduced Stratesphere to an artificial intelligence platform (the "Software").  Thukral (30(b)(6)) Dep. at 82-83.  The Software is a tool that "provides executives, advisors and investors with decision analytics and support around market strategy, enterprise strategy, M&A strategy, investment strategy, competitive strategy, hiring strategy, and more."  Declaration of Tiffany Carwile, Ex. 35 at 3.

At the time, Defendants were looking for investors as they were in desperate need of cash. Thukral (30(b)(6)) Dep. at 71; Carwile Decl. Ex. 109; Caiazza (Ind.) Dep. at 49.  In March 2018, Stratesphere provided a non-binding term sheet to Defendants that contemplated Stratesphere acquiring an 80 percent stake in INC in exchange for a 10 percent interest in Stratesphere and a $1 million capital contribution.  Thukral (30(b)(6)) Dep. at 85; Carwile Decl. Ex. 111.  Ultimately, this did not come to fruition, but negotiations continued.   During this time, to help with Defendants' significant cash flow problems, Stratesphere began paying INC $30,000 per month, and it paid Thukral and Vaid $10,000 each per month.  Farwana (30(b)(6)) Dep. at 103; Farwana Decl. Ex 267.  In total, Stratesphere paid $200,000 to Defendants before there was even a signed agreement.  Farwana Decl. Ex. 267.  These amounts would ultimately be credited against any contribution obligation of Stratesphere.  *Id.*; Carwile Decl. Ex. 1 at § 1.10(a) ("APA").

---

[3] The transcript from the Rule 30(b)(6) deposition of Tariq Farwana as a designated representative of Stratesphere has been previously filed with the Court.

[4] Boston Analytics is a "brand name" used by Pythhos Technology Private, Ltd. ("Pythhos India"), and Pythhos Technology LLC ("Pythhos US" and collectively "Pythhos entities"), which are entities controlled by Defendants Thukral and Vaid.  *See* Thukral 30(b)(6)) Dep. at 11, 23.

[5] The transcript from the Rule 30(b)(6) deposition of Inderpreet Thukral as a designated representative of INC is being separately filed with the Court.  In addition, the transcript from the individual deposition of Damon Caiazza has been previously filed with the Court.

Discussions shifted to an asset purchase agreement, which Defendants provided to their CFO for review.  Thukral (30(b)(6)) Dep. at 89; Carwile Decl. Ex. 112.  The CFO specifically raised concerns that Defendants would not be getting sufficient value for the assets—explaining that they were essentially giving up their intellectual property for free and not getting equity in the purchasing entity.[6]  Carwile Decl. Ex. 112.  Thukral rejected this concern, explaining that "we didn't have any specific concerns about . . . whether it's for free or not."  Thukral (30(b)(6)) Dep. at 90.  Consistent therewith, Defendants "did not do any due diligence" on Stratesphere.  *Id.* at 94-95.

### B.    A Deal Is Reached in August 2018.

Ultimately, a deal was reached, and the APA was signed effective August 22, 2018.  Thukral (30(b)(6)) Dep. at 33; APA.  To further effectuate the deal, Stratesphere formed KHC, a wholly owned subsidiary, to hold the intellectual property and KLLC was formed as a subsidiary of KHC to hold the customer contracts and operate the Software business.  Farwana Decl. ¶¶ 6, 8.  The APA included both a Service Mark Assignment and a Copyright Assignment.  APA, Exs. C, D.  In addition, KHC entered into the MSA with INC.[7]  Carwile Decl. Ex. 2 ("MSA"); Thukral (30(b)(6)) Dep. at 163.  The deal also included employment and confidentiality agreements between Stratesphere and Thukral and Vaid, as well as an operating agreement for KLLC.

---

[6] The CFO also cautioned that under the terms of the agreement, "[Stratesphere] could decide to route the business through other group companies and leave us hanging."  Carwile Decl. Ex. 112 at 4.

[7] Because INC did not have any employees, it then entered into an identical Master Service Agreement with Pythhos US, which in turn entered into an identical Master Service Agreement with Pythhos India.  Thukral (30(b)(6)) Dep. at 172-73.

Carwile Decl. Exs. 6, 9, 10; Thukral (30(b)(6)) Dep. at 120-21; Deposition of Inderpreet Thukral (Ind.) at 17; Deposition of Rajeev Vaid (Ind.) at 20.[8]

The relevant terms of those agreements are as follows:

*1. The APA:* The APA required Defendants to "sell, transfer, assign, [and] convey" all "right, title and interest" in and to various Assets and deliver possession of those Assets as of the Closing date—August 22, 2018. APA §§ 1.01, 2.02. The Assets included the Software and Documentation, Assigned Contracts, all Intangible Assets, research data, all websites, website URLs, all social media accounts, all goodwill, all Intellectual Property Assets, and all Proprietary Intellectual Property Assets, including those described on Schedule 1.01(c).[9] *Id.* § 1.01. Additionally, the Software was defined to include both its source code and object code,[10] and Defendants represented that "the Software is fully operable, meets all applicable specifications, and functions in all material respects, in conformity with the Documentation." *Id.* § 4.06(k), Art. X. In turn, the Documentation was defined to include the documentation listed in Schedule 1.01(h) and all other documentation describing or relating to the Software (including manuals, technical specifications, schematics, and diagrams), and Defendants represented that "the Documentation is complete and accurate in all material respects such that ***the Software does not have any material undocumented feature***." *Id.* § 4.06(k), Art. X (emphasis added). The Asserts further included

---

[8] A copy of the transcript from the February 8, 2022, individual deposition of Inderpreet Thukral will be separately filed with the Court. In addition, a copy of the transcript from the March 1, 2022, individual deposition of Rajeev Vaid will be separately filed with the Court.

[9] Schedule 1.01(c) identifies over 40 intellectual property assets. APA Sch. 1.01(c).

[10] Source code is generally programming statements created by a programmer and object code is generally the output produced when the source code is compiled. Declaration of Brad Warnick at ¶ 4.

"all marketing materials . . . advertising and other promotional materials" used with respect to the Software and the name "Kognetics." *Id.* § 1.01(e); *id.* Ex. C (Service Mark Assignment).

The purchase price for the Assets was Class A membership units in Stratesphere equal to 10 percent of its issued and outstanding membership units and Class B membership units in KLLC equal to 20 percent of its issued and outstanding membership units. *Id.* § 1.05. Separate from the purchase price, KHC agreed to pay INC a royalty in $50,000 installments paid on or about January 31 and July 31 of each year for four years. *Id.* § 1.08. Stratesphere also agreed to make a $1 million capital contribution to KHC in twelve relatively equal monthly installments. *Id.* § 1.10. The amount could be either cash contributions or satisfaction of debts and obligations. Deposition of Rajeev Vaid (February 2022, 30(b)(6)) at 50-51.[11] However, amounts paid before the closing, along with 75 percent of revenue derived from new customer contracts secured by Stratesphere, were to reduce the initial funding requirement. *Id.* at 49; APA § 1.10.

The APA also set forth the exclusive list of representations upon which the parties were relying. APA Arts. IV-V. Defendants specifically agreed that "[t]here are no representations, promises, warranties, covenants or undertakings other than those expressly set forth in or provided for in this Agreement or the Related Agreements." *Id.* § 11.09. The last provision relevant here is the APA's non-compete provision. Defendants agreed that neither they "nor any of their Affiliates" would engage in distributing, providing, marketing, or selling "one or more Competing Products." *Id.* § 9.02(a); Thukral (30(b)(6)) Dep. at 153-56. A Competing Product is "any product or service which performs functions similar to or in substitution for the Software." APA § 9.02(a).

---

[11] The February 28, 2022, transcript from the Rule 30(b)(6) deposition of Rajeev Vaid as a designated representative of INC will be separately filed with the Court.

2. ***The Employment and Confidentiality Agreements:***  Pursuant to their employment agreements, Thukral and Vaid each agreed to "devote substantially all of his working time, reasonable efforts, knowledge and experience to perform successfully his duties and advance [Stratesphere's] interests."  Carwile Decl. Exs. 9, 10 (Emp. Ag.) at § 2.2.  While they could serve on other corporate, civil or charitable boards or committees, they were required to give advance notice to the Managers and to obtain their consent.  *Id.*

In addition, the employment agreements incorporated confidentiality/non-compete agreements through which Thukral and Vaid agreed "not to utilize any Confidential Information for any purpose, other than in the course and scope of [their] work for" Stratesphere.  Carwile Decl. Exs. 9, 10 (Conf. Ag.) at § 10.  They further agreed that, for two years[12] after the termination of their employment, they would not (1) solicit (or assist others in soliciting) any Stratesphere customers or prospective customers and (2) directly or indirectly "engage in, own, manage, operate, join, control" any business that "distributes, provides, markets and/or sells one or more Competing Products."[13]  *Id.*  The relevant contractual obligation imposed on Stratesphere was to pay the salary of Thukral and Vaid.  However, the respective employment agreements did not set a specific salary.  *Id.*  Instead, the salaries were initially set by Stratesphere at $120,000 per year, or $10,000 per month.  Farwana Decl. ¶ 9.

3. ***KLLC Operating Agreement:***  As long as INC remained a member of KLLC, and for five years thereafter, INC's activities were to be limited to employing persons to work on the Software for "the business of" KLLC or its affiliates.  Carwile Decl. Ex. 6 at § 8.03(b).  Any violation of this section, "shall result in a forfeiture of all Class B Units held by [INC]."  *Id.*

---

[12] Vaid's non-compete agreement was for a period of three years.  Carwile Decl. Ex. 10 (Conf. Ag.) at § 10.

[13] "Competing Product" has the same definition as is included in the APA.

**C.** **Plaintiffs Have Consistently Met Their Contractual Obligations; Defendants Have Not and Have Otherwise Engaged in Tortious Conduct.[14]**

**1. Defendants were in breach of their contractual obligations on day one.**

There is no dispute that, effective August 22, 2018, Plaintiffs paid the purchase price for the Assets under the APA. *Id.* Ex. 6 at Exhibit A (noting grant of class B membership units), *id.* Ex. 8 at Exhibit A (noting grant of class A membership units); Thukral (30(b)(6)) Dep. at 119-21 (acknowledging operating agreement and admitting receipt of K1s). Defendants, on the other hand, were in breach of the APA on day one.

Defendants' Chief Products Officer, Hetal Shah, has admitted that over one-fourth of the Assets listed in Schedule 1.01(c) *were not even in existence* at the time of Closing, and therefore, could not have been conveyed. Deposition of Hetal Shah (Feb. 2022) at 142-152; Deposition of Hetal Shah (Jan. 2022) at 45.[15] Another four assets only partially existed in August 2018. Shah (Feb. 2022) Dep. at 142, 144-45, 148. Additionally, Shah could not remember whether four other assets existed in August 2018. *Id.* at 142-152. Therefore, at best, Defendants had only about half of the Schedule 1.01(c) Assets that they agreed to sell to Stratesphere in August 2018.

Shah also conceded that the promised Documentation for the Software "never existed." *Id.* at 119-120; *see also* Carwile Decl. Ex. 138 at 3. The limited documentation in Schedule 1.01(h) was only a "very high-level view of the systems." Deposition of Brad Warnick (30(b)(6)) at 17-18; Thukral (30(b)(6)) Dep. at 103-05 (admitting that Schedule 1.01(h) is not a functional diagram

---

[14] Because the issue of damages has been bifurcated and Defendants have otherwise refused to provide certain discovery on those grounds, Plaintiffs will not address that issue herein. Suffice it to say that, while the exact amount of damages is not yet fully known, there are a number of ways in which Defendants' breaches and tortious conduct have caused harm to Plaintiffs. Farwana Decl. ¶¶ 29-31.

[15] The transcript from the February 15, 2022, deposition of Hetal Shah was previously filed with the Court. The transcript from the January 25, 2022, deposition of Hetal Shah will be separately filed with the Court.

of the Software).[16]  In any event, the diagram does not constitute complete documentation; and indeed, Defendants never provided complete and accurate documentation.  Warnick Decl. ¶¶ 6-7. In October 2019, Defendants even admitted that a network diagram, description of deployable infrastructure, and other documentation would need to be created.  Carwile Decl. Ex. 138 at 3.

### 2. Defendants continued to breach their obligations and engage in tortious conduct throughout the Parties' relationship.

Shortly after Closing, Stratesphere started funding KHC, sending funds to INC to cover operating costs under the MSA, and engaging in other fundraising efforts.  Farwana (30(b)(6)) Dep. at 16, 59-61, 163-64; Farwana Decl. ¶¶ 10, 12, 14-19.  In return, Defendants compounded their initial breach (more aptly described as fraud) by failing to ever deliver a fully functioning version of the Software.  For example, Stratesphere requested access to the Software in January 2019, but Defendants provided access to only the compiled code and not to the Software's source code.  Caiazza (Ind.) Dep. at 94-95; Thukral (30(b)(6)) Dep. at 132-33.  When Defendants eventually provided some of the source code in December 2019, that code was incomplete and non-functioning.  Warnick Decl. ¶¶ 8-11; Deposition of Brad Warnick (Ind.) at 111-13.[17]

Not only did Defendants refuse to fully turn over the purchased Assets, but consistent with their view that Stratesphere was merely an "investor," Defendants also did not involve Plaintiffs in any decisions relating to the Software; did not involve Plaintiffs on deciding what changes to make to the Software, who received Software demonstrations, and customer feedback or complaints; and they did not provide Plaintiffs with copies of the materials or services that they provided to Plaintiffs' customers.  Vaid (February 2022 30(b)(6)) Dep., p. 92; Shah (Jan. 2022)

---

[16] The transcript from the 30(b)(6) deposition of Brad Warnick will be separately filed with the Court.

[17] The transcript from the individual deposition of Brad Warnick has been previously filed with the Court.

Dep. at 54-56, 58; Deposition of Gaurav Kshettry at 95-96, 121-22; Deposition of Milind Tataria at 102; *see also* Farwana (30(b)(6)) Dep. at 57-58.[18]

To add insult to injury, as early as Spring 2019, and unbeknownst to Plaintiffs, Defendants were improperly using Plaintiffs' marketing materials and the Kognetics name to compete with Plaintiffs and to sell the Software on behalf of Boston Analytics. For example, in April 2019, the CEO of Boston Analytics described the company to a potential client as "a boutique consulting firm [that] aims to enable our clients with Management & Operational consulting across various industries; Data analytics and ***Artificial Intelligence*** (***https://www.kognetics.com***/))." Carwile Decl. Ex. 261; Declaration of Ajay Malaviya ¶ 2. Through Boston Analytics, Defendants also appropriated Plaintiffs' marketing materials and marketed the Kognetics Software as their own. *See* Carwile Decl. Ex. 271 at 5 ("Kognetics is a data sciences platform . . . ."); App'x A;[19] Malaviya Decl. ¶ 3-4; *see also* ECF Nos. 60, 69.

During this same time, and unbeknownst to Plaintiffs, Thukral began discussions with Factset Research Systems, Inc. ("Factset") about a potential partnership and/or purchase of the Software. Thukral (30(b)(6)) Dep. at 184; Farwana Decl. ¶ 21. By August 2019, Factset had determined that it was potentially interested in purchasing the "Kognetics business" for a price between $16.5-$25 million. Thukral (30(b)(6)) Dep. at 185; Carwile Decl. Ex. 122. A broker determined that a sale in the range of $20-$30 million would be possible. Carwile Decl. Ex. 123. However, Thukral secretly began negotiating with Factset regarding employment contracts and

---

[18] The transcript from the deposition of Gaurav Kshettry has been previously filed with the Court. The transcript from the deposition of Milind Tataria will be separately filed with the Court.

[19] For the Court's convenience, Plaintiffs have created an appendix to show excerpts from exhibits. Each appendix shows an excerpt from one of Defendants' marketing materials and compares those materials to Plaintiffs' marketing materials. The appendix references the exhibits being compared, and the entire exhibit will be filed with the Court through the declarations.

restricted stock units ("RSUs") in exchange for a lower purchase price. Thukral (30(b)(6)) Dep. at 192-93, 196; Carwile Decl. Exs. 125, 127; Farwana Decl. ¶ 21. Factset's offer then dropped to $9 million and simultaneously provided Thukral, Vaid, and other employees with RSUs in the $5 million range. Carwile Decl. Ex. 129. Approximately two weeks after Factset rejected a counteroffer from Stratesphere, Thukral secretly reached back out to Factset to present an unauthorized offer to sell Plaintiffs' IP for $8 million while providing himself and others with $9 million in RSUs. Thukral (30(b)(6)) Dep. at 202-04, Carwile Decl. Exs. 130, 131, 132. As a result of these secret self-serving negotiations, Stratesphere and Factset were unable to come to terms. Farwana Decl. ¶ 22.

Because Plaintiffs were not fully aware of Defendants' breaches and self-dealing, they continued to satisfy their contractual obligations.[20] All parties agree that Stratesphere met the APA's funding requirements. *See* Farwana Decl. Ex. 207 at 2; Vaid (Feb. 30(b)(6)) Dep. at 36-37; Caiazza (Ind.) Dep. at 52. The $1 million commitment was reduced by the $200,000 in pre-APA funding from Stratesphere, as well as 75 percent of revenue generated by Stratesphere (which would include all new contracts secured after Closing). APA § 1.10; Farwana Decl. ¶¶ 14-16. Further, between cash contributions and direct payment of expenses by Stratesphere, the records show that from September 2018 through August 2019, Stratesphere funded $1,008,988. Farwana Decl. Ex. 267. Thus, Stratesphere more than satisfied its first-year capital contribution requirement; and indeed, Stratesphere continued funding the business, bringing the total funding to over $1.3 million. *Id.* ¶ 17.

---

[20] Although not a subject of this Motion, the evidence will show that Plaintiffs also satisfied their obligations under the MSA.

The records also demonstrate that KHC made its first two royalty payments, on March 29, 2019, and July 25, 2019, respectively.[21]  Farwana Decl. Exs. 268, 269; Caiazza (Ind.) Dep. at 52-53.

Finally, Stratesphere paid the agreed-upon salary ($120,000 per year) to Thukral and Vaid from September 2018 through April 2020.  Farwana Decl. ¶ 20.  Thukral and Vaid received their full salary for 2018.  *Id.*  With respect to 2019, Thukral and Vaid were actually overpaid by $30,000 each.  *Id.*  In the beginning of 2020, Thukral and Vaid were each paid $15,000.  *Id.*  In sum, for the twenty months that they were employed with Stratesphere, Thukral and Vaid were due at most $400,000.  However, records demonstrate that they were paid a total of $410,000.  *Id.*, Ex. 267.  Thus, it is clear that Thukral and Vaid were in fact fully compensated (and indeed, overcompensated by $5,000 each) through the date of their termination (April 21, 2020).

### 3. Defendants' breaches and other tortious conduct continued even after termination of the relationship.

Plaintiffs provided notice of termination of the MSA effective January 17, 2020.  Carwile Decl. Ex. 5.  Pursuant to the terms of the MSA, the contract ended no later than March 17, 2020.  MSA § 9.3.  As a result, Plaintiffs began phasing out Defendants' access to Plaintiffs' systems and the Software.  Farwana Decl. ¶ 26.  Although this termination was entirely permissible, and even predicted by Defendants' own CFO, *see* Carwile Decl. Ex. 112 at 4, Defendants decided to retaliate.

Defendants started using their previously undisclosed domain, kognetics.ai, to covertly communicate with clients.  Shah (Feb. 2022) Dep. at 127-28.  Defendants also improperly copied

---

[21] Admittedly, after it became clear that INC had not actually turned over all the Assets, KHC refused to pay any additional royalties until those Assets were provided in full.  Farwana Decl. ¶ 18.  To date, that still has not happened.  *Id.*

KHC's Software and began providing access to the Software to KLLC's clients through kognetics.ai. *Id.* at 126-27; Deposition of Rajeev Vaid (Mar. 2022, 30(b)(6)) at 49-50.[22] Defendants then informed KLLC customers that they had parted ways with Stratesphere, which they falsely describe as merely an investor, and stated that INC would "on a go forward basis operate as Kognetics Inc.," and that "[a]ll technology and services assets are available with Kognetics Inc." Carwile Decl. Ex. 155; Thukral (30(b)(6)) Dep. at 250. Defendants further tortiously diverted money owed to KLLC by informing customers that the "[b]ank details have changed" and that the customer should process payments for "using Kognetics Application" to INC. *Id.* Exs. 95, 199, 270; Kshettry Dep. at 125-26. At least three customers received emails informing them to change the bank details and to pay INC instead of KLLC. *Id.*

Defendants also continue to solicit Stratesphere's customers. *See, e.g.*, Tataria Dep. at 91; Kshettry Dep. at 84-91. And under the guise of providing "professional services," Defendants continue to provide the same services to customers that KLLC had provided through the Software. Kshettry Dep. at 9, 37, 42, 100-02. These services include providing insights on customers, investors, and industries; answering questions like who can buy a company, what is the market map of an industry, which investor company fits the gaps of other investor portfolio companies; and providing information on the products a company offers, the location and business description of companies, a company's competitors, and which companies could buy or sell the company. *Id.*

Moreover, Defendants continue to use Plaintiffs' marketing materials and to market the same capabilities as the Software. *See* App'x A-E. For example, Defendants sent a slide deck to a prospective client in June 2021 that had the ***exact*** same capability description as a slide deck sent

---

[22] The transcript from the March 2022 30(b)(6) deposition of Rajeev Vaid will be separately filed with the Court.

to Plaintiffs' customers in March 2019. App'x B; Hetal (Feb. 2022) Dep. at 167 (Q. So in Exhibit 34 you are marketing Kognetics' capabilities that include everything on this page? A. That's correct. Q. And in Exhibit 12 you are marketing Boston Analytics' capabilities which include everything on this page? A. That's correct.").

Additionally, in July 2020, Defendants emailed Accenture stating that, with the "Kognetics" tool, Defendants could "ingest about 1 [million] news feeds for developing a long list of M&A candidates, or about 700,000 websites to build an industry map." Carwile Decl. ¶ 160. Defendants then sent a presentation to Accenture, once again detailing the platform in an ***identical*** manner as used in Plaintiffs' marketing materials for the Kognetics Software. App'x C. From February through June 2021, Defendants marketed themselves with the exact same paragraph (even using the same punctuation) used by Plaintiffs in March 2019. App'x D. Defendants also contacted Accenture in 2021 and provided graphs in a marketing presentation that were the same type of graphs used by Plaintiffs. App'x E. There are many more examples throughout 2020 and 2021. *See* ECF Nos. 60, 69.

## III.   LAW AND ANALYSIS

### A.   Stratesphere Did Not Fraudulently Induce Defendants.

In a desperate attempt to concoct a defense to their breaches of their binding contractual obligations, Defendants claimed that Stratesphere had "fraudulently induced" them with the precise promises of performance that are included in the APA—promising to provide ownership interests, to make royalty payments, and to provide funding. 2d Am. CC (ECF No. 32) ¶¶ 61-63. Later, recognizing the baselessness of these allegations, Defendants started arguing that Stratesphere induced them by misrepresenting the value of Stratesphere. Yet, neither of these allegations have merit, and Plaintiffs are entitled to judgment as a matter of law.

The essential elements of a fraudulent inducement claim are (1) a false representation of a fact material to the transaction, (2) knowledge that the representation is false or utter disregard for its truthfulness, (3) intent to induce reliance on the representation, (4) justifiable reliance on the representation under circumstances manifesting a right to rely, and (5) injury proximately caused by the reliance. *Am. Coal Sales Co. v. Nova Scotia Power Inc.*, 2009 WL 467576, at \*24 (S.D. Ohio 2009); *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 503 (1998). Moreover, **clear and convincing evidence** of fraud is needed to set aside a written document. *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 873 (6th Cir. 2007). Defendants have failed to supply the Court with evidence, clear and convincing or otherwise, to support a fraudulent inducement claim.

### 1. Promises of performance contained in the APA are not a valid basis for Defendants' claim.

Fraudulent inducement cannot be based on promises of performance contained within a contract. *See Infocision Mgmt. Corp. v. Found. for Moral Law Inc.*, 2009 WL 2244166, at \*4 (N.D. Ohio 2009) ("[I]f a party could simply, by alleging that a contracting party never intended to fulfill his promise, create a tortious action in fraud, there would be no effective way of preventing almost every contract case from being converted to a tort for jurisdictional purposes."). Indeed, an alleged breach of contract does not create a tort claim; rather, "[w]here the duty allegedly breached . . . is one that arises out of a contract, independent of any duty imposed by law, the cause of action is one of contract." *Schwartz v. Bank One, Portsmouth, N.A.*, 84 Ohio App.3d 806, 810 (4th Dist. 1992); *see also Issac v. Ebix, Inc.*, 2012 WL 1020296, at \*5-6 (S.D. Ohio 2012) (dismissing a fraud claim because the "misrepresentations which the plaintiff relies on in alleging the fraudulent inducement claim are identical to the allegations made in the breach of contract claim"); *Thornton v. Cangialosi*, 2010 WL 2162905, at \*3 (S.D. Ohio 2010) (finding no fraud claim exists when "[t]he representations that allegedly induced [the plaintiff] to enter into

the [contract] are the same allegedly unfulfilled promises that give rise to the breach of contract claim"). This, alone, warrants judgment in favor of Plaintiffs on this prong of Defendants' fraudulent inducement claim.

In any event, even if Defendants could proceed with a fraudulent inducement claim grounded on alleged breaches of contract—which they cannot—they have not identified a shred of evidence suggesting that Stratesphere did not intend to satisfy its obligations under the APA when it entered into that agreement with Defendants. Certainly, conclusory allegations that Plaintiffs did not satisfy their contractual obligations are insufficient to prove that they never intended to comply with those obligations. But it is even worse for Defendants, as set forth above, the evidence demonstrates that Stratesphere did in fact satisfy its contractual obligations. *Supra* at 8, 11-12. As such, this prong of Defendants' fraudulent inducement claim is without merit.

### 2. Stratesphere did not fraudulently induce Defendants with representations regarding Stratesphere's value.

Defendants did not question Stratesphere's value at any point prior to entering into the APA, at any point while they were in business together, or through nearly two years of litigation. Then, on what was the eve of trial, Defendants, for the first time, argued that Stratesphere "fraudulently induced" them with representations about Stratesphere's value. This new concoction is equally baseless.

### a. Defendants did not justifiably rely.

The element of justifiable reliance presents a gaping hole in Defendants' fraudulent inducement claim. Quite simply, the APA makes abundantly clear that Defendants were not relying upon any purported valuation of Stratesphere when entering the APA. The surrounding circumstances also support this conclusion. This is dispositive of Defendants' after-the-fact allegation regarding Stratesphere's value.

It is well-settled that a fraudulent inducement claim cannot be based on an alleged fraud that is directly contradicted by a signed writing, and courts routinely enforce disclaimers of representations outside a written contract.  *See Axios, Inc. v. Thinkware, Inc.*, 2015 WL 5029227, at *7 (S.D. Ohio 2015) ("[T]he license agreement's disclaimer of any prior representations about the software negates any claim that Axios justifiably relied on those alleged misrepresentations."); *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 7 F. Supp.2d 954, 962-963 (N.D. Ohio 1998) ("No party to a contract can claim [justifiable] reliance upon any representation which is expressly disclaimed by another party, no matter what the content of the representation."); *Rodgers v. Sipes*, 2012-Ohio-3070, ¶ 30 (3d Dist.) (concluding that the plaintiff did not justifiably rely when the contract explicitly disclaimed any representations by the defendant).  Moreover, courts have acknowledged that it is reasonable to disclaim all alleged representations outside the four corners of a written agreement, and by doing so, a party "effectively warns another that ***such representations are worthless***."  *Goodyear*, 7 F. Supp.2d at 963 (emphasis added).  As Judge Boggs explained, "unless courts enforce disclaimers of reliance to limit claims of fraud, parties will be deprived of the fundamental promises of contract law." *Id.* (citing *Agristor Leasing v. A.O. Smith Harvestore Prods.*, 803 F.2d 1401 (6th Cir. 1986)).

The APA explicitly sets forth the exclusive list of representations upon which the parties relied.  Significantly, that list does ***not*** contain any representation regarding the "value" of Stratesphere.  *See* APA Art. V.  Indeed, by signing the APA, Defendants clearly and explicitly agreed that "[t]here are no representations, promises, warranties, covenants or undertakings other than those expressly set forth in or provided for in this Agreement or the Related Agreements."

*Id.* § 11.09. Thus, Defendants cannot now claim that they relied upon a supposed representation that was not included in the APA.[23]

Finally, any attempt by Defendants to claim that they justifiably relied on a valuation of Stratesphere is patently absurd in the context of this case. Both Thukral and Vaid have decades of experience evaluating companies. Thukral (30(b)(6)) Dep. at 18-25; Carwile Decl. Ex. 101; Vaid (Ind.) Dep., at 12-17. Even more, the Software that they developed was specifically designed to aid in that very process. *See* Thukral (30(b)(6)) Dep. at 52-55. In other words, Defendants had— at their fingertips—all the tools necessary to value Stratesphere prior to entering into the transactions. Notwithstanding that "know-how," and not withstanding cautionary warnings by their own CFO, Defendants consciously chose not to do any due diligence on Stratesphere. *Id.* at 94-95. Clearly, the value of Stratesphere was never a true a motivating factor.

### b. Defendants have not, and cannot, prove that Stratesphere did not have a value between $30 million and $50 million.

Even if Defendants could get past the dispositive deficiency of justifiable reliance—which they cannot—their claim would nevertheless fail. Defendants' have the burden to prove, by clear and convincing evidence, the falsity of the alleged representation. Defendants make no effort to satisfy this burden, as they simply point to a whiteboard picture to argue that Stratesphere represented its value to be between $30 and $50 million. *See, e.g.*, ECF No. 119-2. However, aside from Defendants' own inadmissible speculation and conjecture, there is no evidence that

---

[23] In a similar fashion, Defendants' attempts to support the allegation that Stratesphere misrepresented its value runs afoul of the parol evidence rule. *See Micrel*, 485 F.3d at 874-75 ("[T]he parol evidence rule may not be avoided by a fraudulent inducement claim which alleges that the inducement to sign the writing was a promise, the terms of which are directly contradicted by the signed writing." (quotation omitted)); *Columbia Gas Transm. Corp. v. Ogle*, 51 F. Supp.2d 866, 873 (S.D. Ohio 1997) (holding that a party cannot prove fraud by claiming that the inducement to enter into an agreement was a promise that is squarely contradicted by the written terms of that agreement).

clearly and convincingly proves that Stratesphere did not have a value of $30 million to $50 million. Indeed, Defendants have not identified an expert who could opinion on Stratesphere's valuation, which is itself a dispositive deficiency.

Because the deal involved an asset purchase, the value of the assets being acquired under the APA must be included in any valuation. Defendants valued the Software by multiplying projected revenue by six (leading to a valuation of approximately $12.12 million). *See* ECF No. 119-2. Applying the same multiplier to Stratesphere's 2018 revenue (approximately $3.4 million), the result would be $20,400,000. Farwana Decl. Ex. 276. So, adding those two numbers would provide an overall valuation in excess of $32,000,000—precisely what Defendants claim. It is also important to note that, in the summer of 2019, Factset offered $16.5-25 million for the Kognetics business. Thukral (30(b)(6)) Dep. at 185-87; Carwile Decl. Ex. 122. Coupled with Stratesphere's existing business, this results in a total value easily within the $30 to $50 million range.

Quite simply, Defendants have failed to demonstrate that, even if Stratesphere represented its value to be $30 to $50 million, that valuation was false.[24] As a result, Defendants' fraudulent inducement claim (Count II of the Second Am. Counterclaim, ECF No. 32) fails as a matter of law.

### B. Plaintiffs Are Entitled to Judgment as to Liability on the Following Contract Claims.

The parties have, respectively, asserted several claims alleging breach of contract. The elements of a breach of contract claim are (i) existence of a contract, (ii) performance by the party

---

[24] It also bears noting that, even if Defendants could establish that the valuation of Stratesphere was false—which they cannot—they have utterly failed to demonstrate that Stratesphere intended to mislead Defendants. To the contrary, as confirmed by Stratesphere's COO, "this deal was not done based on a valuation." Caiazza (Ind.) Dep. at 36-37.

alleging breach, (iii) non-performance by the adverse party, and (iv) damages. *See V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012); *State Farm Fire & Cas. Co. v. Capital Roofing, LLC*, 2020-Ohio-642, 152 N.E.3d 460, ¶ 61 (10th Dist.). Setting aside the baseless fraudulent inducement claim, the parties otherwise do not dispute the existence of the relevant contracts. Moreover, while Plaintiffs have certainly suffered damages, the issue of damages has been bifurcated. Thus, Plaintiffs will focus primarily on the issues of performance and breach.

With respect to the issues of performance and breach, it is important to note that, "[i]f a defendant fails to perform an essential or 'material' element of a contract, not only can it be liable for damages, but it also excuses the plaintiff from any further performance." *Nious v. Griffin Constr., Inc.*, 2004-Ohio-4103, ¶ 16 (10th Dist.). Thus, the party that commits the first material breach cannot maintain an action against the other for a subsequent failure to perform. *See Loudenback Fertilizer Co. v. Tenn. Phosphate Co.*, 121 F. 298, 304 (6th Cir. 1903); *Constellation NewEnergy, Inc. v. Carborundum Grinding Wheel Co.*, 2017 WL 1021365, at *2 (S.D. Ohio 2017) ("Ohio law relieves a party of liability for its breach of a contract if the other party materially breaches the contract first."); *First Energy Sols. v. Gene B. Glick Co.*, 2007-Ohio-7044, ¶ 35 (9th Dist.) ("It is well established that a material breach by one party relieves the other of its obligation to perform under a contract.").

For the following reasons, Defendants have committed the first material breach of the pertinent agreements entitling Plaintiffs to judgment as a matter of law.

### 1. Defendants committed the first material breach of the APA.

The only formal claim that Defendants have made is that KHC breached the APA by failing to pay royalties. 2d Am. CC (ECF No. 32), ¶¶ 56-59. However, as set forth above, Plaintiffs made

the first two royalty payments. *Supra* at 12. Any further royalty obligations are excused because Defendants were the first to materially breach the APA.

Defendants were in material breach of the APA ***on day one***, as nearly half of the Schedule 1.01(c) assets ***did not even exist*** when Defendants signed the APA. *Id.* at 8. Unfortunately, Defendants' initial breaches did not stop there. Defendants failed to provide the required Documentation for the Software and failed to provide working source code for the assets that did exist. *Id.* at 8-9. In addition to their first material breach, thereby excusing Plaintiffs of their obligations, Defendants continued to breach the APA by competing with Stratesphere using the Software and/or the same capabilities of the Software. *Id.* at 10, 12-14. These actions all constitute breaches of the APA entitling Stratesphere to judgment in its favor on Count I of the Second Am. Counterclaims (ECF No. 32) as well as Counts I and III of its Second Am. Comp. (ECF No. 31).

## 2. Defendants committed the first material breach of the employment and confidentiality agreements.

While Thukral and Vaid claim that they are owed a portion of their salary—specifically alleging a failure to pay their full salary in 2020—the evidence clearly shows otherwise. *Supra* at 12. Indeed, applying overpayments from 2019, along with the $15,000 paid to Thukral and Vaid in 2020 demonstrates that their claims are without merit. However, even if Thukral and Vaid could claim that certain amounts are still owed, that assertion necessarily fails because they were the first to breach their respective employment and confidentiality agreements. More specifically, Thukral and Vaid breached these agreements by improperly competing throughout 2019 and beyond and by self-dealing with Factset. *Id.* at 10-11.

Furthermore, Thukral and Vaid cannot maintain a claim for unjust enrichment or quantum meruit for the alleged failure to pay their salaries. Neither tort can be used when a contract governs the parties' relationship. "In the absence of fraud, illegality or bad faith, [plaintiffs] are entitled to

compensation only in accordance with the terms of the written agreement." *Aultman Hosp. Ass'n v. Comm. Mut. Ins. Co.*, 46 Ohio St.3d 51, 55 (1989); *see also Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 222 (6th Cir. 1992). Because there has been no fraud, illegality, or bad faith, Thukral and Vaid can only recover based on the contract. And because they first breached the employment agreements, they are not entitled to recover under the contracts.

As a result, Plaintiffs are entitled to judgment in their favor with regard to Counts IV and V of their Second Am. Comp. (ECF No. 31) and on each of Thukral and Vaid's counterclaims (ECF Nos. 45, 46).

### 3. Defendants committed the first material breach of the KLLC operating agreement.

KLLC is also entitled to judgment in its favor on the claim that INC breached the KLLC operating agreement. First, an operating agreement for KLLC exists and all members signed the agreement. *Supra* at 8. Second, KLLC performed all pertinent duties under the operating agreement. Farwana Decl. ¶ 27. Third, while the operating agreement prohibits INC from engaging in activities unrelated to the business of KLLC, INC undisputedly provided services to and billed customers on its own behalf instead of on behalf of KLLC. *Supra* at 7, 13. As these actions also violate § 8.03(b) of the operating agreement, INC has forfeited its membership in KLLC. *Id.* Accordingly, Plaintiffs respectfully request that this Court enter judgment in favor of KLLC on Counts II and IX of the Second Am. Comp. (ECF No. 31).

### C. Plaintiffs Are Entitled to Judgment as to Liability on Each of the Following Tort Claims.

### 1. Defendants improperly engaged in unfair competition.

When Defendants used the Kognetics name and Plaintiffs' marketing materials to benefit Boston Analytics, and when they continued to use the Kognetics name, along with Plaintiffs'

intellectual property and marketing materials after the termination of the MSA, they engaged in unfair competition.

"[U]nfair competition generally occurs when one person falsely represents that his goods are the goods of another." *Ancestry.com Operations, Inc. v. DNA Diagnostics Ctr., Inc.*, 2016 WL 3999315, at *3 (S.D. Ohio). The claim also "extends to unfair commercial practices" or "to the circulation of false rumors, or publication of statements, all designed to harm the business of another." *Id.* Essentially, the claim exists when a defendant has misrepresented to the public plaintiff's services or misrepresented his own services as those of the plaintiff. *AAA Installers v. Sears Holdings Corp.*, 764 F. Supp.2d 931, 944 (S.D. Ohio 2011). Ohio has long recognized this claim, holding that when

> a person has established a business and reputation for the manufacture and sale of an article of traffic, under a particular name and style of label, whether the words and devices adopted by him constitute a trade-mark or not, another person, whether it be his own name or not, cannot lawfully assume the same name and label, or the same with slight alterations, so as to induce the belief that the imitation is the original.

*Drake Med. Co. v. Glessner*, 68 Ohio St. 337, paragraph three of syllabus (1903).

The holding in *Drake* is helpful in showing that Defendants' conduct constitutes unfair competition. The plaintiff was the owner of "Dr. Drake's German Croup Remedy." *Id.* at 338. The defendant sold a medicine under the same name and in similar packaging. *Id.* at 341. The Supreme Court held that the defendant had no right to market his goods "in such a manner as to deceive an intending purchaser, and induce him to believe he is buying those of the plaintiff." *Id.* at 358. The Court further held that the intent "may be inferred from an examination of the real and spurious labels," and the Court then noted that there was an "effort at simulation," as the form, color, words, and general appearance were "nearly identical." *Id.* at 358-59.

23

The same is true here.  Plaintiffs purchased the exclusive rights to the Kognetics Software, the Kognetics name, and to all the marketing materials and advertisements.  *Supra* at 5.  Starting in Spring 2019 and continuing through at least 2021, Defendants have used the Kognetics name for their own benefit.  *Id.* at 12-14.  They have used the same marketing materials to sell their capabilities as used by Plaintiffs.  *Id.*  Indeed, the materials are nearly identical, if not identical. *Id.*; App'x A-E.  And Defendants conceded that clients would be confused by marketing emails from Boston Analytics that reference the Kognetics Software.  Thukral (30(b)(6)) Dep. at 159-60. Just as in *Drake*, Defendants' intent is to mislead the public into believing that its service is that of Plaintiffs.  Because Defendants' conduct constitutes unfair competition, Stratesphere is entitled to judgment in its favor as to liability on Count VI of its Second Am. Comp. (ECF No. 31).

### 2.  Plaintiffs did not poach employees or otherwise tortiously interfere.

Defendants' tortious interference claim is without merit.  Defendants appear to ground that claim on two arguments: by hiring prior Pythhos employees, Stratesphere interfered with their contract with Pythhos to provide services under the MSA, and that Stratesphere interfered with Pythhos's contracts with its employees.  *See* 2d Am. CC (ECF No. 32) at ¶¶ 105-111.  Both arguments fail.

Tortious interference with a business relationship "generally occur[s] when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another."  *A&B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14 (1995).  The elements are "(1) a business relationship, (2) the wrongdoer's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and (4) damages resulting therefrom."  *McConnell v. Hunt Sports Ent.*, 132 Ohio App.3d 657, 689 (10th Dist. 1999).

With respect to Defendants' poaching claim, it is well established that "an action for tortious interference may only lie against an outside party to the contract or prospective business relationship." *Lundeen v. Smith-Hoke*, 2015-Ohio-5086, ¶ 42 (10th Dist.); *see also Buckeye Ret. Co., LLC v. Busch*, 2017-Ohio-4009, 82 N.E.3d 66, ¶ 116 (2d Dist.) ("[A] party cannot tortiously interfere with its own contract."); *Byrne v. Univ. Hosp.*, 2011-Ohio-4110, ¶ 29 n.1 (8th Dist.) ("Under Ohio law, a claim that a party tortiously interferes with their own contract or business relationship is not a cognizable one."). "The rationale for this limitation is the recognition that a party cannot, obviously, interfere with its own contract because that would substitute tort law for contract law." *Lundeen* at ¶ 42 (quotation and alteration omitted). "Thus, the tort of willful interference with a business relationship does not exist where the defendant was the source of the business opportunity allegedly interfered with." *Id.* (quotation and alteration omitted).

Here, the source of the business relationship between INC and Pythhos was the MSA between Plaintiffs and INC. *Supra* at 4. The ultimate purpose of INC's relationship with Pythhos was for INC to fulfill its obligations under the MSA. Because Plaintiffs are the source of the business relationship allegedly interfered with, Defendants cannot bring a tortious interference claim related to that relationship.[25] *Lundeen* at ¶ 42.

Furthermore, to the extent Defendants assert a claim based on Defendants' employees supposed non-compete provisions, this claim likewise fails. Pursuant to multiple agreements, Defendants were not permitted to compete with Plaintiffs. *Supra* at 6-7. Those terms meant that Plaintiffs *were not* competitors of Defendants—and any argument to the contrary would be an admission that Defendants violated their own non-compete covenants with Plaintiffs. Thus, it is

---

[25] It is also worth noting that Defendants have not, and cannot, establish that the hiring of any former Pythhos employees caused a breach or termination of the business and/or contractual relationship between INC and Pythhos.

25

impossible for Defendants' employees to violate any supposed non-compete provision in an employment contract by going to work for Plaintiffs. Because the employees could not violate their employment contract by working for Plaintiffs, Defendants cannot show that Plaintiffs intentionally caused those employees to breach their agreements. *McConnell* at 689.

Therefore, Plaintiffs are entitled to judgment as a matter of law on count VII of Defendants' Second Am. Counterclaim (ECF No. 32).

### D. Plaintiffs Are Entitled to Judgment on Defendants' Pre-APA Copyright Claim.

Defendants have asserted a copyright infringement claim with respect to the intellectual property that existed prior to the APA. That claim is completely dependent upon Defendants' fraudulent inducement claim. Because the fraudulent inducement claim is patently without merit, Defendants' pre-APA copyright claim must also fail.

To succeed in a copyright infringement action, a party must establish that (1) it owns the copyrighted creation, and (2) that the opposing party copied it. *Feist Publishing, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Enchant Christmas Light Maze & Market Ltd. V. Glowco, LLC*, 958 F.3d 532, 536 (6th Cir. 2020). With respect to the pre-APA copyright claim, Defendants cannot establish the first element. It is undisputed that, pursuant to the clear and unambiguous terms of the APA, INC sold the Software and Documentation, as well as all Intellectual Property Assets and Proprietary Intellectual Property Assets to KHC. APA § 1.01. Moreover, there was also a copyright assignment as part of the APA transaction.[26] *Id.* Ex. D. As a result, there can be no legitimate question that, as it pertains to the alleged pre-APA copyright, KHC is the rightful owner, not INC. The only basis to even pursue such a claim is limited exclusively to the baseless

---

[26] To ensure the effective transfer, quitclaim intellectual property agreements were entered into by and between INC and the Pythhos entities. Carwile Decl. Ex. 115 and 116.

fraudulent inducement claim.  However, as discussed above, there is no legal or factual basis for such a claim.  As a result, Defendants' pre-APA copyright claim is equally without merit.

Therefore, Plaintiffs are entitled to judgment as a matter of law on Count VI of Defendants' Second Am. Counterclaim (ECF No. 32).

### E.    Plaintiffs Are Entitled to Judgment on Defendants' Books and Records Claim.

Former Ohio Revised Code § 1705.22(A)(1), entitled members of an LLC to "true and full information regarding the status of the business and the financial condition of the company." *Germano v. Beaujean*, 2013-Ohio-3846, 997 N.E.2d 1238, ¶ 32 (6th Dist.) (quotation and alteration omitted).  However, individuals are entitled to the information only to the extent that they are members of the LLC and "to the extent [they have] not received such information." *Id.*

First, Defendants requested financial information *after* Plaintiffs filed their complaint. Farwana Decl. ¶ 28.  At that time, INC had already forfeited its membership in KLLC, *see supra* at 22, and therefore, was not entitled to access KLLC's books and records.  Second, Plaintiffs have provided all requested financial information (indeed more than is required under § 1705.22) for all three Plaintiff companies through discovery.  Farwana Decl. ¶ 28.  At this time, there is no information regarding the status of the business and financial condition of the companies that Defendants have not received.  Thus, their claim is moot, and this Court should enter judgment in favor of Plaintiffs as to Count X of Defendants' Second Am. Counterclaim (ECF No. 32).

## IV.    CONCLUSION

For each of the foregoing reasons, there are no genuine issues of material fact and Plaintiffs are entitled to judgment as a matter of law as to Counts I-III, VI, VII, and X of INC's Second Amended Counterclaim (ECF No. 32), the Counterclaims of Thukral and Vaid (ECF Nos. 45, 46), and as to liability on Counts I-VI and IX of Plaintiffs' Second Amended Complaint (ECF No. 31),

as Supplemented (ECF No. 79).  Plaintiffs therefore respectfully request that this Court grant their

Motion for Partial Summary Judgment.

Respectfully submitted,

*/s/ Jonathan P. Corwin*
James E. Arnold  (0037721)
Jonathan P. Corwin (0075056)
Tiffany L. Carwile (0082522)

ARNOLD & CLIFFORD LLP
115 W. Main Street, 4th Floor
Columbus, Ohio  43215
Tel:  (614) 460-1600
Fax: (614) 469-1066
Email:       jarnold@arnlaw.com
                  jcorwin@arnlaw.com
                  tcarwile@arnlaw.com

*Counsel for Plaintiffs/Counterclaim Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 16, 2022, a true and accurate copy of the foregoing *Motion for Partial Summary Judgment* was filed with the Court using the Clerk of Court's electronic filing system, which will send notice of this filing to all parties that have entered an appearance in this matter and consented to electronic service.

<u>*/s/ Jonathan P. Corwin*</u>
Jonathan P. Corwin