*Execution Version*

# ASSET PURCHASE AGREEMENT

CO\5881326.8



EXHIBIT

1

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| ARTICLE I. | PURCHASE AND SALE OF THE ASSETS | 2 |
| Section 1.01. | Assets | 2 |
| Section 1.02. | Excluded Assets | 2 |
| Section 1.03. | Assumed Liabilities | 2 |
| Section 1.04. | Other Liabilities Not Assumed | 3 |
| Section 1.05. | Purchase Price | 3 |
| Section 1.06. | Assignment of Contracts | 3 |
| Section 1.07. | Allocation of Purchase Price | 4 |
| Section 1.08. | Royalty Payments | 4 |
| Section 1.09. | Issuance of Additional Class B Units to Seller | 5 |
| Section 1.10. | Stratesphere Funding Requirements | 6 |
| Section 1.11. | Stratesphere's Option | 6 |
| | | |
| ARTICLE II. | CLOSING | 6 |
| Section 2.01. | Closing Date | 6 |
| Section 2.02. | Deliveries by Seller | 6 |
| Section 2.03. | Deliveries by Purchaser | 8 |
| | | |
| ARTICLE III. | CONDITIONS PRECEDENT TO THE CLOSING OBLIGATIONS OF SELLERS, STRATESPHERE AND PURCHASER AND POST-CLOSING ITEMS | 8 |
| Section 3.01. | Conditions Precedent to Obligations of Seller | 8 |
| Section 3.02. | Conditions Precedent to Obligations of Stratesphere and Purchaser | 9 |
| Section 3.03. | Post-Closing Items | 10 |
| | | |
| ARTICLE IV. | REPRESENTATIONS AND WARRANTIES OF SELLER | 10 |
| Section 4.01. | Organization | 10 |
| Section 4.02. | Authorization and Validity of Agreement | 10 |
| Section 4.03. | No Conflict or Violation | 12 |
| Section 4.04. | Financial Statements | 12 |
| Section 4.05. | Tax Matters | 12 |
| Section 4.06. | Intellectual Property | 12 |
| Section 4.07. | Licenses and Permits | 15 |
| Section 4.08. | Contracts and Commitments | 16 |
| Section 4.09. | Compliance with Law | 16 |
| Section 4.10. | Litigation | 16 |
| Section 4.11. | Title to the Assets | 16 |
| Section 4.12. | Customers | 16 |
| Section 4.13. | Broker's and Finder's Fees | 16 |
| Section 4.14. | Transfer Taxes | 17 |
| Section 4.15. | Material Information | 17 |
| Section 4.16. | Approvals and Consents | 17 |
| Section 4.17. | Ordinary Course of Business | 17 |

CONFIDENTIAL

ARTICLE V.      REPRESENTATIONS AND WARRANTIES OF PURCHASER ............17
  Section 5.01.   Organization; Power................................................................................17
  Section 5.02.   Authorization and Validity of Agreement...............................................17
  Section 5.03.   No Conflict or Violation .........................................................................18
  Section 5.04.   Approvals and Consents..........................................................................18
  Section 5.05.   Broker's and Finder's Fees .....................................................................18

ARTICLE VI.     PRE-CLOSING COVENANTS................................................................18
  Section 6.01.   No Transfer of the Assets.........................................................................18
  Section 6.02.   Operation of Business .............................................................................18
  Section 6.03.   Access; Cooperation................................................................................18
  Section 6.04.   Notification of Certain Matters ...............................................................19
  Section 6.05.   Updates to Disclosure Schedules ............................................................19
  Section 6.06.   Cooperation .............................................................................................19
  Section 6.07.   Governmental Approvals .........................................................................19
  Section 6.08.   Additional Notices and Covenants..........................................................19

ARTICLE VII.    INDEMNIFICATION; SURVIVAL...........................................................20
  Section 7.01.   Indemnification By Seller Group .............................................................20
  Section 7.02.   Indemnification by Purchaser..................................................................20
  Section 7.03.   Indemnification Notice; Litigation Notice ..............................................21
  Section 7.04.   Defense of Third Person Claims ..............................................................21
  Section 7.05.   Disagreement Notice ...............................................................................22
  Section 7.06.   Payment of Losses...................................................................................22
  Section 7.07.   Survival ...................................................................................................22
  Section 7.08.   Deemed Representations and Warranties.................................................22
  Section 7.09.   Sole Remedy ...........................................................................................22
  Section 7.10.   Tax Treatment of Indemnity Payments.....................................................22

ARTICLE VIII.   TERMINATION .....................................................................................23
  Section 8.01.   Events of Termination..............................................................................23
  Section 8.02.   Effect of Termination...............................................................................23

ARTICLE IX.     RESTRICTIVE COVENANTS ................................................................24
  Section 9.01.   Confidential Information..........................................................................24
  Section 9.02.   Non-Competition.....................................................................................24
  Section 9.03.   Remedies .................................................................................................24

ARTICLE X.      DEFINITIONS........................................................................................25

ARTICLE XI.     MISCELLANEOUS................................................................................32
  Section 11.01.  Public Announcements............................................................................32
  Section 11.02.  Costs and Expenses ................................................................................32
  Section 11.03.  Further Assurances..................................................................................32
  Section 11.04.  Addresses for Notices, Etc .....................................................................33
  Section 11.05.  Headings.................................................................................................34
  Section 11.06.  Construction ...........................................................................................34

CO\5881326.8

CONFIDENTIAL

Stratesphere-000003

Section 11.07.   Severability .................................................................................................35
Section 11.08.   Remedies .....................................................................................................35
Section 11.09.   Entire Agreement and Amendment ..............................................................36
Section 11.10.   No Waiver; Cumulative Remedies ...............................................................36
Section 11.11.   Parties in Interest .........................................................................................36
Section 11.12.   Successors and Assigns; Assignment ...........................................................36
Section 11.13.   Governing Law; Jurisdiction and Venue ......................................................37
Section 11.14.   Waiver of Jury Trial ....................................................................................37
Section 11.15.   Counterparts ................................................................................................37
Section 11.16.   Schedules, Exhibits and Certificates ...........................................................37

CO\5881326.8

CONFIDENTIAL

Stratesphere-000004

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Agreement"), dated as of August 22, 2018 is made and entered into by and among Stratesphere, LLC, an Ohio limited liability company ("Stratesphere"), Kognetics Holding Company LLC, an Ohio, limited liability company ("Purchaser"), Kognetics LLC, an Ohio limited liability company ("Kognetics LLC"), Kognetics, Inc., a Delaware corporation ("Seller"), Inderpreet S. Thukral ("Inder") and Rajeev Vaid ("Rajeev," together with Inder the "Guarantors"; and the Seller together with the Guanators, the "Seller Group").

## WITNESSETH:

**WHEREAS**, Stratesphere has formed Purchaser for the purpose of acquiring the Assets, as hereinafter defined;

**WHEREAS**, Purchaser has formed Kognetics LLC to which it will transfer certain Assets comprising the Business, as defined below, other than the Software;

**WHEREAS**, Seller owns all of the right, title and interest in the Software, as defined hereinafter, various trademarks, copyrights, trade secrets and related intellectual property all as further described in this Agreement;

**WHEREAS**, Seller is engaged in marketing, selling and distributing the Software as a subscription service and has certain customer contracts (the "Business");

**WHEREAS**, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, the Assets (as defined below) relating to the Business upon the terms and subject to the conditions set forth in this Agreement;

**WHEREAS**, Purchaser owns 500,000 Class A voting membership units of Kognetics LLC and, in connection with this transaction Kognetics LLC will issue to Seller 125,000 Class B voting membership units, constituting twenty percent (20%) of the total issued and outstanding membership units of Kognetics LLC;

**WHEREAS**, capitalized terms used herein shall have the meanings ascribed to them in Article X;

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and promises contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

CONFIDENTIAL

**AGREEMENT**

## ARTICLE I.
## PURCHASE AND SALE OF THE ASSETS

Section 1.01. **Assets**. Upon the terms and subject to the conditions set forth in this Agreement and on the basis of the representations, warranties, covenants and agreements herein contained, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in and to the following properties, assets and interests of Seller (collectively, the "Assets"), free and clear of all Encumbrances:

(a)     all rights in, to and under the Assigned Contracts and all outstanding offers or solicitations made by or to Seller in the Ordinary Course of Business to enter into any Contract with respect to the Software;

(b)     all Intangible Assets;

(c)     all Intellectual Property Assets and all Proprietary Intellectual Property Assets (as hereinafter defined), including without limitation, such Intellectual Property Assets and Proprietary Intellectual Property Assets as are described on Schedule 1.01(c);

(d)     stationery, purchase order and sale order forms and invoices, brochures, advertising and promotional materials and similar items relating to the Business;

(e)     all marketing materials, research data (including marketing and concept testing data), customer and sales information, literature, advertising and other promotional materials and data, display materials and all training materials in whatever medium (e.g., audio, visual, digital or print), in each case, primarily used with respect to the Software;

(f)     all websites and website URLs and all social media accounts, including administrative rights and access and all content thereon, used in the Business; and

(g)     all goodwill relating to the Business or the Assets, including without limitation all goodwill associated with each registered trademark and trademark application and each unregistered trademark.

(h)     The Software and Documentation as are described on Schedule 1.01(h).

Section 1.02. **Excluded Assets**. Notwithstanding any other provision of this Agreement to the contrary, any assets of Seller, relating to the Business or otherwise, which are not included in the Assets are not part of the sale and purchase contemplated hereunder, are excluded from the definition of Assets and shall remain the sole property of Seller after the Closing (collectively, the "Excluded Assets").

Section 1.03. **Assumed Liabilities**. At the Closing, Purchaser shall assume and agree to discharge the following Liabilities of Seller (collectively, the "Assumed Liabilities"), and

2

CONFIDENTIAL                                                                                    Stratesphere-000006

Purchaser shall not assume, incur, guarantee, or be otherwise obligated with respect to any Liability whatsoever of Seller other than as here stated:

(a) those Liabilities of Seller under the Assigned Contracts accruing on or after the Closing Date, which Assigned Contracts are set forth on <u>Schedule 1.03(a)</u>; and

(b) those Liabilities of Seller under the assigned vendor contracts, but only to the extent set forth on <u>Schedule 1.03(b)</u>, and only to the extent those Liabilities arise after the date hereof.

With respect to any Assumed Liability, such assumption by Purchaser is for the benefit only of Seller and shall not expand, increase, broaden, or enlarge the rights or remedies of any other party, nor create in any other party any right against Purchaser that such party would not have against Seller if this Agreement had not been consummated.

Section 1.04. **Other Liabilities Not Assumed**. Purchaser shall not assume any other Liabilities of Seller. Without limiting the generality of the foregoing, the Assumed Liabilities will not include, and Purchaser shall not assume under this Agreement, any of the Excluded Liabilities.

Section 1.05. **Purchase Price**. The purchase price to be paid by Purchaser to Seller for the Assets (the "<u>Purchase Price</u>") shall be the sum of the following:

(a) Stratesphere shall issue a number of its Class A membership units equal to ten percent (10%) of the issued and outstanding membership units to Seller; and

(b) Kognetics LLC shall issue to Seller 125,000 Class B voting membership units, constituting twenty percent (20%) of Kognetics LLC's issued and outstanding membership units.

Section 1.06. **Assignment of Contracts**.

(a) If required by applicable Law or the terms thereof to properly assign any Assigned Contract without breach or violation thereof, Seller agrees to use commercially reasonable efforts to obtain the consent of each other party to any such Assigned Contract prior to the Closing. Nothing in this Agreement or any of the Related Agreements shall be deemed to constitute an assignment or an attempt to assign any Contract to which Seller is a party if the attempted assignment thereof without the consent of the other party to such Contract would constitute a breach thereof or affect in any way the rights of Seller thereunder.

(b) If there are any consents or approvals required to be obtained pursuant to the <u>Schedule 1.06(b)</u> (the "<u>Required Approvals Schedule</u>") (collectively, the "<u>Material Consents</u>", and each a "<u>Material Consent</u>") that have not yet been obtained (or otherwise are not in full force and effect) as of the Closing, in the case of each Assigned Contract as to which such Material Consent was not obtained (or otherwise are not in full force and effect) (each, a "<u>Restricted Material Contract</u>"), Purchaser may, but shall not be required to, waive the closing conditions as to any such Material Consent and either: (i) elect to have Seller continue to use its commercially reasonable efforts to obtain the Material Consent; or (ii) elect to have Seller retain that Restricted Material Contract and all liabilities arising therefrom or relating thereto. If Purchaser elects to

3

CONFIDENTIAL

have Seller continue its commercially reasonable efforts to obtain any Material Consent and the Closing occurs, notwithstanding this Agreement, neither this Agreement nor the Assignment and Assumption Agreement nor any other document related to the consummation of the transactions contemplated by this Agreement shall constitute a sale, assignment, assumption, transfer, conveyance or delivery or an attempted sale, assignment, assumption, transfer, conveyance or delivery of any Restricted Material Contract, and following the Closing, the parties shall use their respective commercially reasonable efforts, and cooperate with each other, to obtain the Material Consent relating to each Restricted Material Contract as quickly as practicable. Prior to the obtaining of such Material Consents, the parties shall cooperate with each other in any reasonable and lawful arrangements designed to provide to Purchaser the material benefits of use of any and all Restricted Material Contracts for their respective terms (or any right or benefit arising thereunder, including the enforcement for the benefit of Purchaser of any and all rights of Seller against a third party thereunder). When a Material Consent for the sale, assignment, assumption, transfer, conveyance and delivery of a Restricted Material Contract is obtained, Seller shall promptly assign, transfer, convey and deliver such Restricted Material Contract to Purchaser, and Purchaser shall assume the obligations under such Restricted Material Contract assigned to Purchaser from and after the Closing Date pursuant to a special-purpose assignment and assumption agreement substantially similar in terms and conditions set forth in the Assignment and Assumption Agreement (which special-purpose agreement the parties shall prepare, execute and deliver in good faith at the time of such transfer at Purchaser's expense).

Section 1.07. **Allocation of Purchase Price**. The Allocation of Purchase Price Schedule attached hereto as Schedule 1.07 sets forth the allocation of the Purchase Price and the Assumed Liabilities among the Assets (the "Preliminary Allocation"). Purchaser and Seller shall file, in accordance with Section 1060 of the Code, an Asset Allocation Statement on Form 8594 (which reflects such allocation) with their federal income Tax Return for the Tax year in which the Closing Date occurs and shall contemporaneously provide the other parties hereto with a copy of the Form 8594 being filed. Purchaser and Seller each agree not to assert, in connection with any Tax Return, audit or similar proceeding, any allocation of the Purchase Price and the Assumed Liabilities that differs from the allocation set forth on the Allocation of Purchase Price Schedule herein.

Section 1.08. **Royalty Payments.** Purchaser agrees to pay Seller a royalty for each Royalty Year, as hereinafter defined, of $100,000, which amount shall be paid in equal bi-annual installments on or about January 31st and July 31st of each year. In addition, Purchaser shall pay an additional Royalty for each Royalty Year as set forth below:

(a)      for Royalty Year 2019, if Collected Revenue as hereinafter defined, from the Business exceeds $7,000,000 in calendar year 2019, an additional Royalty payment as $50,000 shall be paid on or around January 31, 2020;

(b)      for Royalty Year 2020, if Collected Revenue as hereinafter defined, from the Business exceeds $15,000,000 in calendar year 2020, an additional Royalty payment of $100,000 shall be paid on or around January 31, 2021;

CONFIDENTIAL

(c) for Royalty Year 2021, if Collected Revenue as hereinafter defined, from the Business exceeds $25,000,000 in calendar year 2021, an additional Royalty payment of $250,000 shall be paid on or around January 31, 2022; and

(d) for Royalty Year 2022, if Collected Revenue as hereinafter defined, from the Business exceeds $35,000,000 in calendar year 2022, an additional Royalty payment of $300,000 shall be paid on or around January 31, 2023.

### Section 1.09. **Issuance of Additional Class B Units to Seller**.

(a) Purchaser shall cause Kognetics LLC to issue additional Class B Units to Seller as follows:

(i) if Collected Revenue for calendar year 2019 exceeds $6,000,000 then Seller shall be issued additional Class B Units equal to four percent (4%) of the issued and outstanding membership units of Kognetics LLC effective January 1, 2020, which amount is subject to dilution as a result of issuances of membership units by Purchaser after the date hereof as further described in Section 1.09(b);

(ii) if Collected Revenue for calendar year 2020 exceeds $12,000,000 then Seller shall be issued additional Class B Units equal to four percent (4%) of the issued and outstanding membership units of Kognetics LLC effective January 1, 2021, which amount is subject to dilution as a result of issuances of membership units by Purchaser after the date hereof as further described in Section 1.09(b);

(iii) if Collected Revenue for calendar year 2021 exceeds $20,000,000 then Seller shall be issued additional Class B Units equal to four percent (4%) of the issued and outstanding membership units of Kognetics LLC effective January 1, 2022, which amount is subject to dilution as a result of issuances of membership units by Purchaser after the date hereof as further described in Section 1.09(b); and

(iv) if Collected Revenue for calendar year 2022 exceeds $31,000,000 then Seller shall be issued additional Class B Units equal to four percent (4%) of the issued and outstanding membership units of Kognetics LLC effective January 1, 2023, which amount is subject to dilution as a result of issuances of membership units by Purchaser after the date hereof as further described in Section 1.09(b).

(b) The Class B Units issued to Seller shall, from time to time, be reduced by any issuance of membership units Purchaser to a third party. An example of the dilution is as follows, if in calendar year 2019, Purchaser issues twenty percent (20%) of its membership units to a third party investor, such twenty percent (20%) shall (i) dilute the existing Seller's Class B Units to sixteen percent (16%) and (ii) the four percent (4%) referenced in Section 1.09(a)(i)-(iv) shall be reduced to three point two percent (3.2%).

(c) Should Purchaser or Kognetics LLC be sold prior to 2023 ("Early Sale"), the Collected Revenue of Kognetics LLC, calculated based on the Kognetics LLC's trailing twelve (12) months of Collected Revenue ("Trailing Revenue"), shall determine the Seller's, as of the date of the Early Sale. For an avoidance of doubt, if the Kognetics LLC is sold in 2020, but the

CO\5881326.8

CONFIDENTIAL

Kognetics LLC's Trailing Revenue exceeds $20,000,000 as of date of the sale, the Seller's Class B Units shall, subject to dilution in Section 1.09(a), be equal to thirty-two percent (32%) of Purchaser, as though the grants in Section 1.09(a)(i)-(iii) had occurred.

Section 1.10. **Stratesphere Funding Requirements**.

(a)     Stratesphere shall make capital contributions to Purchaser or secure new customer contracts for Purchaser during the twelve (12) months after Closing in the amount of $1,000,000 less the Pre-Closing Funded Amounts, as hereinafter defined. During the twelve (12) month period, seventy-five (75%) of the accrued revenue derived from new customer contracts secured by Stratesphere shall be applied against the $1,000,000 less the Pre-Closing Funded Amounts to be contributed by Stratesphere to Purchaser. The capital contributions shall be made in twelve (12) relatively equal monthly installments.

(b)     Stratesphere shall assist and support Purchaser in raising equity and/or debt capital of up to $20,000,000 during the five (5) years after Closing as per the current business plan. This capital requirement may change based on revision to the business plan.

Section 1.11. **Stratesphere's Option**. For a period of five (5) years after the Closing, Stratesphere shall have the option to pay an additional $1,250,000 (the "Option Price"), which payment (i) shall be paid the Seller, and (ii) shall decrease the percentage of Seller's Class B Units, based upon the fair market value of Purchaser.

## ARTICLE II.
## CLOSING

Section 2.01. **Closing Date**. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Ice Miller LLP, at 250 West Street, Columbus, Ohio 43215, on August 22, 2018 unless Purchaser and Seller mutually agree otherwise (the "Closing Date"). Subject to the provisions of Article VIII, failure to consummate the transactions contemplated by this Agreement on the date and time and at the place determined pursuant to this Section 2.01 shall not result in the termination of this Agreement and shall not relieve any party of any obligation under this Agreement. In such a situation, the Closing shall occur as soon as practicable, subject to Article VIII. The parties hereto acknowledge and agree that all proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously, and no proceedings shall be deemed taken nor any documents executed or delivered until all have been taken, executed and delivered.

Section 2.02. **Deliveries by Seller**. At the Closing, Seller shall deliver possession of all of the Assets to Purchaser, and Seller shall deliver (or cause to be delivered) to Purchaser originals or copies, if specified, of the following:

(a)     a counterpart of the Bill of Sale transferring all of the Assets to Purchaser, in the form attached hereto as Exhibit A (the "Bill of Sale"), duly executed by Seller;

(b)     a counterpart of the Assignment and Assumption Agreement for Seller to assign and Purchaser and/or Purchaser to assume the Assumed Liabilities and the Assigned Contracts,

6

CO\5881326.8

CONFIDENTIAL                                                    Stratesphere-000010

by and between Purchaser and Seller, in the form attached hereto as Exhibit B (the "Assignment and Assumption Agreement"), duly executed by Seller;

(c)     counterparts of (i) the Trademark Assignment, for Seller to transfer and assign to Purchaser all Intellectual Property Assets and Proprietary Intellectual Property Assets described therein, by and between Purchaser and Seller, in the form attached hereto as Exhibit C (the "Trademark Assignment"), duly executed by Seller and (ii) the Copyright Assignment, for Seller to transfer and assign to Purchaser all Intellectual Property Assets and Proprietary Intellectual Property Assets described therein, by and between Purchaser and Seller, in the form attached hereto as Exhibit D (the "Copyright Assignment"), duly executed by Seller;

(d)     counterparts of all agreements, documents and instruments required to be delivered by Seller pursuant to any of the Related Agreements, executed by Seller;

(e)     copies of each consent, waiver, authorization and approval required pursuant to Section 3.02(g) hereof or necessary for the assignment of the Assigned Contracts to Purchaser as contemplated by Section 1.06;

(f)     a Certificate of Existence of Seller issued by the Secretary of State of the State of formation of Seller, dated within ten (10) calendar days of the Closing, which shall be included with the certificate set forth in Section 2.02(h);

(g)     a certificate, dated the Closing Date, duly executed by the CEO of Seller pursuant to Section 3.02(a) of this Agreement;

(h)     a certificate, dated as of the Closing Date, duly executed by an officer of Seller certifying (i) true, correct and complete copies of the resolutions of the Board of Directors of Seller authorizing the transactions described in this Agreement and the Related Agreements, (ii) a true, correct and complete copy of the Articles of Incorporation, or similar documentation of Seller, in effect as of the Closing Date, (iii) a true, correct and complete copy of the Bylaws or similar Governing Document of Seller in effect as of the Closing Date, (iv) a true and correct list of the Shareholders of Seller as of the Closing Date, and (v) a correct list of all the officers of Seller as of the Closing Date;

(i)     evidence of the releases of all Encumbrances on the Assets, each in form and substance reasonably satisfactory to Purchaser;

(j)     an opinion of Counsel for Seller, that all actions required to be taken by it to transfer the Software, Intellectual Property Assets and Proprietary Intellectual Property Assets have been taken;

(k)     a disclaimer (the "Disclaimer Instrument") executed and delivered by the Pythhos Affiliates in the form reasonably acceptable to Purchaser but generally providing that it does not have any interest whatsoever in the Software, the Intellectual Property Assets and the Propriety Property Assets, and the extent it does, any such interest is assigned to Purchaser;

(l)     a signed contract in form acceptable to purchaser pursuant to which any Pythhos Affiliate which currently provides services to Seller, agrees to provide such services to HoldCo;

CO\5881326.8

(m)    such other documents as Purchaser may reasonably request for the purpose of otherwise facilitating the consummation or performance of any of the transactions contemplated by this Agreement or any of the Related Agreements; and

(n)    Inder and Rajeev shall execute employment agreements with Purchaser, in the form mutually acceptable to Purchaser.

Section 2.03. **Deliveries by Purchaser.**    Subject to fulfillment or waiver of the conditions set forth in Section 3.02, at the Closing, Purchaser shall deliver (or cause to be delivered) to the respective member of the Seller Group originals, or copies if specified, of the following agreements, documents and other items:

(a)    to Seller Class A units of Stratesphere representing ten percent (10%) of the issued and outstanding membership Units in Stratesphere;

(b)    to Seller the 125,000 Class B Units;

(c)    a counterpart of the Assignment and Assumption Agreement, duly executed by Purchaser;

(d)    counterparts of (i) the Trademark Assignment, duly executed by Purchaser and (ii) the Copyright Assignment, duly executed by Purchaser;

(e)    counterparts of all agreements, documents and instruments required to be delivered by Purchaser pursuant to any of the Related Agreements, duly executed by Purchaser;

(f)    copies of each consent, waiver, authorization and approval required pursuant to Section 3.01(e) of this Agreement;

(g)    RESERVED; and

(h)    a certificate, dated the Closing Date, duly executed by the Manager of Purchaser pursuant to Section 3.01 of this Agreement.

## ARTICLE III.
### CONDITIONS PRECEDENT TO THE CLOSING OBLIGATIONS OF SELLERS, STRATESPHERE AND PURCHASER AND POST-CLOSING ITEMS

Section 3.01. **Conditions Precedent to Obligations of Seller.**  The obligations of the Seller Group to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or prior to the Closing, of the following conditions, any one or more of which may be waived in writing by Seller (in its sole and absolute discretion):

(a)    Representations and Warranties of Purchaser. All representations and warranties made by Purchaser (considered collectively and individually) in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if made by Purchaser on such date (except for those representations and warranties which refer to facts existing at a specific

8

CO\5881326.8

CONFIDENTIAL                                                                          Stratesphere-000012

date, which shall be true and correct as of such date), and Seller shall have received a certificate to that effect from Purchaser dated as of the Closing Date.

(b)     Performance of the Obligations of Purchaser.  Purchaser shall have performed, complied with or fulfilled in all material respects all of the covenants, agreements, obligations and conditions required under this Agreement and each of the Related Agreements to which it is a party to be performed, complied with or fulfilled by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate to that effect from Purchaser dated as of the Closing Date.

(c)     Legal Proceedings.  Neither Purchaser nor Seller shall be subject to any injunction, preliminary restraining order or other similar decree of a court of competent jurisdiction prohibiting the consummation of the transactions contemplated by this Agreement or any of the Related Agreements.

(d)     No Violation of Orders.  There shall not be any preliminary or permanent injunction or other order issued by any Governmental Entity that declares this Agreement or any of the Related Agreements invalid or unenforceable in any respect or prevents or attempts to prevent the consummation of the transactions contemplated hereby or thereby.

(e)     Required Approvals.  All consents and approvals of any Governmental Entity, or any Person necessary to permit the consummation of the transactions contemplated by this Agreement or any of the Related Agreements (including the Material Consents, each of which is listed on the Required Approvals Schedule for Purchaser), shall have been received.

Section 3.02.  **Conditions Precedent to Obligations of Stratesphere and Purchaser.** The obligation of Stratesphere and Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or prior to the Closing, of the following conditions, any one or more of which may be waived in writing by Stratesphere and/or Purchaser (in its sole and absolute discretion):

(a)     Representations and Warranties of Seller.  All representations and warranties made by the Seller Group in this Agreement (considered collectively and individually) shall be true and correct in all material respects on and as of the Closing Date as if made by the Seller Group on and as of such date (except for those representations and warranties which refer to facts existing at a specific date, which shall be true and correct as of such date), after giving effect to any Disclosure Schedule Updates, and Purchaser shall have received a certificate to that effect from the Seller Group dated as of the Closing Date.

(b)     Performance of the Obligations of Seller.  Seller shall have performed, complied with or fulfilled in all material respects all covenants, agreements, obligations and conditions (considered collectively and individually) required by this Agreement and each of the Related Agreements to which it is a party to be performed, complied with or fulfilled by Seller on or prior to the Closing Date, and Purchaser shall have received a certificate to that effect from Seller dated as of the Closing Date.

(c)     Legal Proceedings.  Seller shall not be subject to any injunction, preliminary restraining order or other similar decree of a court of competent jurisdiction prohibiting the

9

CONFIDENTIAL                                      Stratesphere-000013

consummation of the transactions contemplated by this Agreement or any of the Related Agreements. Since the date of this Agreement, there shall not have been commenced or to the Knowledge of Seller threatened, against any Seller, or against any Related Person of Seller, any Proceeding (i) involving any challenge to, or seeking damages or other relief in connection with, any of the transactions contemplated by this Agreement, or (ii) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with any of the transactions contemplated by this Agreement.

(d)     No Violation of Orders. There shall be no preliminary or permanent injunction or other order issued by any Governmental Entity which declares this Agreement or any of the Related Agreements invalid or unenforceable in any respect or prevents or attempts to prevent the consummation of the transactions contemplated hereby or thereby.

(e)     Related Agreements. The applicable Persons shall have entered into the Related Agreements.

(f)     Material Adverse Effect. There shall not have occurred any Material Adverse Effect.

(g)     Required Approvals. All consents and approvals of any Governmental Entity or any Person necessary to permit the consummation of the transactions contemplated by this Agreement or any of the Related Agreements (including the Material Consents, each of which is listed on the Required Approvals Schedule for Seller), shall have been received.

Section 3.03. **Post-Closing Items**. The Seller Group hereby agrees to complete the post-closing items listed on the attached Schedule 3.03, by the date specified next to each item on Schedule 3.03.

### ARTICLE IV.
### REPRESENTATIONS AND WARRANTIES OF SELLER

Each member of the Seller Group, jointly and severally, hereby represent and warrant to Purchaser, subject to such exceptions as may be specifically disclosed in the Schedules to this Agreement delivered by Seller concurrently with the execution of this Agreement, dated as of the date hereof (the "Disclosure Schedules"), on the date hereof and on the Closing Date, as follows:

Section 4.01. **Organization**. Seller is a corporation duly organized and validly existing under the Laws of the State of Delaware, all reports required to be filed with the Delaware Secretary of State have been filed; no articles of dissolution have been filed with the Delaware Secretary of State, and has all requisite corporate power and authority to own its properties and assets and to conduct the Business and its other business as it is now conducted.

Section 4.02. **Authorization and Validity of Agreement**. Seller has the corporate power and corporate authority to enter into, execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, to perform all of its obligations under this Agreement and to comply with and fulfill the terms and conditions of this Agreement. This Agreement has been duly executed and delivered by Seller and constitutes Seller's legal, valid and binding obligation, as applicable, enforceable against Seller, in accordance with its terms and

10

CO\5881326.8

CONFIDENTIAL                                                                          Stratesphere-000014

conditions, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditor's rights generally or by general principles of equity.

11

CONFIDENTIAL

Stratesphere-000015

Section 4.03. **No Conflict or Violation**.

(a)     The execution, delivery and performance of this Agreement and each of the Related Agreements does not and shall not violate or conflict with any provision of the articles of incorporation, bylaws or other Governing Documents of Seller.

(b)     Performance of this Agreement and each of the Related Agreements does not and shall not: (i) violate any provision of Law applicable to Seller, the Business or the Software; or (ii) violate or result in a breach of or constitute (with or without due notice or lapse of time or both) a default under any Contract, consent order or other instrument or obligation to which Seller is a party, or by which Seller's assets or properties relating to the Business may be bound, except for such violations, breaches, or defaults which would not have a Material Adverse Effect.

Section 4.04. **Financial Statements**. Attached hereto as Schedule 4.04 are copies of the financial information of Seller relating to the Business which have been provided to Purchaser prior to the date of this Agreement (collectively, the "Financial Statements"). The Financial Statements have been prepared from the books and records of Seller in accordance with generally accepted accounting principles consistently followed throughout the periods (except as set forth in notes or statements to the Financial Statements), and they fairly present, in all material respects, the information contained therein and are true, correct and complete in all material respects. There has not been any change between the date of the most recent Financial Statements and the date of this Agreement that has materially or adversely affected the Business or the Assets or condition or prospects, financial or other, or results of operations of the Business, and, no fact or condition exists or, to the Knowledge of Seller, is contemplated or threatened, which might cause any such change at any time in the future.

Section 4.05. **Tax Matters**. With respect to the Business:

Seller has filed or caused to be filed on a timely basis all Tax Returns with respect to Taxes that are or were required to be filed, except where the failure to file Tax Returns would not have a Material Adverse Effect. Seller has paid, or made provision for the payment of, all Taxes shown to be due thereon, except such Taxes as are set forth on Schedule 4.05 or which are not yet delinquent or are being contested in good faith. Except as set forth on Schedule 4.05, Seller currently is not the beneficiary of any extension of time within which to file any Tax Return. To Seller's Knowledge, no claim has ever been made by any Governmental Entity in a jurisdiction where Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code.

Section 4.06. **Intellectual Property**.

(a)     Schedule 1.01(c) sets forth a true and complete list of all of the patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, registered trademarks, trademark applications, registered copyrights and copyright applications, and all applications, registrations, and renewals in connection therewith, used in, necessary for or relating to the Business as presently conducted, owned by Seller (the foregoing, together with all rights related thereto and

12

CONFIDENTIAL

arising therefrom, including all goodwill related thereto and the right to sue for past infringement, and all copies and tangible embodiments thereof (in whatever form or medium)), which are collectively referred to in this Agreement as the "Intellectual Property Assets". To the extent indicated in Schedule 1.01(c), the Intellectual Property Assets have been duly registered in such offices as are indicated therein. Seller is the sole and exclusive owner free and clear of all Encumbrances of the Intellectual Property Assets.

(b)     The term "Proprietary Intellectual Property Assets" means and refers to all trade secrets and confidential business information (including all specifications or formulae, algorithms, ideas, research and development, know-how, compositions, technical data, methods of processing or analyzing data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), trademarks for which application for registration has not been made, copyrightable works and copyrights for which application for registration has not been made, domain names, and trade dress, unregistered logos, and trade names used in, necessary for, or relating to the Business as presently conducted, and all rights related thereto and arising therefrom (including all goodwill related thereto and the right to sue for past infringement) and all copies and tangible embodiments thereof (in whatever form or medium), including without limitation those specifically set forth in Schedule 1.01(c). Seller is the sole and exclusive owner free and clear of all Encumbrances of (a) all Proprietary Intellectual Property Assets set forth on Schedule 1.01(c) and, (b) to the Knowledge of Seller, all other Proprietary Intellectual Property Assets.

(c)     With respect to all Intellectual Property Assets or Proprietary Intellectual Property Assets (each an "IP Item" and together the "IP Items"), (i) Seller has by operation of law or by securing all necessary assignments, work-for-hire agreements, or other agreements or consents, obtained title to such IP Items from any other prior owner (including without limitation any title arising in connection with any work product ("Work Product") created by any employee, consultant, or independent contractor engaged by Seller, or by any other prior owner to develop or create any such IP Items, or any part thereof) such that rights, title, and interests in and to such IP Items and all Work Product related thereto rest solely with Seller and not in whole or in part in any such employee, consultant, independent contractor, third party, or former owner; (ii) Seller has taken reasonable precautions to maintain the secrecy of all trade secrets that are the subject of this Agreement and have no Knowledge of any breach of such secrecy; (iii) to Seller's Knowledge, no IP Item is the subject of any outstanding injunction, judgment, order, decree, ruling, or charge; and (iv) no action, suit, Proceeding, hearing, investigation, charge, complaint, claim, or demand is pending, or, to the Knowledge of Seller, is threatened that challenges the legality, validity, enforceability, use, or ownership of any IP Item.

(d)     No Seller has interfered with, infringed upon, misappropriated, or violated any intellectual property rights of any third party in any material respect. No Seller has received any charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or violation (including any claim that a Seller must license or refrain from using any intellectual property rights of any third party). To the Knowledge of Seller, no third party has interfered with, infringed upon, misappropriated, or violated any intellectual property rights of Seller in the Business in any material respect.

CONFIDENTIAL                                                                                      Stratesphere-000017

(e)     Attached as Schedule 4.06(e), sets forth the name and employer of any individual who has created, contributed to, or edited any portion the Software. Except for the individuals listed on Schedule 4.06(e), no individual has created, contributed to, edited, or otherwise worked on the Software.

(f)     The Seller's rights, title, and interest in the Intellectual Property Assets and the Proprietary Intellectual Property Assets are valid, subsisting, and enforceable by Seller in all applicable jurisdictions, and are not subject to any pending or threatened challenge or claim to the contrary.

(g)     The registration, ownership, and exercise of the Seller's rights in the Intellectual Property Assets and the Proprietary Intellectual Property Assets did not, and when exercised by Purchaser will not, infringe or otherwise violate the intellectual property or other rights of any third party or violate any applicable regulation or law. No person or entity has infringed or otherwise violated, or is currently infringing or otherwise violating, any rights in, to, or related to the Intellectual Property Assets or Proprietary Intellectual Property Assets.

(h)     Seller has provided Purchaser with true and complete copies of all Licenses and Permits (or in the case of any oral agreements, a complete and accurate written description thereof), including all modifications, amendments, and supplements thereto and waivers thereunder. Each License and Permit is valid, binding, and enforceable between Seller and the other parties thereto; and neither Seller nor any other party thereto is in breach of or default under (or is alleged to be in breach or default under) any License or Permit, or has provided or received any notice of breach, default of, or any actual or intended termination of any License or Permit.

(i)     Seller has taken all reasonable steps to preserve the confidentiality of the Confidential Information, including requiring all Persons having access thereto to execute written non-disclosure agreements. Except for Purchaser and certain employees and contractors of Seller who are bound by enforceable obligations prohibiting their use or disclosure of the Confidential Information other than for the benefit of Seller, no Confidential Information has been disclosed to any Person and there has been no security breach relating to, no violation of any security policy regarding, and no unauthorized access to, any of the Confidential Information. Seller has no duty or obligation to deliver, license, or make available any of the Confidential Information to any escrow agent or other Person, other than the Purchaser pursuant to this Agreement. Without limiting the foregoing, Seller has neither themselves, nor caused, authorized, or permitted any other Person to have, licensed, distributed, or disclosed, and knows of no licensing, distribution, or disclosure of, any Source Code to any third party, and Seller has taken commercially reasonable physical and electronic security measures to prevent disclosure of any Source Code. No (i) consummation of the transactions contemplated hereby, (ii) event that has occurred, or (iii) circumstance or condition that exists, will (with or without notice or lapse of time, or both), or would reasonably be expected to, result in the disclosure or release of any Source Code to any third party.

(j)     Seller shall have provided to Purchaser, on or before the Closing Date, a written, absolute, irrevocable waiver in favor of Purchaser from each individual who is an author (sole or joint) of any of the works of authorship comprising or comprised by the Software or

14

     

Documentation, in relation to all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be known as "moral rights" (collectively, "Moral Rights") vested in such author in relation to the Software or Documentation. Without limiting the foregoing, to the extent that any Moral Rights are vested in Seller as authors (sole or joint) of any of the Software or Documentation, Seller hereby absolutely and irrevocably waive in favor of Purchaser to the extent permitted by applicable Law, any and all claims Seller may now or hereafter have in any jurisdiction to any and all such Moral Rights.

(k)     Seller further represent and warrant to Purchaser that as of the Closing Date:

(i)     the Software is fully operable, meets all applicable specifications, and functions in all material respects, in conformity with the Documentation;

(ii)    the Documentation is complete and accurate in all material respects such that the Software does not have any material undocumented feature;

(iii)   all media on which the Software or Documentation is delivered to Purchaser are free of any damage or defect in design, material, or workmanship, and will remain so under ordinary use as contemplated by (I) this Agreement and, with respect to the Software, (II) the Documentation;

(iv)    the Software contains no harmful or malicious code, including any: (I) virus, Trojan horse, worm, backdoor, or other software or hardware devices the effect of which is to permit unauthorized access to, or to disable, erase, or otherwise harm, any computer, systems, or software; or (II) time bomb, drop dead device, or other software or hardware device designed to disable a computer program automatically with the passage of time or under the positive control of any Person, or otherwise prevent, restrict, or impede any use of such program;

(v)     the Software was not developed using, has not been distributed with, and does not contain or operate in such a way that it is compiled with or linked to, any Open Source Components, other than the Open Source Components and corresponding controlling Open Source Licenses specifically described in Schedule 4.06;

(vi)  -  no Software or Documentation contains anything that is unlawful, obscene, libelous, defamatory, or indecent or that infringes, misappropriates, or otherwise violates the rights of any Person; and

(vii)   no Software or Documentation or related technology or technical data (or any products that include or use any of the foregoing) constitutes or contains any Controlled Technology.

Section 4.07. **Licenses and Permits**. Seller has obtained and maintained in full force and effect all material Licenses and Permits required to operate the Business as presently conducted in the Ordinary Course of Business. The consummation of the transactions contemplated hereby shall not give any Governmental Entity the right to terminate any of the material Licenses and Permits or the conduct of the Business, except for such terminations which would not have a Material Adverse Effect. Seller is in compliance in all material respects with

15

CO\5881326.8

all terms, conditions and requirements of all material Licenses and Permits and no Proceeding is pending or, to the Knowledge of Seller, threatened relating to the revocation or limitation of any of the material Licenses or Permits.

Section 4.08. **Contracts and Commitments**. Schedule 4.08 contains a list of all of the following Contracts (collectively, the "Material Contracts"):

(a) Contracts relating to any joint venture, partnership, strategic alliance or sharing of profits or losses with any Person to which Seller is a party relating to the Business or by any of the Assets is bound; and

(b) Customer, distributor, marketing and sales representative agreements relating to the Business.

All of the Material Contracts are in full force and effect in all material respects. Except as set forth on Schedule 4.08, no Seller, nor to the Knowledge of any Seller, any other party thereto, has breached any material provision of, or is in material default under the terms of, nor to the Knowledge of any Seller, does any condition exist which, with or without notice or lapse of time, or both, would cause a Seller or any other party to be in material default under any of the Material Contracts. Except as set forth on Schedule 4.08, the consummation of the transactions contemplated by this Agreement shall not afford any other party the right to terminate any such Material Contract.

Section 4.09. **Compliance with Law**. Seller and the Business are in compliance in all material respects with all applicable Laws. Seller is not in material default with respect to any order, writ, judgment, award, injunction or decree of any Governmental Entity or arbitrator applicable to it or the Business or any of the Assets. No Seller has received, any written notice from any Governmental Entity or any other Person regarding any actual, alleged, possible or potential violation of, or failure to comply with, any term or requirement of any order to which any Seller or any of the Assets is or has been subject.

Section 4.10. **Litigation**. (a) There are no investigations, inquiries, audits or Proceedings pending or, to the Knowledge of any Seller, threatened against or affecting the Assets, (b) there are no unsatisfied judgments of any kind against the Assets, and (c) no Seller is subject to any judgment, order, decree, rule or regulation of any court or Governmental Entity that has had or could reasonably be expected to have a Material Adverse Effect.

Section 4.11. **Title to the Assets**. Seller has good and marketable title to, and are the sole and exclusive owner of, all of the Assets, free and clear of all Encumbrances.

Section 4.12. **Customers**. Schedule 4.12 lists (i) the names and addresses of each of the customers of the Business for the trailing twelve-month period ended May 31, 2018, and (ii) the amount for which each such customer was invoiced during such periods. None of the customers listed on Schedule 4.12 has indicated, in writing, and no Seller has Knowledge, that any such customer will stop, or materially decrease the rate of, doing business with the Seller.

Section 4.13. **Broker's and Finder's Fees**. No broker, finder or other Person is entitled to any commission or finder's fee in connection with this Agreement or the transactions

16

CONFIDENTIAL                                                                 Stratesphere-000020

contemplated by this Agreement as a result of any actions or commitments of Seller (or its Affiliates).

Section 4.14. **Transfer Taxes**. There are no sales, use, transfer or similar Taxes imposed by any state law in connection with the transactions contemplated by this Agreement, and in the event of any such Taxes, Seller shall pay all such Taxes when due directly to the applicable taxing authority.

Section 4.15. **Material Information**. Neither the Financial Statements nor this Agreement (including the Schedules and Exhibits hereto) nor any certificate or other information or document furnished or to be furnished by Seller to Purchaser contains or will contain any untrue statement of a material fact nor to the Knowledge of Seller (or its advisors, agents, consultants or representatives) omits or will omit to state a material fact required to be stated herein or therein or necessary to make the statements herein or therein not misleading.

Section 4.16. **Approvals and Consents**. The execution, delivery and performance of this Agreement and each of the Related Agreements to which it is a party by Seller do not require Seller to obtain the consent or approval of, or to make any filing with, any Governmental Entity or any other Person except (a) as may be required to transfer any Licenses or Permits, (b) as may be required of any Seller's lenders, and (c) such consents, approvals and filings, the failure to obtain or make which would not, individually or in the aggregate, have a Material Adverse Effect on Purchaser or on the ability of a Seller to perform their obligations hereunder.

Section 4.17. **Ordinary Course of Business**. Seller has operated the Business in the Ordinary Course of Business.

## ARTICLE V.
### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Seller as follows:

Section 5.01. **Organization; Power**. Purchaser is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Ohio and has all requisite corporate power and authority to own its properties and assets and to conduct its business as it is now conducted.

Section 5.02. **Authorization and Validity of Agreement**. Purchaser has all requisite organization power and authority to enter into this Agreement and each of the Related Agreements to which it is a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and each of the Related Agreements to which it is a party and the performance of the obligations of Purchaser hereunder and thereunder have been duly authorized by all necessary corporate action of Purchaser, and no other corporate proceedings on the part of Purchaser are necessary to authorize the execution, delivery or performance of this Agreement and each of the Related Agreements to which it is a party. This Agreement and each of the Related Agreements to which it is a party has been duly executed by Purchaser and constitutes Purchaser's valid and binding obligation, enforceable against Purchaser in accordance with their respective terms, except as enforceability may be limited by

17

CONFIDENTIAL

applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditor's rights generally or by general principles of equity.

Section 5.03. **No Conflict or Violation**. The execution, delivery and performance of this Agreement and each of the Related Agreements to which it is a party by Purchaser do not and shall not (a) violate or conflict with any provision of its articles of organization, operating agreement or other Governing Documents of Purchaser, (b) violate any applicable provision of Law applicable to Purchaser or its business or (c) violate or result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any Contract to which Purchaser is a party or by which it is bound or to which any of its properties or assets is subject, except for such violations, breaches, or defaults which would not have a Material Adverse Effect.

Section 5.04. **Approvals and Consents**. The execution, delivery and performance of this Agreement and each of the Related Agreements to which it is a party by Purchaser do not require Purchaser to obtain the consent or approval of, or to make any filing with, any Governmental Entity or any other Person except (a) as may be required to obtain the transfer of any Licenses or Permits, and (b) such consents, approvals and filings, the failure to obtain or make which would not, individually or in the aggregate, have a Material Adverse Effect on Seller or on the ability of Purchaser to perform its obligations hereunder.

Section 5.05. **Broker's and Finder's Fees**. No broker, finder or other Person is entitled to any commission or finder's fee in connection with this Agreement or the transactions contemplated by this Agreement as a result of any actions or commitments of Purchaser or its Affiliates.

## ARTICLE VI.
## PRE-CLOSING COVENANTS

Except as otherwise required or permitted hereunder, Purchaser and Seller covenant and agree to comply with each of the following provisions, as applicable to it, between the date hereof and the Closing Date, unless the applicable party obtains the prior written waiver of the other party (which consent shall not be unreasonably withheld, conditioned or delayed).

Section 6.01. **No Transfer of the Assets**. Seller shall not, and shall not enter into any agreement, arrangement, commitment or understanding to, sell, lease, license, transfer, assign, convey, pledge or otherwise dispose of or grant any security interest in any of the Assets, except in the Ordinary Course of Business.

Section 6.02. **Operation of Business**. Seller shall continue to conduct the business affairs of Seller in the Ordinary Course of Business between the date of this Agreement and the Closing Date.

Section 6.03. **Access; Cooperation**. Seller shall (a) provide Purchaser and its Personnel, accountants, legal counsel and representatives (collectively, the "Purchaser Group"), the right, upon reasonable advance written notice, to access during normal business hours, its records, and (b) furnish to Purchaser such additional information concerning Seller as shall be reasonably requested.

CONFIDENTIAL

Section 6.04. **Notification of Certain Matters**. Seller shall give prompt written notice to Purchaser of:

(a) the occurrence, or failure to occur, of any event which occurrence or failure would be likely to cause any representation or warranty of Seller contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing Date; and

(b) any failure of Seller to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by Seller hereunder.

Section 6.05. **Updates to Disclosure Schedules**. Seller shall deliver to Purchaser, as soon as possible after discovery and in any event within two (2) Business Days after discovery and one (1) Business Day prior to the Closing Date, written notice of supplemental information (other than historical financial statements of Seller) updating the information set forth in the representations and warranties of Seller set forth in Article IV of this Agreement (the "Disclosure Schedule Updates"). If such Disclosure Schedule Updates reflect an occurrence which, on a cumulative basis as to all occurrences in other such supplemental information, in Purchaser's discretion could reasonably be expected to have a Material Adverse Effect or has or could reasonably be expected to adversely affect the ability of Seller to convey any material portion of the Assets to Purchaser pursuant to this Agreement, Purchaser shall have the right to terminate this Agreement pursuant to and in accordance with Section 8.01(c) of this Agreement by delivering a written notice of such termination to Seller prior to the Closing in accordance with Section 8.01(c).

Section 6.06. **Cooperation**. Purchaser and Seller shall each use its reasonable Best Efforts to cooperate with the other and the other's employees, attorneys, accountants and other agents and, generally, do such other acts and things in good faith as may be reasonable to timely effectuate the purposes of this Agreement and the consummation of the transactions contemplated hereby in accordance with the provisions of this Agreement. Each party also shall use its reasonable Best Efforts to cooperate, and cause its Related Persons to cooperate with the other (a) with respect to all filings Seller or Purchaser shall be required by applicable Law to make, and (b) in obtaining all consents set forth on the Required Approvals Schedule.

Section 6.07. **Governmental Approvals**. Promptly after the execution of this Agreement, Purchaser shall file all applications and reports which are required to be filed by Purchaser with any Governmental Entity in connection with the transactions contemplated by this Agreement. Purchaser shall also promptly provide all information that any Governmental Entity may require in connection with any such application or report. Purchaser shall pay all fees and amounts in connection with such applications and reports.

Section 6.08. **Additional Notices and Covenants**. Purchaser shall give all notices to any Governmental Entities and other third parties and take such other action required to be given or taken by it in connection with the transactions contemplated by this Agreement.

19

CONFIDENTIAL

Stratesphere-000023

## ARTICLE VII.
## INDEMNIFICATION; SURVIVAL

Section 7.01. **Indemnification By Seller Group**. Each member of the Seller Group shall, jointly and severally, indemnify and hold harmless Purchaser and its successors, members, managers, Personnel, representatives, Affiliates and agents (collectively, the "Purchaser Indemnified Parties") from and against any and all damages, losses, obligations, Liabilities, claims, encumbrances, penalties, costs and expenses (including costs of investigation and defense and reasonable attorneys' fees and expenses), (each, an "Indemnity Loss"), directly or indirectly arising from or relating to:

(a)     the actual breach or nonperformance of any warranties, representations, covenants or agreements of the Seller Group in this Agreement or the Related Agreements or in any certificate or schedule hereto or in the Related Agreements;

(b)     any Liability of Seller relating to the Excluded Assets or the Excluded Liabilities;

(c)     any Liability of Seller or relating to the Assets, the Assumed Liabilities, or the operation of the Business arising out of the transactions entered into or events occurring before the Closing;

(d)     any Liability arising from a claim by a third Person for any tort or any breach or violation of any contractual, quasi contractual, legal, fiduciary, or equitable duty by the Seller Group, whether before, at, or after the Closing; and

(e)     any and all Proceedings, demands, assessments, audits or judgments arising out of any of the foregoing.

Section 7.02. **Indemnification by Purchaser**. Purchaser shall indemnify and hold harmless the Seller Group and their successors, shareholders, Personnel, representatives, Affiliates and agents (collectively, the "Seller Indemnified Parties") from and against any and all Indemnity Losses arising from or relating to:

(a)     the actual breach or nonperformance of any warranties, representations, covenants or agreements of Purchaser in this Agreement or in the Related Agreements or in any certificate or schedule hereto or to the Related Agreements;

(b)     any Assumed Liability;

(c)     any Liability of Purchaser or relating to the Assets, the Assumed Liabilities, or the operation of the Business arising out of the transactions entered into or events occurring after the Closing;

(d)     any Liability arising from a claim by a third Person for any tort or any breach or violation of any contractual, quasi contractual, legal, fiduciary, or equitable duty by Purchaser, whether before, at, or after the Closing; and

20

CO\5881326.8

(e)     any and all Proceedings, demands, assessments, audits or judgments arising out of any of the foregoing.

Section 7.03. **Indemnification Notice; Litigation Notice**.     If a party entitled to indemnity pursuant to Section 7.01 or Section 7.02 (the "Claimant") believes that it has suffered or incurred any Indemnity Loss, it shall so notify the party which the Claimant believes has an obligation to indemnify (the "Indemnifying Party") promptly in writing describing such Indemnity Loss in reasonable detail, the amount thereof, if known, and the method of computation of such Indemnity Loss, all with reasonable particularity (the "Indemnification Notice"). If any action at Law, suit in equity, arbitration or administrative action is instituted by or against a third party with respect to which the Claimant intends to claim any Liability or expense as an Indemnity Loss under this Article VII, it shall promptly notify the Indemnifying Party in writing of such action, matter or suit describing such Indemnity Loss, the amount thereof, if known, and the method of computation of such Indemnity Loss, all with reasonable particularity (the "Litigation Notice") in lieu of an Indemnification Notice. To the extent failure to promptly notify the Indemnifying Party of such action or suit can reasonably be deemed to increase the Liability or expense to the Claimant, the Indemnifying Party shall not be obligated to reimburse Claimant for the amount of such increase in liability or expense.

Section 7.04. **Defense of Third Person Claims**. The Indemnifying Party shall have twenty (20) calendar days after receipt of the Litigation Notice to notify the Claimant that it acknowledges its obligation to indemnify and hold harmless the Claimant with respect to the Indemnity Loss set forth in the Litigation Notice and that it elects to conduct and control any legal or administrative action or suit with respect to an identifiable claim (the "Election Notice"). If the Indemnifying Party gives a Disagreement Notice (as hereinafter defined) or does not give the foregoing Election Notice during such 20-day period, the Claimant shall have the right (but not the obligation) to defend, contest, settle or compromise such Proceeding in the exercise of its reasonable discretion; provided, however, that the right of the Claimant to indemnification hereunder shall not be conclusively established thereby. If the Indemnifying Party timely gives the foregoing Election Notice and provides information satisfactory to the Claimant in its reasonable discretion confirming the Indemnifying Party's financial capacity to defend such Indemnity Loss and provide indemnification with respect to such Indemnity Loss, the Indemnifying Party shall have the right to undertake, conduct and control, through counsel reasonably satisfactory to the Claimant and at the Indemnifying Party's sole expense, the conduct and settlement of such action or suit, and the Claimant shall cooperate with the Indemnifying Party in connection therewith; provided, however, that (a) the Indemnifying Party shall not thereby consent to the imposition of any injunction against the Claimant without the prior written consent of the Claimant, (b) the Indemnifying Party shall permit the Claimant to participate in such conduct or settlement through legal counsel chosen by the Claimant, but the fees and expenses of such legal counsel shall be borne by the Claimant, except as provided in clause (c) below, (c) upon a final determination of such action or suit, the Indemnifying Party shall promptly reimburse the Claimant, to the extent required under this Article VII, for the full amount of any Indemnity Loss incurred by the Claimant, except fees and expenses of legal counsel that the Claimant incurred after the assumption of the conduct and control of such action or suit by the Indemnifying Party in good faith and (d) the Claimant shall have the right to pay or settle any such action or suit; provided, however, that in the event of such payment or settlement,

CONFIDENTIAL

Stratesphere-000025

the Claimant shall waive any right to indemnity therefor by the Indemnifying Party and no amount in respect thereof shall be claimed as an Indemnity Loss under this Article VII.

Section 7.05. **Disagreement Notice**. If the Indemnifying Party does not agree that the Claimant is entitled to full reimbursement for the amount specified in the Indemnification Notice or the Litigation Notice, as the case may be, the Indemnifying Party shall notify the Claimant (the "Disagreement Notice") within twenty (20) calendar days of its receipt of the Indemnification Notice or the Litigation Notice, as the case may be.

Section 7.06. **Payment of Losses**. The Indemnifying Party shall pay to the Claimant in cash the amount to which the Claimant may become entitled by reason of the provisions of this Article VII within fifteen (15) Business Days after such amount is finally determined either by mutual agreement of the parties or, in the case of an Indemnity Loss described in any Litigation Notice, the date on which both such amount and Claimant's obligation to pay such amount have been determined by a final judgment of the trial court or administrative body having jurisdiction over such Proceeding. In the event that the Seller Group is obligated to indemnify Purchaser and is financially unable to do so, then the percentage of the membership interests issued to the Seller shall be reduced based upon the fair market value of Stratesphere at such time, determined in good faith by Stratesphere.

Section 7.07. **Survival**. Claims for indemnification shall only be valid to the extent that such claims are made within a period of eighteen (18) months from the Closing Date; provided, however, that the applicable statute of limitations period shall apply with respect to claims relating to Liabilities for Taxes and no limitations period shall apply with respect to claims relating to matters of title, including but not limited to Section 4.6 (Intellectual Property) and Section 4.11 (Title to Assets).

Section 7.08. **Deemed Representations and Warranties**. All statements contained in certificates and other instruments attached hereto or delivered or furnished on behalf of any party hereto shall be deemed representations and warranties of that party pursuant to this Agreement.

Section 7.09. **Sole Remedy**. The right to indemnification under this Article VII, subject to all of the terms, conditions and limitations hereof, shall constitute the sole and exclusive right and remedy available to any party hereto for any actual or threatened breach of this Agreement or any Related Agreement or for any violation of Laws in connection with the transactions provided for in this Agreement or any Related Agreement, and none of the parties hereto shall initiate or maintain any legal action at law or in equity against any other party hereto which is directly or indirectly related to any breach or threatened breach of this Agreement or any of the Related Agreements or for any violation of Laws in connection with the transactions provided for in this Agreement or any Related Agreement, except that Purchaser may pursue legal or equitable relief against Seller or the Seller Group (pursuant to Section 9.03) for a breach or violation of Section 9.01 or Section 9.02 of this Agreement.

Section 7.10. **Tax Treatment of Indemnity Payments**. To the maximum extent permitted by Law, it is the intention of the parties to treat any indemnity payment made under this Agreement as an adjustment to the Purchase Price for all Tax purposes, and the parties agree to file their Tax Returns accordingly.

22

## ARTICLE VIII.
## TERMINATION

Section 8.01. **Events of Termination**. Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated at any time prior to completion of the Closing, as follows:

(a) by Seller if there has been a material misrepresentation or a material default or breach by Purchaser with respect to Purchaser's representations and warranties in Article V of this Agreement or the due and timely performance of any of the material covenants or agreements of Purchaser contained in this Agreement, and in the case of a material default or breach of a material covenant or agreement, such material default or material breach shall not have been cured (or reasonable efforts commenced to cure such breach or default if such breach or default cannot be cured within a 10-day period) within ten (10) calendar days after receipt by Purchaser of written notice specifying in reasonable detail the nature of such default or breach;

(b) by Purchaser if there has been a material misrepresentation or a material default or breach by any Seller with respect to its representations and warranties in Article IV of this Agreement or the timely performance of any of the material covenants or agreements of any Seller contained in this Agreement, and in the case of a material default or breach of a material covenant or agreement, such material default or breach shall not have been cured within ten (10) calendar days (or reasonable efforts commenced to cure such breach or default that cannot be cured within a ten (10) day period) after receipt by Seller of written notice specifying in reasonable detail the nature of such default or breach;

(c) by Purchaser if any information reflected in any Disclosure Schedule Update in Purchaser's discretion could reasonably be expected to have a Material Adverse Effect or has or could reasonably be expected to materially and adversely affect the ability of Seller to convey any material portion of the Assets to Purchaser pursuant to this Agreement within five (5) Business Days of delivery of the Disclosure Schedules Update;

(d) by written agreement of Seller and Purchaser; or

(e) by Seller or Purchaser if the Closing has not occurred by the date which is thirty (30) days after the Closing Date.

This Agreement may not be terminated after completion of the Closing.

Section 8.02. **Effect of Termination**. In the event this Agreement is terminated pursuant to Section 8.01, all rights and obligations of the parties shall terminate without any liability of a party to the other parties; provided, however, that the rights and obligations of the parties set forth in this Section 8.02 and Section 9.01, Section 11.01, and Section 11.02 of this Agreement shall survive the termination of this Agreement indefinitely.

23

CONFIDENTIAL                                                                    Stratesphere-000027

## ARTICLE IX.
## RESTRICTIVE COVENANTS

Section 9.01. **Confidential Information**. Purchaser, and each member of the Seller Group agree that he, she or it shall treat in confidence and shall not use, disseminate or disclose, other than in connection with the transactions contemplated by this Agreement, all documents, materials and other information regarding the other parties to this Agreement which he, she or it obtains during the course of the negotiations leading to the consummation of the transactions contemplated by this Agreement (whether obtained on, prior to or following the date hereof) or the preparation of this Agreement or any of the Related Agreements (the "Confidential Information"). Seller or Purchaser, however, shall be entitled to disclose this Agreement and the Related Agreements, together with the exhibits and schedules attached hereto and thereto, to their respective legal and tax counsel, advisors and consultants (collectively, "Advisors"), and lenders and lender's Advisors, and Stockholders so long as such third parties agree to be bound by terms of confidentiality no less restrictive than those provided in this Section 9.01.

### Section 9.02. **Non-Competition**.

(a)     For a period equal to three (3) years following the Closing (the "Restricted Period) no Seller nor the Seller Group nor any of their Affiliates shall, directly or indirectly, engage in, own, manage, operate, join, control, as partner, shareholder, consultant, manager, agent or otherwise, any individual, corporation, partnership, firm, other company, business organization, activity, entity or Person that distributes, provides, markets and/or sells one or more Competing Products. The geographic scope for the restriction set forth in this Section 9.02(a) shall be the world, which geographic scope Seller represents is coextensive with the geographic scope of Seller's Business. As used herein, a "Competing Product" shall mean any product or service which performs functions similar to or in substitution for the Software.

(b)     Seller and Seller Group hereby acknowledge and agree that the Restricted Period, geographic scope and scope of restricted activity specified herein are reasonable and necessary in view of the transactions contemplated by this Agreement and the nature of the business in which Seller was engaged or is engaged as of Closing and in which Purchaser is, or shall be, engaged. Seller and Seller Group further acknowledge and agree that the restrictions set forth in this Section 9.02 are reasonable and necessary to protect Purchaser's investment under this Agreement and to safeguard the value and goodwill associated with the Assets. Seller and Seller Group acknowledge and agree that Purchaser would not have entered into this Agreement but for Seller's and Seller Group's agreements and obligations pursuant to this Section 9.02. If the scope of any stated restriction is too broad to permit enforcement of such restriction(s) to its full extent, then the parties agree that such restriction shall be enforced and/or modified to the maximum extent permitted by law. The parties agree that in the event of a breach of this Section 9.02, the Restricted Period shall be extended with respect to the breaching party by the period of the breach.

Section 9.03. **Remedies**. Upon any breach of Section 9.01 or Section 9.02 by any Seller or any member of the Seller Group, Purchaser shall be entitled to each of the following remedies, which shall be deemed cumulative:

CO\5881326.8

CONFIDENTIAL                                                                    Stratesphere-000028

(a)     Injunctive Relief.     Seller and each member of the Seller Group hereby acknowledge that any breach of <u>Section 9.01</u> or <u>Section 9.02</u> shall cause irreparable injury to the goodwill and proprietary rights of Purchaser and its Affiliates and subsidiaries, for which Purchaser shall not have an adequate remedy at law.  Accordingly, Seller and each member of the Seller Group agree that Purchaser shall be able to seek immediate injunctive relief in the form of a temporary restraining order, preliminary injunction and/or permanent injunction against Seller and each member of the Seller Group or any of them (without the requirement of posting any bond but after making any required showing to the court) to restrain or enjoin any actual or threatened violation of any provision of <u>Section 9.01</u> or <u>Section 9.02</u>.

(b)     Costs, Expenses and Attorneys' Fees.  Purchaser shall be entitled to recover from Seller and each member of the Seller Group or any of them all costs, expenses and reasonable attorneys' fees incurred by Purchaser in seeking either enforcement of <u>Section 9.01</u> or <u>Section 9.02</u> of this Agreement or damages for a breach of such Sections; provided, however, that, in the event the remedy contemplated by <u>Section 9.03(a)</u> is denied, then Seller and each member of the Seller Group shall be entitled to recover from Purchaser all costs, expenses and reasonable attorneys' fees incurred by each of them in defending such action.

ARTICLE X.
DEFINITIONS

As used in this Agreement, the following terms have the meanings indicated below:

"<u>Affiliate</u>" shall mean any Person that directly or indirectly controls, is controlled by or is under common control with Purchaser or Seller, as the case may be.  As used in this definition, "control" (including, its correlative meanings "controlled by" and "under common control with") means possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of ten percent (10%) or more of outstanding voting securities or partnership or other ownership interests, by Contract or otherwise).

"<u>Assigned Contracts</u>" shall mean all Contracts relating to the Business, the Products and/or the Software set forth on <u>Schedule 1.06</u>.

"<u>Best Efforts</u>" shall mean the efforts that a reasonable prudent person desirous of achieving a result would use in similar circumstances to achieve that result as expeditiously as possible.

"<u>Business Day</u>" shall mean any day other than Saturday, Sunday and any day on which commercial banks in the State of Ohio are authorized by law to be closed.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended.

"<u>Collected Revenue</u>" shall mean cash receipts from the Business for the applicable year all as determined in accordance with GAAP and as shown on the abstracts or summaries of the unaudited, internally prepared financial statements of the Purchaser for such year.

CO\5881326.8

CONFIDENTIAL                                                        Stratesphere-000029

"Contracts" shall mean any contract, agreement, indenture, note, bond, loan, instrument, lease, conditional sale contract, mortgage, license, franchise, insurance policy, commitment or other arrangement or agreement, whether written or oral.

"Controlled Technology" shall include any matter, the export, re-export, or release of which to certain jurisdictions or countries is prohibited or requires an export license or other governmental approval under any Law, including the US Export Administration Act and its associated regulations.

"Documentation" shall mean the documentation listed in the attached Schedule 1.01(h) and all other documentation (whether in human or machine readable form) describing or relating to the Software, including each of the following: operating, installation, administrator, and user manuals and training materials; technical, functional, service level, and other requirements and specifications; file and record layouts and fields; schematics; flow charts; algorithms; architectural diagrams; data models; build instructions; compilation instructions; testing and configuration documentation; developer annotations, programming notes, and technical data; programming, hardware, system, and network design and configuration documentation; and any other documents describing or relating to the creation, design, development, installation, implementation, execution, structure, function, performance, correction, modification, improvement, or use of the Software or the Software's operating environment, and all updates, upgrades, corrections, modifications, translations, releases, versions, and derivative works and improvements of each of the foregoing items set forth in this definition.

"Encumbrance" shall mean all liens (statutory or other), leases, licenses, mortgages, pledges, security interests, conditional sales agreements, charges, claims, options, easements, rights of way (other than easements of record), restrictions, and other encumbrances of any kind or nature whatsoever, including those encumbrances set forth on any schedule hereto.

"Excluded Liabilities" shall include the following: (a) any Liability arising out of or related to the products or services of any Seller to the extent sold prior to the Closing Date; (b) any Liability for Taxes arising out of the operation of the Business prior to the Closing Date, including: (i) any Taxes arising as a result of Seller's operation of its Business or ownership of the Assets prior to the Closing Date; (ii) any cost, expense or Taxes that shall arise as a result of the sale of the Assets pursuant to this Agreement; and (iii) any deferred Taxes of any nature; (c) any Liability arising out of or relating to any Seller's credit facilities or any security interest related thereto; (d) any environmental, health and safety Liabilities arising out of or relating to the operation of the Business prior to the Closing Date; (e) any Liability under the employee plans or seller's benefit obligations or relating to payroll, vacation, sick leave, pension benefits, employee stock option or profit-sharing plans, stock purchase plan, bonus plan or arrangement, health care plans or benefits or any other employee plan or benefits of any kind for Seller's or its Affiliate's employees or former employees, or both, or for any officers, directors or security holder of Seller or its Affiliates; (f) any Liability to distribute to any of any Seller's shareholders or otherwise apply all or any part of the consideration received hereunder; (g) any Liability arising out of any Proceeding pending as of the Closing Date, whether or not set forth in the schedules hereto, or any Proceeding commenced after the Closing Date and arising out of, or relating to, any occurrence or event happening prior to the Closing Date; (h) any Liability of any Seller (or costs and expenses in connection therewith) to the extent that such Liability is actually

26

CONFIDENTIAL

satisfied or paid on behalf of Seller by an insurer or insurers under a policy issued to Seller; (i) any Liability arising from any violation by any Seller or by its officers, employees, or agents of any statute (or rule or regulation thereunder) or executive regulation of the United States or any state or any political subdivision or agency thereof or any statutes (or rule or regulation thereunder) or executive, administrative, or quasi judicial regulation of any foreign government; (j) any Liability for or arising under any claim for workers' compensation or for any tort, breach of any legal duty, breach or violation of any contract or violation or breach of any law, statute, ordinance, rule, regulation, injunction, or decree, or any liability or obligation for any "product liability" or other claim connected in any manner with any products, events, or activities produced or taking place prior to the Closing; and (k) any Liability of any Seller under this Agreement or any of the Related Agreements.

"Files and Records" shall mean all files, records and other information of any Seller in its possession or in the possession of its agents, attorneys, or consultants, relating to the Business, or the Assets, whether in hard copy or magnetic or electronic or other format including customer lists and records, referral sources, historical evidence of acquisition (subject to any existing written confidentiality obligation restricting the disclosure of any asset purchase agreement or portions thereof), use, and protection of the Intellectual Property Assets or Proprietary Intellectual Property Assets (including without limitation any agreements and assignments to acquire the same from any prior owner and evidence of Seller's or any prior owner's use of the same (including as may be useful to establish the date of first use in commerce of any trademark and use as of the date of application for trademark registration) as may be necessary or desirable for Purchaser to protect its interest in any such intellectual property after Closing), research and development reports and records, specifications and drawings, sales and advertising material, software, correspondence, manuals, studies, sales literature and promotional material, production reports and records, operating guides, copies of financial and accounting records and copies of records relating to the employees and Personnel of any Seller to be employed by Purchaser following the Closing.

"GAAP" shall mean United States generally applied accounting principles as in effect from time to time, as consistently applied.

"Governing Documents" shall mean, with respect to any particular entity: (a) if a corporation, the articles or certificate of incorporation and the bylaws of such entity; (b) if a general partnership, the partnership agreement and any statement of partnership; (c) if a limited partnership, the limited partnership agreement and the certificate of limited partnership; (d) if a limited liability company, the articles of organization and the operating agreement; (e) if another type of Person, any other charter or similar document adopted or filed in connection with the creation, formation or organization of the Person; (f) all equity holders' agreements, voting agreements, voting trust agreements, joint venture agreements, registration rights agreements or other agreements or documents relating to the organization, management or operation of any Person or relating to the rights, duties and obligations of the equity holders of any Person; and (g) any amendment or supplement to any of the foregoing.

"Governmental Entity" shall mean any court, government agency, department, commission, board, bureau or instrumentality of the United States, any local, county, state, federal or political subdivision thereof, or any foreign governmental entity of any kind.

27

CO\5881326.8

"Intangible Assets" shall mean all intangible personal property rights of any Seller, including going concern value, goodwill, the benefit of third party representations, warranties and guarantees, customer lists and related information (including telephone numbers, facsimile numbers, addresses and e-mail addresses), Files and Records, business plans and strategies, referral sources and all other intangible assets of any Seller, whether or not patentable or registrable.

The phrases "to the Knowledge of" any Person, or "Known to" any Person, or words of similar import, shall mean the actual knowledge of such Person without independent investigation, except that with respect to any matters relating to or affecting title to the Assets (including without limitation Section 4.06 and Section 4.11) such phrases shall mean actual knowledge after reasonable investigation.

"Law" shall mean any local, county, state, federal, foreign or other law, statute, regulation, ordinance, rule, order, decree, judgment, consent decree, settlement agreement or governmental requirement enacted, promulgated, entered into, agreed or imposed by any Governmental Entity.

"Liability" with respect to any Person, shall mean any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"Licenses and Permits" shall mean all licenses, permits, franchises, certificates, approvals and authorizations that relate directly or indirectly to, or are necessary for, the conduct or operation of the Business or the ownership or use of the Assets and all pending applications therefor or renewals thereof.

"Material Adverse Effect" or "Material Adverse Change" means, when used with respect to Seller, any change, event, circumstance or effect that, individually, has a materially adverse effect upon the Business, Assets, financial condition, or results of operations of the Business taken as a whole; provided, however, that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: (a) any adverse change, event, development or effect arising from or relating to (i) general business or economic conditions, including such conditions related to the business of any Seller, (ii) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (iii) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (iv) changes in GAAP, (v) changes in law, rules, regulations, orders, or other binding directives issued by any governmental entity, (vi) the taking of any action contemplated by this Agreement and the other agreements contemplated hereby, (vii) any "act of God," including, but not limited to, weather, natural disasters and earthquakes, (viii) any failure by

28

CONFIDENTIAL

Seller to meet its internal financial projections or (ix) changes resulting from the announcement of the execution of this Agreement or the transactions contemplated hereunder; and (b) any adverse change in effect on, or development with respect to, the business of Seller which is cured by Seller prior to the earlier of (x) the Closing Date and (y) the date on which this Agreement is terminated pursuant to Article VIII hereof.

"Open Source Components" shall mean any software component that is subject to any open source copyright license agreement, including any GNU General Public License or GNU Library or Lesser Public License, or other obligation, restriction, or license agreement that substantially conforms to the Open Source Definition as prescribed by the Open Source Initiative or otherwise may require disclosure or licensing to any third party of any source code with which such software component is used or compiled.

"Open Source License" shall mean an open source copyright license agreement controlling the distribution and use of one or more Open Source Components.

"Ordinary Course of Business" shall mean any action taken by a Person if such action is consistent in nature, scope and magnitude (including with respect to quantity and frequency) with the past practices of such Person's business and is taken in the ordinary course of the normal day-to-day operations of such Person's business.

"Person" shall mean any individual, corporation, partnership, joint venture, association, limited liability company, joint-stock company, trust or unincorporated organization, or any Governmental Entity, officer, department, commission, board, bureau or instrumentality thereof.

"Personnel" shall mean either any director, officer, employee, consultant, agent or other personnel of Seller or personnel of Purchaser, as applicable.

"Pre-Closing Funded Amounts" shall mean the total payments made by Stratesphere to Seller prior to Closing for working capital purposes.

"Proceeding" shall mean any action, arbitration, audit, hearing, investigation, litigation or suit.

"Pythhos Affiliate" shall mean Pythhos Technology LLC d/b/a Boston Analytics, Pythhos Technology Pct. Ltd., Pythhos Technology Singapore Holding Pte. Ltd., Pythhos Technology Holding Limited and Pythhos Technology Holding (B.V.I.) Inc.

"Related Agreements" shall mean the Bill of Sale, the Assignment and Assumption Agreement, the Trademark Assignment, the Copyright Assignment, and any other documents and instruments executed and delivered in connection with any of them.

"Related Person" shall mean: With respect to a particular individual: (a) each other member of such individual's Family; (b) any Person that is directly or indirectly controlled by any one or more members of such individual's Family; and (c) any Person with respect to which one or more members of such individual's Family serves as a director, officer, partner, executor or trustee (or in a similar capacity).

29

CO\5881326.8

With respect to a specified Person other than an individual:

(i)     any Person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such specified Person;

(ii)     each Person that serves as a director, officer, partner, executor or trustee of such specified Person (or in a similar capacity); and

(iii)     any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity).

For purposes of this definition: (a) "control" (including "controlling," "controlled by," and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise, and shall be construed as such term is used in the rules promulgated under the Securities Act; (b) the "Family" of an individual includes: (i) the individual; (ii) the individual's spouse; (iii) any other natural person who is related to the individual or the individual's spouse within the second degree; and (iv) any other natural person who resides with such individual.

"Securities Act" shall mean the Securities Act of 1933, as amended and the rules and regulations promulgated thereunder from time to time.

"Software" shall mean the software listed in the attached Schedule 1.01(h) as more specifically described in the Documentation, including: (i) the software's Source Code and object code; and (ii) all databases, files, application programming interfaces, and other components of and works embodied in the software (including any audio or visual content or screen displays in the user interface), and all updates, upgrades, corrections, modifications, translations, releases, versions, and derivative works and improvements of each of the foregoing databases, files, application programming interfaces, and other components of and works embodied in the software.

"Source Code" shall mean the human readable source code of the Software to which it relates, in the programming language in which the Software was written, together with all related flow charts and technical documentation, including a description of the procedure for generating object code, all of a level sufficient to enable a programmer reasonably fluent in such programming language to understand, build, operate, support, maintain, and develop modifications, upgrades, updates, adaptations, enhancements, new versions and other derivative works and improvements of, and to develop computer programs compatible with, the Software.

"Tax" or "Taxes" shall mean all federal, state, local and foreign taxes (including excise taxes, value added taxes, occupancy taxes, employment taxes, unemployment taxes, ad valorem taxes, custom duties, transfer taxes and fees), levies, imposts, impositions, assessments and other governmental charges of any nature imposed upon a Person, including all taxes and governmental charges imposed upon any of the personal properties, real properties, tangible or Intangible Assets, income, receipts, payrolls, transactions, stock transfers, capital stock, net worth or franchises of a Person (including all sales, use, withholding or other taxes which a

30

CONFIDENTIAL                                                                    Stratesphere-000034

Person is required to collect or pay over to any government), and all related additions to tax, penalties or interest thereon.

"Tax Return" shall mean and include all returns, statements, declarations, estimates, forms, reports, information returns and any other documents (including all consolidated, affiliated, combined or unitary versions of the same), including all related and supporting information, filed or required to be filed with any Governmental Entity in connection with the determination, assessment, reporting, payment, collection or administration of any Taxes.

In addition to terms defined above, the following terms shall have the respective meanings given to them in the sections set forth below:

| **Defined term** | **Section** |
|---|---|
| Advisors | Section 9.01 |
| Agreement | Preamble |
| Allocation | Section 1.07 |
| Assets | Section 1.01 |
| Assignment and Assumption Agreement | Section 2.02(b) |
| Assumed Liabilities | Section 1.03 |
| Bill of Sale | Section 2.02(a) |
| Business | Recitals |
| Claimant | Section 7.03 |
| Closing | Section 2.01 |
| Closing Date | Section 2.01 |
| Competing Product | Section 9.02(a) |
| Confidential Information | Section 9.01 |
| Copyright Assignment | Section 2.02(c) |
| Disagreement Notice | Section 7.05 |
| Disclosure Schedule Updates | Section 6.05 |
| Disclosure Schedules | Article IV |
| Election Notice | Section 7.04 |
| Excluded Assets | Section 1.02 |
| Financial Statements | Section 4.04 |
| Fundamental Matters | Section 7.08 |
| Indemnification Cap | Section 7.08 |
| Indemnification Notice | Section 7.03 |
| Indemnifying Party | Section 7.03 |
| Indemnity Loss | Section 7.01 |
| Independent Auditor | Section 1.05(b)(iii) |
| Intellectual Property Assets | Section 4.06(a) |
| IP Items | Section 4.06(c) |
| Litigation Notice | Section 7.03 |
| Material Consent | Section 1.07(b) |
| Material Contracts | Section 4.09 |
| Other Party's Indemnified Parties | Section 7.08 |
| Proprietary Intellectual Property Assets | Section 4.06(b) |

31

CONFIDENTIAL

| | |
|---|---|
| Purchase Price | Section 1.05 |
| Purchaser Indemnified Parties | Section 7.01 |
| Required Approvals Schedule | Section 1.07(b) |
| Restricted Material Contract | Section 1.07(b) |
| Restricted Period | Section 9.02(a) |
| Royalty Year | Section 1.08 |
| Seller | Preamble |
| Seller Group | Preamble |
| Seller Indemnified Parties | Section 7.02 |
| Seller Stockholders | Preamble |
| Seller's Calculation | Section 1.05(b)(iii) |
| Tax Benefit | Section 7.09(b) |
| Trademark Assignment | Section 2.02(c) |
| Transition Services Agreement | Section 2.02(d) |
| Work Product | Section 4.07(c) |

## ARTICLE XI.
## MISCELLANEOUS

Section 11.01. **Public Announcements**. No party to this Agreement shall make any public announcement of the transactions provided for in or contemplated by this Agreement or any of the Related Agreements unless the form and substance of the announcement are mutually agreed upon by each party, which agreement shall not be unreasonably withheld, conditioned or delayed, or unless public disclosure is necessary to comply with applicable Laws.

Section 11.02. **Costs and Expenses**. Whether or not the transactions contemplated by this Agreement and the Related Agreements are consummated, except as otherwise expressly provided herein, each of the parties shall bear all expenses and costs incurred by it in connection with this Agreement and the Related Agreements and the transactions contemplated by any of them, including, without limitation, the fees and disbursements of any legal counsel, independent accountants or any other Person or representative whose services have been used by such party.

Section 11.03. **Further Assurances**.

(a)     From and after the date of this Agreement, the parties shall cooperate reasonably with each other in connection with any steps required to be taken as part of their respective obligations under this Agreement or any of the Related Agreements, and shall: (a) furnish upon request to each other such further information; (b) execute and deliver to each other such other documents; and (c) do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of transactions contemplated by this Agreement and the Related Agreements.

(b)     Without limiting the foregoing, to the extent, if any, not executed and delivered to Kognetics LLC with this Agreement, Seller shall execute and deliver to Purchaser such assignments and other documents, certificates, and instruments of conveyance in a form suitable for filing with the United States Copyright Office ("US Copyright Office") or United States Patent and Trademark Office ("USPTO"), as applicable, and the registries and other recording

32

CONFIDENTIAL                                    Stratesphere-000036

governmental authorities in all applicable jurisdictions (including with respect to legalization, notarization, consularization, apostille, certification, and other authentication) as necessary to record and perfect the Trademark Assignment(s) and the Copyright Assignment(s), and to vest in Purchaser all right, title, and interest in the IP Items in accordance with applicable Law. As between Seller and Purchaser, Purchaser shall be responsible, at Purchaser's expense, for filing the Trademark Assignment(s) and the Copyright Assignment(s), and other documents, certificates, and instruments of conveyance with the applicable governmental authorities; provided that, upon Purchaser's request, Seller shall take such steps and actions, and provide such cooperation and assistance, to Purchaser and its successors, assigns, and legal representatives, including the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments, powers of attorney, or other documents, as may be necessary to effect, evidence, or perfect the assignment of the IP Items to Purchaser, or any of Purchaser's successors or assigns.

Section 11.04. **Addresses for Notices, Etc**. All notices, requests, demands and other communications that are required or may be given pursuant to the terms of this Agreement or any of the Related Agreements shall be in writing, and delivery shall be deemed sufficient in all respects and to have been duly given as follows: (a) on the actual date of service if delivered personally; (b) at the time of receipt of confirmation by the transmitting party if by facsimile transmission; (c) at the time of receipt if given by electronic mail to the e-mail addresses set forth in this Section 11.04, provided that a party sending notice by electronic delivery shall bear the burden of authentication and of proving transmittal, receipt and time of receipt; (d) on the third day after mailing if mailed by first class mail return receipt requested, postage prepaid and properly addressed as set forth in this Section 11.04; or (e) on the day after delivery to a nationally recognized overnight courier service during its business hours or the Express Mail service maintained by the United States Postal Service during its business hours for overnight delivery against receipt, and properly addressed as set forth in this Section:

If to any Seller:

_____

_____

_____

Attention: _____

Facsimile: _____

E-mail: _____

With a copy to (which copy shall not constitute notice hereunder):

_____

_____

_____

Attention: _____

Facsimile: _____

E-mail: _____

33

CO\5881326.8

If to Purchaser:

> Kognetics Holding Company LLC
> 147 N. High Street
> Gahanna, Ohio 43230
> Attention: Tariq Farwana
> Facsimile: 614-416-8153
> E-mail: tfarwana@stratesphere.com

With a copy to (which copy shall not constitute notice hereunder):
> Ice Miller LLP
> 250 West Street
> Columbus, Ohio 43215
> Attn: Richard A. Barnhart
> Facsimile: 614-228-3175
> E-mail: richard.barnhart@icemiller.com

Any party may change its address or other contact information for notice by giving notice to each other party in accordance with the terms of this Section 11.04. In no event shall delivery to a copied Person alone constitute delivery to the party represented by such copied Person.

Section 11.05. **Headings**. The article, section and paragraph headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

Section 11.06. **Construction**.

(a)     The parties have participated jointly in the negotiation and drafting of this Agreement and the Related Agreements, and, in the event of an ambiguity or a question of intent or a need for interpretation arises, this Agreement and the Related Agreements shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement or any of the Related Agreements.

(b)     Except as otherwise specifically provided in this Agreement or any of the Related Agreements (such as by "sole", "absolute discretion", "complete discretion" or words of similar import), if any provision of this Agreement or any of the Related Agreements requires or provides for the consent, waiver or approval of a party, such consent, waiver or approval shall not be unreasonably withheld, conditioned or delayed.

(c)     The Schedules referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. Disclosure of any fact or item in any Schedule hereto referenced by a particular Section in this Agreement shall be deemed to have been disclosed with respect to every other Section in this Agreement, but only to the extent that the import for such other Sections is reasonably apparent from the face of such disclosure as so made.

CO\5881326.8

CONFIDENTIAL                                                                Stratesphere-000038

(d)     Words of any gender used in this Agreement or any of the Related Agreements shall be held and construed to include any other gender; words in the singular shall be held to include the plural and words in the plural shall be held to include the singular, unless and only to the extent the context indicates otherwise.

(e)     Reference to any Law means such Law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any Law means that provision of such Law from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision.

(f)     "Hereunder," "hereof," "hereto," "herein," and words of similar import shall be deemed references to this Agreement as a whole and not to any particular article, section or other provision hereof.

(g)     "Including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term.

(h)     "Or" is used in the inclusive sense of "and/or."

(i)     References to documents, instruments or agreements shall be deemed to refer as well to all addenda, appendices, exhibits, schedules or amendments thereto.

Section 11.07. **Severability**. The invalidity or unenforceability of any provision of this Agreement or any of the Related Agreements shall in no way affect the validity or enforceability of any other provision of this Agreement or any of the Related Agreements. Wherever possible, each provision hereof shall be interpreted in such a manner as to be effective and valid under applicable Law. In case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision or provisions shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability, without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

Section 11.08. **Remedies**. Each party hereby acknowledges that its obligations under this Agreement are unique and that any breach or threatened breach of such obligations may result in irreparable harm and substantial damages to the other party. Accordingly, notwithstanding any provision of this Agreement to the contrary, in the event of a breach or threatened breach by either party of any of the provisions of this Agreement (including, a failure by a party to consummate the transactions contemplated by this Agreement after all the conditions to close set forth in Article III have been satisfied by the other party), the substantially nonbreaching party shall have the right, in addition to exercising any other remedies at law or equity that may be available to it under this Agreement or otherwise, to obtain ex parte, preliminary, interlocutory, temporary or permanent injunctive relief, specific performance and other equitable remedies in any court of competent jurisdiction to prevent the substantially breaching party from violating such provision or provisions or to prevent the continuance of any violation thereof, together with an award or judgment for any and all damages, losses, liabilities, expenses and costs incurred by

35

CONFIDENTIAL                                                    Stratesphere-000039

the substantially non-breaching party as a result of such breach or threatened breach, including attorneys' fees incurred in connection with, or as a result of, the enforcement of this Agreement. Each party expressly waives any requirement based on any Law, that the substantially non-breaching party post a bond as a condition of obtaining any of the above described remedies.

Section 11.09. **Entire Agreement and Amendment**. This Agreement and the Related Agreements, including the Exhibits and Schedules referred to and incorporated by reference herein and therein that forms a part of this Agreement and the Related Agreements contain the entire understanding of the parties with respect to the subject matter of this Agreement and the Related Agreements. There are no representations, promises, warranties, covenants or undertakings other than those expressly set forth in or provided for in this Agreement or the Related Agreements. This Agreement and the Related Agreements supersede all prior agreements and understandings among the parties hereto with respect to the transactions contemplated by this Agreement and the Related Agreements. This Agreement may not be amended, supplemented or otherwise modified except by a written agreement executed by each of the parties hereto.

Section 11.10. **No Waiver; Cumulative Remedies**. Except as specifically set forth herein, the rights and remedies of the parties to this Agreement are cumulative and not alternative. No failure or delay on the part of any party in exercising any right, power or remedy under this Agreement or any of the Related Agreements shall operate as a waiver of such right, power or remedy, and no single or partial exercise of any such right, power or remedy shall preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. To the maximum extent permitted by applicable law: (a) no claim or right arising out of this Agreement or any of the Related Agreements can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party shall be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party shall be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or any of the Related Agreements.

Section 11.11. **Parties in Interest**. Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any Person other than Seller and Purchaser, and their respective successors and permitted assigns.

Section 11.12. **Successors and Assigns; Assignment**. This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and permitted assigns. Seller shall not have the right to assign or delegate its rights or duties hereunder or under any of the Related Agreements, in whole or in part, without the prior written consent of Purchaser. Purchaser may, without any prior notice to or consent of Seller, assign or delegate, in whole or in part, its rights and duties under this Agreement and the Related Agreements to any Affiliates or to any Person who shall acquire all or substantially all of the Assets or the then outstanding voting securities of Purchaser whether by purchase, merger, consolidation or otherwise. Except as expressly set forth herein, nothing in this Agreement shall confer any claim, right, interest or remedy on any Person (other than the parties hereto) or inure to the benefit of any Person (other than the parties hereto).

36

CONFIDENTIAL

Section 11.13. **Governing Law; Jurisdiction and Venue**.

(a)     Applicable Law.   The Laws of the State of Ohio shall govern the creation, interpretation, construction and enforcement of and the performance under this Agreement and the Related Agreements and all transactions and agreements contemplated by any of them, as well as any and all claims arising out of or relating in any way to this Agreement or any of the Related Agreements, notwithstanding the choice of law rules of any other state or jurisdiction.

(b)     Court Proceedings.   Any action or Proceeding permitted by the terms of this Agreement to be filed in a court, which the action or Proceeding is brought to enforce, challenge or construe the terms or making of this Agreement or any of the Related Agreements, and any claims arising out of or related to this Agreement or any of the Related Agreements, shall be exclusively brought and litigated exclusively in a state or federal court having subject matter jurisdiction and located in Columbus, Ohio. Each party hereby irrevocably waives any objection or defense which it may now or hereafter have of improper venue, forum non conveniens or lack of personal jurisdiction; provided, however, that Purchaser, in its sole discretion, may elect to bring any action or claim relating to or arising out of a breach by Seller of Sections 9.01, 9.02 or 9.03 of this Agreement in the county or state where the breach by Seller occurred or where any breaching Seller can be found. Each party further irrevocably consents to the service of process out of such courts by the mailing of a copy thereof, by registered mail, postage prepaid, to the party and agrees that such service, to the fullest extent permitted by applicable laws, (i) shall be deemed in every respect effective service of process upon it in any suit, action or Proceeding arising out of or related to this Agreement or any of the Related Agreements and (ii) shall be taken and held to be valid personal service upon and personal delivery to it. Nothing herein contained shall affect the right of each party to serve process in any other manner permitted by applicable laws.

Section 11.14. **Waiver of Jury Trial**.   For any action or Proceeding which is permitted under this Agreement to be filed in a court, each party hereby expressly and irrevocably waives any right to a trial by jury in such action or Proceeding, including but not limited to those actions or Proceedings to enforce or defend any rights under this Agreement or any of the Related Agreements or under any amendment, consent, waiver, instrument, document or agreement delivered or which may in the future be delivered in connection with any of them or arising from any relationship existing in connection with this Agreement or any of the Related Agreements. Each party agrees that in any such action or Proceeding, the matters shall be tried to a court and not to a jury.

Section 11.15. **Counterparts**.   This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which shall together constitute one and the same agreement. Facsimile transmission of a counterpart hereto shall constitute an original hereof.

Section 11.16. **Schedules, Exhibits and Certificates**.    All Schedules and Exhibits referred to herein form an integral part of this Agreement and shall be deemed to be part of this Agreement to the same extent as if set forth in the text of this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

37

CO\5881326.8

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

STRATESPHERE, LLC

By: _____

Name: Tariq Fawwana, Managing Director

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

KOGNETICS HOLDING COMPANY LLC

By: _____

Name: Tariq Farwana, President

*Signature Page to*
*Asset Purchase Agreement*

CONFIDENTIAL

Stratesphere-000043

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

KOGNETICS LLC

By: _____

Name: Tatig Harwana , President

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

Rajeev Vaid

*Signature Page to*
*Asset Purchase Agreement*

CONFIDENTIAL

Stratesphere-000045

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

Inderpreet S. Thukral

CONFIDENTIAL

Stratesphere-000046

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

KOGNETICS, INC.

By: _____

Name: ____ INDERPREET S. THUKRAL

Title: ____ CEO

*Signature Page to*
*Asset Purchase Agreement*

CONFIDENTIAL

Stratesphere-000047

**Disclosure Schedules to Asset Purchase Agreement**

**By and Among:**

**Stratesphere, LLC**
**Kognetics Holding Company LLC**

**Purchasers:**

**Kognetics LLC**

**Sellers:**

**Kognetics, Inc.**
**Inder Thukral**
**Rajeev Vaid**

**August 22, 2018**

**Schedules:**

**Schedule 1.01(c)** – Intellectual Property Assets and all Proprietary Intellectual Property Assets
**Schedule 1.01(h)** – Software and Documentation
**Schedule 1.03(a)** – Assumed Liabilities – Assigned Contracts
**Schedule 1.03(b)** – Assumed Liabilities – Assigned Vendor Contracts
**Schedule 1.06** – Assigned Contracts
**Schedule 1.06(b)** – Material Consents
**Schedule 1.07** – Allocation of Purchase Price
**Schedule 1.11** – Stratesphere Option/ Ownership Percentage
**Schedule 4.04** – Financial Statements
**Schedule 4.05** – Tax Matters
**Schedule 4.06(e)** – Name and Employer of Anyone who has Contributed to the Software
**Schedule 4.06(e)(k)(v)** – Open Source Code
**Schedule 4.08** – Material Contracts
**Schedule 4.12** – Customers

CO\5968816.1

CONFIDENTIAL

Stratesphere-000048

## Schedule 1.01(c)

## Intellectual Property Assets and all Proprietary Intellectual Property Assets

| Category | Critical IP |
|---|---|
| Algorithm - Graph Analytics | Identifying Convergence Trends in a Sector |
| Algorithm - Graph Analytics | Identifying Potential Acquirers for a Company |
| Algorithm - Graph Analytics | Identifying Strategic Gaps for a Company |
| Algorithm – Machine Learning | Predicting Industry Maturity |
| Algorithm – Machine Learning | Predicting Funding Likelihood for an Industry |
| Algorithm – Machine Learning | Predicting Acquisition Likelihood for an Industry |
| Algorithm – Machine Learning | Classifying companies by industry segment using unstructured text corpus as input |
| Algorithm – Machine Learning | Concept recommendation Engine suggests concepts that frequently correlate with fed concept |
| NLP - Pipelines | Extracting Events/ Signals from Unstructured corpus for Company, Country, People, Sector etc. |
| NLP - Pipelines | Extracting Facts about companies from unstructured corpus |
| NLP - Pipelines | Extracting partners, customers from company website |
| NLP - Pipelines | Semantic Search Pipeline |
| Taxonomy/ Ontologies | Company Events Taxonomy |
| Taxonomy/ Ontologies | Country Events Taxonomy |
| Taxonomy/ Ontologies | Person Events Taxonomy |
| Taxonomy/ Ontologies | Product Events Taxonomy |
| Taxonomy/ Ontologies | Industry Taxonomy - For 50+ TMT sectors |
| Taxonomy/ Ontologies | Taxonomy to identify reported non-recurring items in a company financial statement |
| Application | M&A Deal Sourcing Application |
| Application | M&A Smart Automation Application |
| Knowledge Graph | Kognetics Knowledge Graph |
| Proprietary Data/ Insights - Companies | Company Business Signals |
| Proprietary Data/ Insights - Companies | Critical Strategic Gaps |
| Proprietary Data/ Insights - Companies | Potential Acquirers |
| Proprietary Data/ Insights - Companies | Funding Momentum |
| Proprietary Data/ Insights - Companies | Acquisition Momentum |
| Proprietary Data/ Insights - Companies | Exit Momentum |
| Proprietary Data/ Insights - Industry | Industry Maturity |
| Proprietary Data/ Insights - Industry | Funding Likelihood for Industry |
| Proprietary Data/ Insights - Industry | Acquisition Likelihood for Industry |

CO\5968816.1

CONFIDENTIAL

| | |
|---|---|
| Proprietary Data/ Insights - Industry | Funding Momentum |
| Proprietary Data/ Insights - Industry | Acquisition Momentum |
| Proprietary Data/ Insights - Industry | Exits Momentum |
| Proprietary Data/ Insights - Industry | Converging Sub-Industry Segments |
| Proprietary Data/ Insights - Investor | Investment Momentum by Sector |
| Proprietary Data/ Insights - Investor | Exit Momentum by Sector |
| Proprietary Data/ Insights - Investor | Critical Strategic Gaps for Portfolio Companies |
| Proprietary Data/ Insights - Investor | Portfolio Companies by Sector |
| Proprietary Data/ Insights - Investor | High Growth Portfolio Companies by Sector |
| Proprietary Data/ Insights - Investor | Portfolio Companies Due for Exit by Sector |
| Proprietary Data/ Insights - Investor | Active Investment Partners by Sector |
| Proprietary Data/ Insights - Investor | Strategic Buyers for Portfolio Companies |
| Proprietary Data/ Insights - Industry | Sector Market Maps |

CO\5968816.1

### Schedule 1.01(h)

### Software and Documentation



CO\5968816.1

Stratesphere-000051

**Schedule 1.03(a)**

**Assumed Liabilities – Assigned Contracts**

1. **Union Square Advisors, US**
2. **Code Advisors, US**
3. **BMO Capital Partners, US**
4. **Houlihan Lokey, US**
5. **Lazard, US**
6. **Vista Equity, US**
7. **Workday, US**
8. **KPMG LLP**
9. **Tailwind**
10. **DBS Bank**
11. **The Bakery (for Deloitte)**
12. **DMI**

CO\5968816.1

CONFIDENTIAL

Stratesphere-000052

**Schedule 1.03(b)**

**Assumed Liabilities – Assigned Vendor Contracts**

1. **Crunchbase Data License**
2. **Morning Star Data License**
3. **Xignite Data License**
4. **Amazon AWS Cloud Hosting**
5. **Microsoft Office 365**
6. **Neo4j Enterprise**
7. **Apache Solr and Lucene License**
8. **Github License**

CONFIDENTIAL

## Schedule 1.06

### Assigned Contracts

1. **Union Square Advisors, US**
2. **Code Advisors, US**
3. **BMO Capital Partners, US**
4. **Houlihan Lokey, US**
5. **Lazard, US**
6. **Vista Equity, US**
7. **Workday, US**
8. **KPMG LLP**
9. **Tailwind**
10. **DBS Bank**
11. **The Bakery (for Deloitte)**
12. **DMI**

CO\5968816.1

CONFIDENTIAL

Stratesphere-000054

**Schedule 1.06(b)**

**Material Consents**

1. **Union Square Advisors, US**
2. **Code Advisors, US**
3. **BMO Capital Partners, US**
4. **Houlihan Lokey, US**
5. **Lazard, US**
6. **Vista Equity, US**
7. **Workday, US**
8. **KPMG LLP**
9. **Tailwind**
10. **DBS Bank**
11. **The Bakery (for Deloitte)**
12. **DMI**

CO\5968816.1

CONFIDENTIAL

Stratesphere-000055

## Schedule 1.07

**Allocation of Purchase Price**

CO\5968816.1

CONFIDENTIAL

## Schedule 3.03

### Post-Closing Delieverables

- Seller Group must furnish etiher a Quitclaim Intellectual Property Assignment signed by Pythhos Technology Pvt. Ltd., and any other affiliate which worked on the Software or alternatively an applicable MSA – August 31, 2018
- Explain Schedule 1.01(c) – August 24, 2018
- Obtain consents as set forth on Schedule 1.03(b) – renewal date of each contract
- Obtain consents as set forth on Schedule 1.06(b) – September 30, 2018
- Certifiacte of Existence for Kogentics Inc. – August 24, 2018
- Complete the Officer's Certificate – August 31, 2018
- Complete Exhibit A to the Quitclaim Intellectual Property Assignment – August 31, 2018

CO\5968816.1

## **Schedule 4.04**

**Financial Statements**

CO\5968816.1

## KOGNETICS INC.

### BALANCE SHEET AS AT DECEMBER 31, 2017

|  |  | Actual | Actual |
|---|---|---|---|
|  | Schedule No. | As At 31-Dec-17 USD | As At 31-Dec-16 USD |
| **SOURCES OF FUNDS :** |  |  |  |
| **SHAREHOLDERS' FUNDS** |  |  |  |
| Share Application | 1 | 201,750 | 202,500 |
| Reserve and Surplus |  |  |  |
| **LOAN FUNDS** | 2 |  |  |
| Un Secured Loans |  | - | - |
|  |  | **201,750** | **202,500** |
| **APPLICATIONS OF FUNDS :** |  |  |  |
| **FIXED ASSETS** | 3 |  |  |
| Gross Block |  | 510,000 | 200,000 |
| Less: Accumulated depreciation |  | - | - |
| **Net Block** |  | **510,000** | **200,000** |
| **CURRENT ASSETS, LOANS AND ADVANCES** |  |  |  |
| Cash and Bank Balances | 4 | 207 | - |
| Sundry Debtors | 5 | 79,500 | - |
|  | A | **79,707** | **-** |
| **Less: CURRENT LIABILITIES AND PROVISIONS** |  |  |  |
| Current Liabilities | 6 | 413,710 | 1,000 |
|  | B | **413,710** | **1,000** |
| **NET CURRENT ASSETS** |  | **175,997** | **199,000** |
| **PROFIT & LOSS ACCOUNT DEBIT BALANCE** |  | 25,753 | 3,500 |
|  |  | **201,750** | **202,500** |
|  |  | - | - |

For and on behalf of the Board

**Inder Thukral**
**Chief Executive Officer**

CONFIDENTIAL

Stratesphere-000059

**<u>Schedule 4.05</u>**

**Tax Matters**

**Kognetics Inc. has filed on a timely basis all tax Returns with respect to Taxes that are or were required to be filed. Kognetics Inc. has paid all Taxes and there are no pending payments.**

CO\5968816.1

CONFIDENTIAL

Stratesphere-000060

## Schedule 4.06(e)

**Name and Employer of Anyone who has Contributed to the Software**

| Individuals Name | Employer |
|---|---|
|  |  |
| Dr. Inder Thukral | Kognetics Inc. |
| Rajeev Vaid | Kognetics Inc. |
| Hetal Shah | Kognetics Inc. |
| Kartikeyan Nagaiyan | Kognetics Inc. |
| Gaurav Kshettry | Kognetics Inc. |
|  |  |

CO\5968816.1

CONFIDENTIAL

## Schedule 4.06(e)(k)(v)

### Open Source Code

1. **Stanford NLP**
2. **Apache Solr and Lucene**
3. **Apache Jena**
4. **Protégé for Ontology**

CONFIDENTIAL

Stratesphere-000062

## Schedule 4.08

### Material Contracts

1. **The Bakery (for UK, Deloitte)**
2. **Harjinder Singh (for DMI in the US)**

CO\5968816.1

CONFIDENTIAL

Stratesphere-000063

**Schedule 4.12**

**Customers**

| Customer Name | Customer Address | Invoiced Amount (MRR) |
|---|---|---|
| CODE ADVISORS | 920 Broadway, 14th Floor, New York, NY 10010 | $  6,666.67 |
| Union Square Advisors LLC | Two Embarcadero Centre, Suite 1330, San Francisco, CA 94111 | $ 15,000.00 |
| Vista Equity Partners Management, LLC | 401 Congress Avenue, Suite 3100, Austin, Texas 78701 | $  6,250.00 |
| BMO Capital Markets Corp | 115 S LaSalle Street, 37 W, Chicago, IL 60603 | $  1,250.00 |
| Houlihan Lokey, Inc. | 10250 Constellation Blvd, 5th Fl., Los Angeles 90067 | $  3,750.00 |
| KPMG LLP | 345 Park Avenue, 37th Floor, New York, NY 10154 | $  4,166.67 |
| Workday, Inc. | 6110 Stoneridge Mall Rd., Pleasanton, CA 94588 | $  2,710.00 |
| Lazard Freres & Co. LLC | 4 Embarcadero Center, Suite 650, San Francisco, CA 94111 | $  1,250.00 |
| DBS Bank Ltd | 12 Marina Boulevard, DBS Asia Central @, Marina Bay Financial, Centre Tower 3, Singapore 018982 | $ 15,000.00 |
| UBS Securities LLC | 1285 Avenue of the Americas, New York, NY 10019. | $  3,750.00 |
| The Bakery | Unit 6, Dalston Square, London E8 3GT | $5,000.00 (Trial) |
| DMI | One Rock Spring Plaza, 6550 Rock Spring Drive, 7th Floor, Bethesda, MD 20817 | $20,000.00 (Project) |

CONFIDENTIAL

**EXHIBIT A**

Bill of Sale

Stratesphere-000065

*Execution Version*

# BILL OF SALE

## August 22, 2018

This Bill of Sale (the "Bill of Sale"), dated as of the date first set forth above, is made and entered into, by and between Kognetics Inc., a Delaware corporation ("Seller") to and in favor of Kognetics LLC, an Ohio, limited liability company ("Purchaser"). The Purchaser and Seller may each be referred to herein as a "Party" and collectively as the "Parties."

WHEREAS, Purchaser and Seller have entered into a certain Asset Purchase Agreement, dated as of the date hereof ("APA"), providing for Purchaser to purchase those certain Assets (as defined below);

WHEREAS, Seller is the owner of the assets as set forth on Exhibit A attached hereto and incorporated herein by reference (the "Assets");

WHEREAS, Seller desires to convey, transfer, assign, deliver, and contribute to Purchaser all of its right, title, and interest in and to the Assets; and

WHEREAS, Purchaser shall accept, all rights, title and interest in and to the Assets as specified in the APA and this Bill of Sale;

NOW, THEREFORE, in consideration of the premises and of the terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, each intending to be legally bound, hereby agree as follows:

1.      Seller hereby sells, grants, conveys, assigns, transfers and delivers to Purchaser any and all of Seller's right, title and interest in Assets. Such sale, transfer, conveyance and assignment shall be effective on the date hereof.

2.      The Seller further agrees that it will at any time and from time to time, at the request of the Purchaser, execute and deliver to the Purchaser any and all other and further instruments and perform any and all further acts reasonably necessary to vest in the Purchaser the right, title and interest in or any of the Assets which this instrument purports to transfer to the Purchaser. Seller further covenants that it will execute, at Purchaser's expense, all documents, papers, forms and authorizations and take all other actions that may be necessary to assist Purchaser in registering any trademarks with the United States Patent and Trademark Office and other foreign offices, as necessary.

3.      Any individual, partnership, corporation or other entity may rely, without further inquiry, upon the powers and rights herein granted to the Purchaser and upon any notarization, certification, verification or affidavit by any notary public of any state relating to the authorization, execution and delivery of this Bill of Sale or to the authenticity of any copy, conformed or otherwise, hereof.

1

CO\5910909.2

CONFIDENTIAL

Stratesphere-000066

4.     All of the terms and provisions of this Bill of Sale will be binding upon the Seller and its successors and assigns and will inure to the benefit of the Purchaser and its successors and assigns.

5.     The Parties acknowledge and agree that the consideration for the purchase and sale of the Assets is set forth in the APA, and each Party agrees that such consideration is legally sufficient for purposes of the acquisition of the Assets by the Purchaser.

6.     This Bill of Sale shall be governed by the laws of the State of Ohio, without regard to conflicts of law principles thereunder.

7.     This Bill of Sale is being delivered in connection with the Closing and is made subject to the provisions of the APA. In the event of any conflict or inconsistency between this Bill of Sale and the APA, the APA shall be the controlling document. Any terms used herein, including terms used in the attached Exhibit A, but not otherwise defined herein shall have the meaning ascribed to them in the APA.

8.     A signature transmitted through an electronic medium shall be deemed an original.

[Signatures appear on following page]

2

CO\5910909.2

CONFIDENTIAL

Stratesphere-000067

IN WITNESS WHEREOF, the undersigned has executed this Agreement effective as of the day and year first above written.

**SELLER:**

Kognetics Inc.
   a Delaware corporation

By: _____
Name: _____
Title: _____

*Signature Page to*
*Bill of Sale*

CONFIDENTIAL

Stratesphere-000068

Exhibit A
Assets

A.    All rights in, to and under the Assigned Contracts and all outstanding offers or solicitations made by or to Seller in the Ordinary Course of Business to enter into any Contract with respect to the Software;

B.    all Intangible Assets;

C.    all Intellectual Property Assets and all Proprietary Intellectual Property Assets (as hereinafter defined), including without limitation, such Intellectual Property Assets and Proprietary Intellectual Property Assets as are described on Schedule 1.01(c);

D.    stationery, purchase order and sale order forms and invoices, brochures, advertising and promotional materials and similar items relating to the Business;

E.    all marketing materials, research data (including marketing and concept testing data), customer and sales information, literature, advertising and other promotional materials and data, display materials and all training materials in whatever medium (e.g., audio, visual, digital or print), in each case, primarily used with respect to the Software;

F.    all websites and website URLs and all social media accounts, including administrative rights and access and all content thereon, used in the Business; and

G.    all goodwill relating to the Business or the Assets, including without limitation all goodwill associated with each registered trademark and trademark application and each unregistered trademark.

H.    The Software and Documentation as are described on Schedule 1.01(h).

CO\5910909.2

CONFIDENTIAL

Stratesphere-000069

**EXHIBIT B**

**Assignment and Assumption Agreement**

CONFIDENTIAL

*Execution Version*

## ASSUMED LIABILITIES AND ASSIGNED CONTRACTS ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSUMED LIABILITIES AND ASSIGNED CONTRACTS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is made this 22nd day of August, 2018, by and between Kognetics Inc., a Delaware corporation ("Assignor") and Kognetics, LLC, an Ohio limited liability company ("Assignee").

RECITALS:

A.    Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of the date hereof (the "APA");

B.    Pursuant to the APA, Assignor shall assign all of Assignor's rights, title and interests in the Assumed Liabilities, the Assigned Contacts and the assigned vendor contracts as set forth in the APA, to the Assignee and Assignee shall accept such assignment of the Assignor's rights, title and interests in the Assumed Liabilities, Assigned Contracts and assigned vendor contracts (collectively, the "Assigned Rights");

C.    Simultaneously with execution of the APA, Assignor and Assignee shall execute this Assignment and all of Assignee's rights title and interest in the Assigned Rights to the Assignee; and

D.    Capitalized terms used herein, but not defined herein, shall have the meaning as ascribed to them in the APA.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, intending to be legally bound, mutually agree as follows:

SECTION 1.    <u>ASSUMPTION TIME</u>

1.1    This Assignment shall automatically become effective, without the further action of any party hereto, as of the Closing.

SECTION 2. <u>ASSIGNMENT OF ASSIGNED RIGHTS</u>

2.1    <u>Assignment of Rights</u>. Subject to the terms and conditions of the APA, Assignor hereby assigns, transfers, conveys and delivers to Assignee, and Assignee hereby accepts from Assignor, all of Assignor's right, title and interest in and to the Assigned.

2.2    <u>Assumption of Duties</u>. Subject to the terms and conditions of the APA, Assignee hereby assumes and agrees to discharge, perform and fulfill all of the Assignor's duties, obligations, and restrictions imposed under the Assigned Rights arising on and after the Closing.

SECTION 3. <u>REPRESENTATIONS AND WARRANTIES OF ASSIGNOR</u>

3.1    Assignor hereby represents and warrants to the Assignee that the Assignor has all legal right to transfer all of Assignor's rights, title and interest under the Assigned Rights to the

CO\5910908.2

CONFIDENTIAL

Stratesphere-000071

Assignee and, unless otherwise agreed to between Assignor and Assignee, the Assignor has received the required consents to assign such Assigned Rights to the Assignee.

       3.2     Assignor hereby represents and warrants to the Assignee that, as of the date hereof, the Assignor is not in breach of any of its rights under the Assigned Rights.

SECTION 4.  <u>MISCELLANEOUS</u>

       4.1     This Assignment supersedes all other agreements and understandings of the parties with respect to this assignment and assumption of the Assigned Rights (other than the rights and obligations of the parties as set forth in the APA).

       4.2     This Assignment may be modified or amended only by a written agreement executed by all parties hereto.

       4.3     This Assignment and the obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

       4.4     This Assignment shall be governed by and construed in accordance with the laws of the State of Ohio, without reference to any choice of law principles.

       4.5     This Assignment may be executed in one or more counterparts, each of which shall be deemed an original and for purposes of this Assignment signatures received via an electronic medium shall be legally binding.

[Signature Page Follows]

CO\5910908.2

CONFIDENTIAL

IN WITNESS WHEREOF, Assignor and Assignee have signed this Assignment on the date first above written.

**ASSIGNOR:**                                      **ASSIGNEE:**

Kognetics, Inc.                                    Kognetics LLC


By: _____          By: _____
Name: _____          Name: _____
Its: _____          Its: _____

CONFIDENTIAL                                     Stratesphere-000073

**EXHIBIT C**

**Service Mark Assignment**

CONFIDENTIAL

Stratesphere-000074

## SERVICE MARK ASSIGNMENT

1.    DEFINITIONS

1.1    ASSIGNOR means **Kognetics Inc.**, a Delaware corporation, on behalf of itself and any of its owners, wholly owned subsidiaries, related entities, and officers (collectively, "Assignor").

1.2    ASSIGNEE means **Kognetics LLC**, an Ohio Limited Liability Company ("Assignee").

1.3    MARK means and includes each and every property identified in the attached Exhibit A that is used as, or is intended for use as, a source designation, including all goodwill, common-law rights, and statutory rights in the listed properties.

1.4    RELATED MARKS means and includes any and all in-use and intended source designations, including all goodwill, common-law rights, and statutory rights therein, incorporating, part of, resulting from, and/or otherwise associated with any source designation listed in Exhibit A.

1.5    RELATED MARK CASES means and includes:

    a.    any and all (whether or not listed in Exhibit A) United States state applications, federal applications, state registrations, federal registrations, common-law usage, Trademark Trial and Appeal Board proceedings, other administrative proceedings, alternative dispute resolution proceedings, and/or court litigation proceedings incorporating, referring to, relating to, and/or embodying any source designation listed in Exhibit A and/or RELATED MARKS; and

    b.    any and all (whether or not listed in Exhibit A) non-United States applications, registrations, common-law usage, administrative proceedings, alternative dispute resolution proceedings, and/or court litigation proceedings incorporating, referring, relating to, and/or embodying any source designation listed in Exhibit A and/or RELATED MARKS.

1.6    TRANSFERRED RIGHTS includes, but is not limited to, any and all rights, title, and/or interests assigned or otherwise transferred in this assignment.

1.7    GEOGRAPHIC SCOPE means worldwide.

1.8    EFFECTIVE DATE means the earliest of (a) the date of first use of the MARK, (b) the filing date of the MARK, (c) the filing date of the RELATED MARK CASES, and (d) the date this assignment is first signed by at least one of the parties hereto.

2.    ASSIGNMENT OF RIGHTS

2.1    Intellectual Property. The ASSIGNOR hereby assigns to the ASSIGNEE all rights, title, and interest in and/or to the MARK, RELATED MARKS, and RELATED MARK CASES.

2.2    Consideration. The ASSIGNOR hereby acknowledges receipt of good, valuable, and sufficient consideration from the ASSIGNEE for this assignment.

1

CONFIDENTIAL

2.3     Right to Claim Priority. The ASSIGNOR hereby assigns to the ASSIGNEE all right, title, and interest to claim priority to and/or from the MARK, RELATED MARKS, and RELATED MARK CASES.

2.4     Infringement, Dilution, and Misappropriation. The ASSIGNOR hereby assigns to the ASSIGNEE all past, present, and future causes of action for infringement, dilution, unfair competition, counterfeiting, and/or misappropriation of the MARK, RELATED MARKS, and/or RELATED MARK CASES, whether the infringement, dilution, unfair competition, counterfeiting, and/or misappropriation is committed and/or the cause of action therefor comes into existence before, during, or after the EFFECTIVE DATE.   This assignment specifically includes the right to sue for, recover, and collect damages for infringement, dilution, unfair competition, counterfeiting, and/or misappropriation of the MARK, RELATED MARKS, and/or RELATED MARK CASES that occurred prior to the EFFECTIVE DATE of this Service Mark Assignment agreement.

2.5     Remedies. The ASSIGNOR hereby assigns to the ASSIGNEE all past, present, and future remedies for infringement, dilution, unfair competition, and/or misappropriation, including, but not limited to, equitable relief, damages, royalties, profits, exceptional case awards, attorneys' fees, and costs.

2.6     Scope.   All assignments and/or other transfers of rights and/or title, both legal and equitable, made herein are to the full extent of the GEOGRAPHIC SCOPE such that no right, title, or interest remains with the ASSIGNOR.

3.      FUTURE PERFORMANCE

3.1     Communicate Information.   The ASSIGNOR hereby agrees to and will communicate to the ASSIGNEE and/or its legal representatives all facts and/or information known to the ASSIGNOR with respect to the TRANSFERRED RIGHTS, as reasonably requested by the ASSIGNEE.

3.2     Sign Documents.   The ASSIGNOR hereby agrees to and will sign and return any and all documents that ASSIGNEE reasonably desires to be signed that are directly or indirectly related to the TRANSFERRED RIGHTS.   These documents may include, but are not limited to, assignments, oaths, declarations, affidavits, and powers of attorney.

3.3     Legal Proceedings. The ASSIGNOR hereby agrees to and will truthfully testify and/or participate in any legal, administrative, and/or quasi-legal proceedings regarding any facts and/or information known to the ASSIGNOR related to the TRANSFERRED RIGHTS at the request of the ASSIGNEE and/or its legal representatives.

3.4     Generally Protect Assignee's Rights. The ASSIGNOR hereby agrees to and will do everything reasonable to help in securing, maintaining, and/or enforcing rights to the TRANSFERRED RIGHTS for the ASSIGNEE.

3.5     No Additional Consideration Required. The ASSIGNOR agrees to and will perform the acts mentioned herein without the requirement of any additional consideration.

CONFIDENTIAL                                                                         Stratesphere-000076

4.      PRIVILEGE

4.1      Assignment of Privilege. The ASSIGNOR hereby assigns to the ASSIGNEE all past, present, and future rights and privileges related to any attorney-client privilege, common-interest privilege, and/or work-product protection of the ASSIGNOR in relation to the TRANSFERRED RIGHTS.

4.2      Prevent Waiver of Privilege. The ASSIGNOR hereby agrees to not engage in any acts resulting in the intentional or unintentional waiver of the attorney-client privilege, work-product protection, and/or common-interest privilege without the express written authorization from the ASSIGNEE and/or its legal representatives.

4.3      Partial Waiver of Privilege. The ASSIGNOR hereby agrees that any partial waiver of the attorney-client privilege, common-interest privilege, and/or work-product protection of the ASSIGNOR does not constitute total waiver.

5.      COVENANTS AND WARRANTIES

5.1      Authority to Convey. The ASSIGNOR hereby covenants and warrants that the ASSIGNOR has the full right and authority to convey the TRANSFERRED RIGHTS assigned by this assignment.

5.2      No Conflicts. The ASSIGNOR hereby covenants and warrants that the ASSIGNOR has not executed, and will not execute, any documents, and has not performed, and will not perform, any acts conflicting with this Assignment.

6.      MISCELLANEOUS

6.1      Issue Registration to Assignee. The ASSIGNOR hereby authorizes and requests that any and all registrations (federal, state, and foreign) concerning the MARK, RELATED MARKS, and/or RELATED MARK CASES issue to the ASSIGNEE, its successors in interest, its assigns, and/or its legal representatives.

6.2      Severability. If any provision of this assignment is ruled invalid and/or unenforceable by a court or other tribunal, such decision shall not affect the validity and/or enforceability of the remaining provisions of this assignment.

6.3      Choice of Law. This assignment shall be interpreted and controlled by the laws of the United States, and in particular in accordance with the laws of the State of Ohio, without reference to the conflict of law principles thereof.  It is further understood that ASSIGNOR consents to the federal and state courts of Ohio located in Franklin County in connection with any dispute arising under the assignment.

6.4      Effective Date. This assignment is hereby made effective as of the EFFECTIVE DATE.

CONFIDENTIAL

Stratesphere-000077

IN WITNESS WHEREOF, this Assignment has been duly executed by the below signed Assignor this 22nd day of August 2018.

ASSIGNOR:

**Kognetics Inc.,**
    a Delaware corporation

By: _____

Name: _____

Its: _____

STATE OF OHIO        :
                                  : ss.

COUNTY OF FRANKLIN    :

The foregoing Service Mark Assignment was acknowledged before me this _____ day of August 2018, by *Inder Thukral, CEO of Kognetics Inc.*, for and on behalf of the corporation.

_____
Notary Public

**ASSIGNEE:**

Assignee hereby accepts the sale, transfer, and assignment of the TRANSFERRED RIGHTS, this 22nd day of August, 2018.

**Kognetics LLC**
    an Ohio Limited Liability Company

By: _____

Name: _____

Its: _____

4

Stratesphere-000078

## EXHIBIT A

| Mark | Application No.<br>Filing Date | Registration No.<br>Registration Date |
|---|---|---|
| KOGNETICS | n/a | n/a |
| KOGNETICS<br>INTELLIGENCE. INSIGHTS. | n/a | n/a |
| | | |
| | | |
| | | |

CO\5913200.2

5

CONFIDENTIAL

Stratesphere-000079

**EXHIBIT D**

**Copyright Assignment**

CONFIDENTIAL

Stratesphere-000080

*Execution Version*

# COPYRIGHT ASSIGNMENT

WHEREAS, Kognetics Inc., a Delaware corporation ("Assignor"), on behalf of itself and any of its owners, wholly owned subsidiaries, affiliates, officers, and employees, is the owner of the following copyrights:

*All copyrights relating to, comprised of, arising out of or connected with, whether in electronic or print form, services rendered by or products supplied by Kognetics Inc. to its clients, customers, third parties, etc., including but not limited to marketing materials, service/products delivered, proposals, collaterals, process know-how, frameworks, practices, procedures, software, formulae, algorithms, etc., at any time from the date of commencement of Kognetics Inc.'s operations until the Effective Date under the Asses Purchase Agreement, dated August 22, 2018, by and among Stratesphere, LLC, Kognetics Inc., Kognetics Holding Company LLC, Kognetics LLC, Inder Thukral and Rajeev Vaid and all previous and subsequent editions of any of the foregoing.*

WHEREAS, Kognetics LLC, an Ohio Limited Liability Company ("Assignee"), is desirous of acquiring said copyrights, and Assignor desires to assign all rights in the copyrights, including the right to register same and to bring suit, collect damages, and pursue all other remedies for past, current, and future infringement, and all goodwill associated said copyrights, to Assignee and its successors and assigns.

NOW, THEREFORE, in consideration of the sum of one dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby assigns to Assignee and its successors and assigns all right, title, and interest worldwide in and to said copyrights, including the right to register same and the right to bring suit, collect damages, and pursue all other remedies for past, current, and future infringement, and all goodwill associated said copyrights.

Signed in Franklin County, Ohio, this 22nd day of August, 2018, to be effective August 22, 2018.

Kognetics Inc.
  a Delaware corporation

By: _____

Name: _____

Its: _____

1

CONFIDENTIAL

STATE OF OHIO )
                    ) SS:
COUNTY OF )

        Before me, a Notary Public in and for said County and State, personally appeared _____, _____ of the Assignor, who acknowledged the execution of the foregoing Assignment, and who, having been duly sworn, stated that all matters referred to therein are true.

        WITNESS my hand and Notarial Seal this_____day of_____, 2018.

My Commission Expires:

_____       _____
                                  Notary Public

My County of Residence:

_____       _____
                                     Printed

2

Stratesphere-000082