**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

STRATESPHERE LLC, *et al.*,

      Plaintiffs-Counterclaim Defendants,

v.

KOGNETICS INC, *et al.*,

      Defendants-Counterclaimants.

Case No. 2:20-cv-2972

Judge Michael H. Watson

Magistrate Judge Chelsey M. Vascura

**DEFENDANTS-COUNTERCLAIMANTS'**
**PARTIAL MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Defendant-Counterclaimants Kognetics, Inc., Inderpreet Thukral, and Rajeev Vaid (collectively, "Kognetics"), hereby move this Court to enter summary judgment in Kognetics' favor on the following claims: (1) Kognetics' breach of contract claim against Kognetics Holding Company ("KHC") (Counts I & IV); (2) Kognetics' declaratory judgment claims against StrateSphere LLC, KHC, and Kognetics LLC (with Tariq Farwana, "StrateSphere" or "Counterclaim Defendants") (Counts III & V); (3) Kognetics' fraudulent inducement claim against Counterclaim Defendants (Count II); and (4) Thukral and Vaid's breach of contract and unjust enrichment/quantum meruit claims against Counterclaim Defendants (Counts I & II, Docs. 45 & 46, respectively). Summary judgment on the foregoing claims effectively moots Counterclaim Defendants' remaining claims against Kognetics, leaving only Kognetics' shareholder claims, tortious interference claims, and copyright infringement claims for trial and Kognetics' damages at a post-trial hearing. The bases and support for the Motion for Partial Summary Judgment are more fully discussed in the attached Memorandum in Support.

Date: May 16, 2022

Respectfully submitted,

 /s/ Shawn J. Organ
Shawn J. Organ (0042052)
  *Trial Attorney*
Kirsten R. Fraser (0093951)
Connor Organ (0097995)
**Organ Law LLP**
1330 Dublin Road
Columbus, Ohio  43215
614.481.0900
614.481.0904 (f)
sjorgan@organlegal.com
kfraser@organlegal.com
corgan@organlegal.com

*Attorneys for Defendants-Counterclaimants*
*Kognetics, Inc., Inderpreet Thukral, and*
*Rajeev Vaid*

## MEMORANDUM IN SUPPORT

There are two case dispositive issues and a third meritless issue before this Court that can be decided as a matter of law. The first issue is whether StrateSphere[1] fraudulently induced Kognetics to enter the Asset Purchase Agreement (the "APA") and the Master Service Agreement (the "MSA"). In exchange for a majority interest in software that Kognetics had developed (the "Software"), StrateSphere provided a 10% ownership interest in StrateSphere LLC to Kognetics. The undisputed evidence shows that in July 2018, just one month before the APA's execution, Farwana directly represented to Kognetics that StrateSphere LLC was worth $30 million to $50 million—setting Kognetics' 10% interest at $3 to $5 million. Farwana lied to induce Kognetics to part with its Software.

The facts and evidence reflect that in June 2018, Farwana and StrateSphere co-founder Damon Caiazza—without holding a member meeting—approved a self-dealing repurchase of 10% of StrateSphere LLC's outstanding shares from Farwana's family trust (the "Farwana Trust"), setting the value of the company at $50 million and that 10% interest at $5 million. Farwana and Caiazza set this $50 million value without the substantiation of a formal valuation, and thus this value is unsupported by StrateSphere LLC's books and records. Even Farwana admits it is pure fiction. That this valuation was fraudulent is bolstered by StrateSphere having repurchased a different member's 3% interest in late-2018 for only $100,000. In that stock repurchase transaction, StrateSphere LLC valued itself at a mere $2,821,330—reducing its earlier valuation by more than $47 million. And, this December valuation was *after* StrateSphere had acquired the interest in the Kognetics Software and all of Kognetics' clients. By drastically

---

[1] "StrateSphere" refers collectively to Plaintiff/Counterclaim Defendants StrateSphere LLC, Kognetics Holding Company LLC ("KHC LLC"), and Kognetics LLC ("KLLC"), as well as Tariq Farwana. The individual entities are referred to as needed.

overstating its own value in July, StrateSphere fraudulently induced Kognetics to enter the APA and to transfer its highly valuable Software to StrateSphere.

Separate from StrateSphere's fraud—there is another issue: whether, under the First Breach Doctrine, the APA, MSA, and employment contracts of Kognetics founders Thukral and Vaid were voided by StrateSphere breaching each of the contracts from the very beginning. Regarding the APA, StrateSphere committed the first breach when it failed to make timely and sufficient capital contributions to Kognetics LLC in the months immediately following the APA's execution, and when it failed to make the very first $50,000 royalty payment due to Kognetics in January 2019.  In fact, there is no legitimate dispute that StrateSphere has never made a single royalty payment to Kognetics, or that StrateSphere now owes Kognetics $300,000 in royalties.  As for the MSA, StrateSphere likewise committed a separate first breach when they underpaid Kognetics by more than $539,000 in operating expenses and $295,000 in reimbursements.  That StrateSphere owes money under the MSA is also not legitimately disputed, as again, StrateSphere admits that it did not pay invoices under the MSA in full. Finally, StrateSphere committed the first breach of both Thukral and Vaid's employment agreements, when it failed to pay each approximately $25,000 owed under those agreements. Each of these breaches renders the respective APA, MSA, and employment agreements unenforceable, and, in particular, makes the non-competition provisions contained within the APA and employment agreements unenforceable.

Contrary to StrateSphere's efforts to cast themselves as victims of rogue employees who sought to "compete" with StrateSphere in violation of the APA, this lawsuit and all related problems are of StrateSphere's own creation, as StrateSphere violated every agreement it entered with Counterclaim Plaintiffs.  The problem with the APA and how the facts played out is that

StrateSphere received the Software in exchange for StrateSphere's **_future_** promises: (1) to provide membership interests; (2) to make capital contributions to KLLC to grow the new partnership's business; (3) to make royalty payments to Kognetics; (4) to compensate Thukral and Vaid under employment agreements; and, (5) to pay Counterclaim Plaintiffs to continue to manage and update the Software under the MSA, because StrateSphere did not have the employees who could operate or maintain the Software.

But, at best, StrateSphere could not afford to pay the promises it made, or at worst, never intended to live up to its obligations. What is undisputed (and evidenced in StrateSphere's books and records) is the following:

- StrateSphere misrepresented it was worth $30 to $50 million;

- Kognetics executed a Bill of Sale at closing, giving StrateSphere legal possession and control of the Software;

- StrateSphere recognized revenue associated with the Software in KLLC's books immediately following the APA's close;

- StrateSphere consistently underfunded KLLC from the start in spite of its obligations under the APA;

- StrateSphere did not make royalty payments to Kognetics; and,

- StrateSphere never paid an invoice to Kognetics in full under the MSA;

- StrateSphere did not pay Vaid and Thukral their full salaries in 2020.

Each of these events predate any of StrateSphere's allegation that Kognetics "competed"—and that alone is telling. After the APA closed, StrateSphere was Kognetics' sole source of revenue. Rather than being Kognetics' saving grace, however, StrateSphere unilaterally breached the APA, the MSA, and the Employment Agreements as a means to choke off Kognetics' life line and with it, Kognetics' ability to pay its employees, vendors, and creditors, including the Indian government. Consequently, Kognetics never sought to "compete"

with StrateSphere, rather Kognetics told clients to start paying them directly for the services they were providing to the clients. This nuclear-option circumvention was not "competition"; it was self-help to mitigate the damage StrateSphere inflicted by failing to pay its undisputed debts to Kognetics.

Despite StrateSphere's clear failings under the APA, MSA, and employment agreements, StrateSphere had the temerity to run to the Franklin County Common Pleas Court and claim to be the "victim" of its own (underpaid) employees who were improperly "competing". Then in late 2021, after discovery showed there was nothing to StrateSphere's case, StrateSphere injected a Hail Mary theory into the case. Without evidence, or even a good faith basis to make this assertion, StrateSphere claimed Kognetics had improperly copied the Software and used the Software to create a new, competing piece of software. StrateSphere has essentially abandoned this claim, making it ripe for summary judgment.

In the end, each of StrateSphere's theories of this case relate to after-the-fact issues that arose in 2020 or later. Due to StrateSphere's conduct in 2018 and 2019, namely StrateSphere's fraudulent inducement, and first breaches, however, StrateSphere's claims are all moot. Put simply, this entire case boils down to two issues.

The first issue is whether StrateSphere fraudulently induced Kognetics to enter the APA, MSA, or employment agreements. If so, Kognetics has a choice of remedies. It can void those agreements and receive damages suffered because of StrateSphere's deceptive behavior, as well as punitive damages and litigation costs. Alternatively, Kognetics can chose to not void the contracts, but seek damages for the fraud. For purposes of this Motion and (if necessary) the upcoming bench trial on liability, Kognetics simply seeks summary judgment as to

StateSphere's liability for the fraudulent inducement. By agreement of the Parties and this Court, damages will be determined in a separate hearing.

The second issue, is whether StateSphere first breached the APA, MSA, and Employment Agreements, thus voiding Kognetics, Thukral, and Vaid's obligations under the respective agreements.

Lastly, Kognetics, Thukral, and Vaid are also entitled to summary judgment regarding StateSphere's First Supplemental Complaint, because StateSphere had no basis for bringing the Supplement, and there are no facts that support the claims made in the First Supplemental Complaint.

Regardless of which theory applies, Kognetics, Thukral, and Vaid are entitled to summary judgment on their claims against StateSphere, and dismissal of StateSphere's claims against them, leaving only Kognetics' shareholder claims, tortious interference claims, and copyright infringement claims for trial.

## BACKGROUND

**A.      StateSphere Takes an Interest in the Kognetics Software.**

For nearly a decade, Thukral and Vaid led Kognetics as it designed and built the Software, which uses artificial and augmented intelligence to analyze merger, acquisition, and investment opportunities for businesses, analysts, and others in the financial-services sector. (Ex. A, Decl. of I. Thukral, Aug. 12, 2021, ¶ 2). The Software is essentially a living-industry taxonomy with a database that requires daily data inputs and human adjustments so that the information in the Software is updated and valuable to its users. (*Id.* at ¶ 4). The Software is similar to a program like Westlaw. New cases, articles, and other materials must be uploaded to the database daily so that Westlaw remains up to date. (*Id.*). Further, the data fed into Westlaw

must be analyzed, tagged, processed, and checked for accuracy (in other words, curated) before its customers can properly use the technology. (*Id*.). It is the same with the Software. The Software requires daily updates through human curation to stay competitive and useful. The Software was marketed to clients through Thukral and Vaid's company, Kognetics. (*Id*. at ¶ 5).

StrateSphere first worked with Boston Analytics—the consulting division of Pythhos Technology Pvt Ltd. and sister company to Kognetics, Inc.—in 2017 on a consulting engagement. (Ex. B, Decl. of R. Vaid, March 23, 2022, at ¶ 2). By late 2017 and into early 2018, the two companies started discussing a partnership which would combine the Software's capabilities with StrateSphere's business opportunities in the Middle East. (30(b)(6) Dep. of D. Caiazza (Doc. 123-3) at 26:20–24, Feb. 18, 2022, "30(b)(6) Caiazza Dep.").

**B.      StrateSphere Artificially Inflates Its Value Through a Self-Dealing Transaction To Induce Acceptance of the APA and MSA.**

StrateSphere, by its own admission, has never had a formal business valuation. (30(b)(6) Dep. of T. Farwana (Doc. 123-2) at 94:18–20, Feb. 24, 2022, "30(b)(6) Farwana Dep."). Under StrateSphere's 2016 Amended and Restated Operating Agreement, StrateSphere's members decided to simply "agree" that the company was worth $15 million in 2016. (Ex. C at 4, StrateSphere Operating Agreement (Doc. 123-5), § 4.1(g)(ii)). In substantiation of that valuation, StrateSphere issued 224 Class A Shares to a new member, Edwin Eisendrath, at a "fair market value" of $111.40 per share, so that the newly issued shares were cumulatively worth $24,954.16. (Ex. D, February 13, 2016 Restricted Share Grant Agreement). That valuation remained the same for over two years.

Two years later, on June 28, 2018, while Kognetics and StrateSphere were negotiating the Asset Purchase Agreement, StrateSphere "determined" that StrateSphere was now worth $50 million. (Ex. E at 1, June 28, 2018 Written Actions Without a Meeting). In other words,

overnight and without holding a meeting of the Board of Managers or the Members, StrateSphere declared that it had more than tripled in value. (*See id.*). Even more, StrateSphere authorized the repurchase of 10% of StrateSphere's shares from the majority member, the Farwana Trust. StrateSphere was authorized to pay the Farwana Trust with a $5 million promissory note bearing 12% interest, in exchange for the 10% interest in StrateSphere, which was worth exactly $1,500,000 just days earlier. (*See id.*).

The $50 million valuation in mid-2018 was untethered to reality. By StrateSphere's own admission, the $50 million valuation was not based on StrateSphere's revenue, EBITDA, or comparable businesses. (30(b)(6) Farwana Dep. at 96:10–97:2). Even worse, just months later, in December 2018, StrateSphere entered into a separate, subsequent share repurchase in which Farwana represented that the company's value ranged from $1,410,556 to $2,821,330. (Ex. F, T. Farwana Email to A. Saxena). Specifically, when former employee Atul Saxena sought to sell his 3.5447% interest in StrateSphere back to the company, Farwana—without Kognetics' input—told Saxena, "Based on the company's liquidity and risks associated with recent events in KSA, we are prepared to offer you $50,000 to $100,000 for your shares in StrateSphere." (*Id.*). Using Farwana's December valuation, the Farwana Trust shares were worth, at best, $282,133— a $1,467,867 difference from the mid-2018 valuation. And Farwana testified that even he does not take the $50 million valuation of StrateSphere seriously, because he values his family's majority stake in StrateSphere at "a million dollars, $2 million"—which again sets the total value of StrateSphere LLC nowhere near the $50 million valuation artificially assigned to StrateSphere in June 2018. (30(b)(6) Farwana Dep. at 112:6–15).

Yet, throughout the negotiation with Thukral and Vaid regarding the Kognetics Software, StrateSphere, through Farwana, represented to Thukral and Vaid that StrateSphere was in fact

7

worth $30 to $50 million. (Vaid Decl. at ¶ 9). Farwana made that representation to Thukral and Vaid on a whiteboard during negotiations in July 2018. (Ex. G, Photo of Whiteboard; Vaid Decl. at ¶¶ 8–11). The whiteboard shows that Farwana knew that Thukral and Vaid valued the Software's business at approximately $12 million (based on Kognetics' approximately $2 million in revenues times a valuation multiplier of 6). (Vaid Decl. at ¶¶ 8–11). Farwana sought to purchase an 80% stake in the Kognetics business, meaning Farwana needed to come up with a package worth $9.6 million to pay the price Thukral and Vaid sought. (*Id.*). Farwana told Thukral and Vaid that a 10% stake in StrateSphere was worth $3 to $5 million—the bulk of the purchase price. (*Id.*). For the remainder, Farwana added capital contributions, royalty payments, and fundraising assistance as sweeteners for the cash-strapped Kognetics. Based on these conditions, it appeared StrateSphere had created a bundle of overstated stock and future promises to pay for the Software's $9.6 million price tag.

Farwana knew, however, that the $50 million valuation was fictional, and was nothing more than a number he had reverse-engineered specifically to induce the sale. (30(b)(6) Farwana Dep. at 95:10–96:9). On August 22, 2018, Vaid and Thukral entered into the APA in reliance on the understanding that they were selling their Software in exchange for shares worth $5 million, and other consideration. (Vaid Decl. at ¶ 13).

## C.    The Terms of the APA.

Under the APA, the StrateSphere Companies defined the "Purchase Price" of the Software as the sum of (a) "Class A membership units" of StrateSphere "equal to ten percent (10%) of the issued and outstanding membership units to [Kognetics]"; and (b) "125,000 Class B voting membership units" of KLLC (a newly created entity to house the Software's receivables). (Ex. H at 3, APA, § 1.05). Moreover, under the APA, KHC (a newly created entity to hold the

Software's IP) agreed to pay Kognetics an annual royalty of $100,000, "which amount shall be paid in equal bi-annual installments on or about January 31st and July 31st of each year." (*Id.* at 4, § 1.08). Those royalty payments were subject to increase based on revenue targets for a given year. (*Id.*). Finally, § 1.10 of the APA (titled "StrateSphere Funding Requirements") obligated StrateSphere to make capital contributions to KHC or "secure new customer contracts" for the first year following closing totaling $1 million, made in monthly, relatively equal installments. (*Id.* at 6, § 1.10). StrateSphere was also obligated to assist and support KHC in raising equity or debt capital of up to $20 million during the five years after close. (*Id.* at 6, § 1.10(b)).

**D.      The Terms of the MSA.**

Under the MSA, Kognetics agreed to service the Software through research and analysis work, building industry maps, creating analytics, and other ad hoc projects. (Ex. I, MSA at Annex. A). This included Kognetics providing the "development, production and creation of Deliverables and other related services as requested by [StrateSphere] from time to time pursuant to the mutually agreed SOW." (*Id.* at §1.1.5).

The fees were set at a maximum of $2.5 million per annum, based on resources used. (*Id.* at 11, Annex. A). Payments were due monthly, and overdue invoices accrued at an interest rate of 18% per annum. (*Id.* at ¶ 7). Under the MSA, KHC was responsible for "all taxes." (*Id.*). Last, all intellectual property rights in the deliverables, including updates to the Software, were to be owned by KHC, "subject to payment of charges, fees, and costs . . . in full." (*Id.* at ¶ 10.1). Consequently, any Deliverables, as well as Software enhancements, upgrades, or modifications are owned by StrateSphere, unless StrateSphere failed to pay. Which is precisely what happened.

9

### E.    StrateSphere Immediately Breaches the APA and MSA.

After executing the APA and MSA on August 22, 2018, Kognetics immediately complied with the APA and the MSA.  Kognetics conveyed to the StrateSphere Companies a Bill of Sale transferring all defined assets from Kognetics to the StrateSphere companies.  (Ex. I, APA at 66–69).  Kognetics also gave StrateSphere the legal possession and control of the Software—a right that StrateSphere demonstrated conclusively when it exercised in April 2020 the power to unilaterally shut down the Software, including customer access to the Software.  (Vaid Decl. at ¶¶ 17, 25, 27).  Monthly subscription revenue for the Software was booked in KLLC's account. (*Id.* at ¶ 18).  And Kognetics continued to maintain and update the Software, as well as perform additional tasks for StrateSphere as required under the MSA.  (*Id.* at ¶¶ 18–20).

Despite performing its obligations, in the first month after StrateSphere and Kognetics closed on the APA, September 2018, StrateSphere failed to make the first capital contribution it owed under the APA.  (*Id.* at ¶ 21).  Indeed, through 2018 and 2019, StrateSphere repeatedly underpaid the promised capital contributions, and failed to raise any equity or debt capital as contractually obligated.  (*Id.* at ¶ 22).  StrateSphere's failure is captured in an email Caiazza sent to Farwana telling Farwana that StrateSphere owed $296,111 to Kognetics LLC to be in compliance with the APA and MSA.  (Ex. J, Email from D. Caiazza to T. Farwana (Doc. 123-6), Dec. 31, 2018.)  The debt has only grown since then.  Likewise, StrateSphere failed to make the required royalty payments to Kognetics, which, to date, total $300,000 in missed payments. (Thukral Decl. at ¶ 21).  StrateSphere's own financial documents acknowledge these debts to Kognetics.  Specifically, KHC's October 31, 2019 Balance Sheet shows a royalty obligation to Kognetics of $400,000.  (Ex. K, KHC Balance Sheet as of Oct. 31, 2019 (Doc. 123-7)).  By October 31, 2019, that liability should have been reduced by $100,000, if the royalties had been paid, but it was not.  Further, in a document signed by Farwana, the StrateSphere Companies

agreed that Kognetics, Inc. was owed "$100,000 for Royalty Year 2019 and $50,000 as of January 31, 2020." (Ex. L, Omnibus Restructuring Agreement (Doc. 123-8)).

Just as it failed to make good on any of its promises under the APA, StrateSphere likewise consistently underpaid Kognetics under the MSA by more than $539,000 in services and $295,000 in reimbursable costs. (Thukral Decl. at ¶ 22). Moreover, it is undisputed that StrateSphere owes these exact amounts to Kognetics, as StrateSphere and Kognetics worked together in December 2019 to reconcile precisely what StrateSphere owed. (*Id.*). In this reconciliation, StrateSphere extensively reviewed the supporting documentation for Kognetics' invoices to StrateSphere. (*Id.*). Despite knowing exactly how much it owes Kognetics, StrateSphere still—nearly two and a half years later—has not paid Kognetics for the services that were indisputably provided to StrateSphere. (Vaid Decl. at ¶ 21).

Likewise, StrateSphere underpaid Thukral and Vaid by approximately $25,000 each in 2020 under the Employment Agreements. StrateSphere's General Ledger shows that it only paid Thukral and Vaid $10,000 each in 2020, even though they should have each been paid $35,000 for the months that they were StrateSphere employees. (Ex. M, StrateSphere Ledger 2021 (Doc. 123-9)).

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with

significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347.

The Court is not obliged to *sua sponte* search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute." *Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 741 (6th Cir. 2012) (quotation omitted). If the nonmoving party fails to make the necessary showing for an element upon which it bears the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

Granting summary judgment depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ARGUMENT

### A.    The StrateSphere Companies Fraudulently Induced Kognetics to Enter the APA and MSA.

The first issue before the Court is whether the StrateSphere Companies fraudulently induced Kognetics to enter the APA and MSA by misrepresenting the value of the equity Kognetics would receive in exchange for the Software. The straightforward facts before the

12

Court are essentially a hornbook example of fraudulent inducement. And the material facts are summed up in a photo from a July 2018 meeting between Farwana, Thukral, and Vaid.



Farwana acknowledges that his handwriting is in the upper left corner of this photo. (Dep. of T. Farwana (Doc. 123-1), Feb. 25, 2022 at 55:8–56:3). The photo clearly shows Farwana's deceit. His handwriting shows that the price of the Kognetics business was $9.6 million (in orange), and that he represented 10% of StrateSphere was worth $3 to $5 million—the bulk of the consideration for the Software. Farwana knew that the $50 million valuation was pure fiction, yet made that representation to Kognetics for the express purpose of obtaining the Software. (30(b)(6) Farwana Dep. at 95:10–97:2). Kognetics relied on Farwana's representation, and sold the Software to StrateSphere to their detriment. (Vaid Decl. at ¶ 13).

Under Ohio law, a fraudulent inducement claim requires showing that: (1) the defendant made a representation; (2) the representation was material to the transaction; (3) the defendant made the representation either knowing it was false or with such utter disregard for the truth or falsity that one may infer that it was knowingly false; (4) the defendant intended to mislead the

13

plaintiff into relying on the representation; (5) the plaintiff justifiably relied on the defendant's

representation; and (6) the plaintiff's reliance on the defendant's representation proximately

cause the plaintiff's injury. *Volbers-Klarich v. Middletown Mgmt, Inc.*, 125 Ohio St.3d 494, 501,

2010-Ohio-2057, 929 N.E.3d 434, ¶ 27. The indisputable facts establish each of these elements.

As such, summary judgment should be entered in Kognetics' favor, and against StrateSphere.

### 1. StrateSphere's Claimed Value of $50 Million Was Admittedly False and Made to Induce Assent to the APA.

*So when we were doing the Kognetics transaction, they presented to us what the value of their software was somewhere in the 4.8 million size. They thought it was a fair $5 million value. We were going to give 10 percent of the company. That's what—how that valuation ended up to be used.*

—30(b)(6) Farwana Dep. at 95:13-19

StrateSphere intentionally misrepresented its value to induce the sale of the Software.

"A classic claim of fraudulent inducement asserts that a misrepresentation of facts outside the

contract or other wrongful conduct induced a party to enter into the contract. Examples include a

party to a release misrepresenting the economic value of the released claim ... ." *Rui He v. Rom*,

751 F. App'x 664, 671 (6th Cir. 2018) (affirming a finding of fraudulent inducement where the

economic value of investments and services sold had been misrepresented) (citing *ABM Farms,*

*Inc. v. Woods*, 1998-Ohio-612, 81 Ohio St. 3d 498, 503, 692 N.E.2d 574, 578). This case

presents that classic claim.

StrateSphere claimed that it was worth $50 million making a 10% stake in the company

worth $5 million. There is no legitimate dispute that StrateSphere made this representation—it

did so in whiteboard handwriting captured in the photograph above in July 2018. Farwana and

Caiazza used this same number in their June 28, 2018 declaration that the value of StrateSphere

had more than tripled overnight to $50 million, so that Farwana could enrich himself by

$5 million. (Ex. N, June 29, 2019 Written Actions Without a Meeting of the Members).

14

Nor is there a genuine dispute that StrateSphere was never actually worth $50 million. Farwana, on behalf of StrateSphere, disclaimed the $50 million value repeatedly in his deposition.  (30(b)(6) Farwana Dep. at 95:10–97:2; 102:3–13; 105:6–106:16).  And when Farwana made an offer to repurchase Saxena's StrateSphere shares in late-2018, he valued the company at $1.4 to $2.8 million.  Notably, there had not been any events that would have significantly devalued StrateSphere in the intervening months between the APA in August 2018 and the Saxena repurchase in December 2018.

Last, the whiteboard photograph makes clear that Farwana not only misrepresented StrateSphere's value, but he used that misrepresentation to convince Kognetics, Thukral and Vaid that the package he was offering met their price of $9.6 million for 80% of the Kognetics business.  (Vaid Decl. at ¶ 11).  Farwana testified that he knew a $5 million valuation of StrateSphere was critical to sealing the deal, stating, "the value of [the Software] in the eye of the beholder was five million . . . we took the approach that we'll take [the Software], we have 10 percent available here . . . so that gives you whatever parameter you want to satisfy for yourself." (30(b)(6) Farwana Dep. at 102:9–18).  In other words, Farwana knew that a $50 million company value would make a 10% stake in the company equal to the value Kognetics had put on the Software, and that value was needed to seal the deal.

At bottom, the $50 million valuation was self-serving for Farwana (it enriched him by $5 million, and bought him the Software) but it was a lie.  Farwana knew it was a lie, but he told it anyway to get the Software.  As such, the first, third, and fourth elements for fraudulent inducement have been met.

2.      **The $50 Million Valuation of StrateSphere Was Material to the APA and was Justifiably Relied Upon.**

Kognetics, Thukral, and Vaid justifiably relied upon StrateSphere and Farwana's false representation as to the value of the 10% interest in StrateSphere—which was a material misrepresentation.  StrateSphere's misrepresentations to Kognetics about the overinflated value of StrateSphere and the overinflated value that Kognetics would receive in exchange for the Software was material, as the 10% interest in StrateSphere represented the lion's share of the benefit of the bargain that Kognetics expected from the APA and MSA.  As noted above, the Software and its attendant business was valued at approximately $12 million, making an 80% share in that business worth $9.6 million.  The promised $5 million equity interest in StrateSphere made up over half of that payment.  Simply put, if StrateSphere had not agreed to issue Kognetics what it represented was $5,000,000 in equity as part of the payment under the APA, Kognetics would not have entered the APA.  (Vaid Decl. at ¶ 11).

Kognetics, Thukral, and Vaid justifiably relied on StrateSphere's material misrepresentation.  Reliance is justifiable when the representation "does not appear unreasonable on its face" and "if under the circumstances . . . there is no apparent reason to doubt the veracity of the representation."  *Lepera v. Fuson*, 83 Ohio App. 3d 17, 26, 613 N.E.2d 1060, 1065 (1992).  Accordingly, to determine whether reliance was justifiable, the Court "must inquire into the relationship between the parties" as well as the "surrounding circumstances."  *Id.*

There are many layers to the relationship between StrateSphere and Kognetics, as well as the attendant circumstances to the APA's negotiation that supports Kognetics justifiably relying on StrateSphere's representations regarding its value.  First, the $50 million valuation appeared reasonable based on the information available to Thukral and Vaid at the time.  StrateSphere advertised a long history of successful projects including partnering with defense contractors to

16

develop economic development projects within Saudi Arabia, had invested in entrepreneur educational software, in BMX track construction (including constructing a track for the Olympic games in Brazil), and other projects. (Vaid Decl. ¶ 5; https://web.archive.org/web/2017053108 3518/http://www.StrateSphere.com/company). By 2018, when negotiations between StrateSphere and Kognetics had become serious, StrateSphere had been in business for approximately twelve years, and thus appeared to have a track history of success. (*Id.*).

Second, StrateSphere and Kognetics had had a productive working relationship leading up to the APA negotiations. (Caiazza 30(b)(6) Dep. at 26:1–7). As early as August 2017, StrateSphere and Kognetics' sister company Boston Analytics had negotiated a joint venture agreement to pursue business in Saudi Arabia together. (*Id.* at 27:11–28:4). Accordingly, trust had been built between the two organizations. (Vaid Decl. at ¶ 5).

Third, StrateSphere was the purchaser, while Kognetics was the seller. Under the non-binding term sheet entered in March 2018, StrateSphere had the right to conduct legal and financial due diligence regarding "all aspects of the Kognetics business." (Ex. O, Non-Binding Term Sheet, Mar. 30, 2018 at 2). Kognetics was not granted the reciprocal right to review StrateSphere's financials. Thus, Kognetics did not have any outside source of information to confirm StrateSphere's representations, other than the word of Farwana and Caiazza—the two perpetrators of the inside deal that artificially set StrateSphere's value at $50 million.

Last, Kognetics was not represented by counsel while StrateSphere was represented by the reputable law firm, Ice Miller, and its former managing partner Richard Barnhart. (Vaid Decl. at ¶ 15). Barnhart also served on StrateSphere's advisory board. (*Id.*). As such,

Kognetics, Thukral, and Vaid trusted that the deal being put together by Ice Miller was on the up and up, given Barnhart's reputation and insights into StrateSphere's business.  (*Id.*).[2]

Given the relationship between the parties and the surrounding circumstances, reliance on StrateSphere's material representations regarding its value was justifiable.  Accordingly, based on the undisputed facts, the second and fifth elements of fraudulent inducement are met.

### 3.  Kognetics' Relied on StrateSphere's Lie to Its Detriment.

Undoubtedly, Kognetics has been harmed by entering into the APA and the MSA. Kognetics transferred ownership, custody, and control of the Software to StrateSphere, only to then be underpaid under the APA and MSA, resulting in extreme financial hardship.  (Vaid Decl. at ¶¶ 21–23).  Even more, Kognetics watched as StrateSphere took the Software, comprised of years of work and millions of dollars of investment, and drove it into the ground.  (*Id.* at ¶¶ 29–30).  Finally, Kognetics, Thukral, and Vaid have been deprived of the opportunity to compete in the marketplace due to the noncompetition clause in the APA, which has improperly deprived them of revenue for years.  (*Id.*).

For the reasons above, StrateSphere fraudulently induced Kognetics to execute the APA and MSA, which resulted in StrateSphere owning, controlling, and taking custody of the Software to Kognetics' detriment.  Thus, Kognetics has the option to void the APA and MSA and receive damages that Kognetics suffered because of StrateSphere's deceptive behavior, as well as punitive damages and litigation costs.

---

[2]    Unfortunately, what Kognetics did not know was that Barnhart was the holder of a mortgage issued by an entity related to Farwana secured by property in Florida that was not released until March 2020, and thus was not independent or without bias.  (Exs. P & Q)

**B.      Alternatively, Under the "First Breach" Doctrine, the StrateSphere Companies Breached the APA and MSA.**

Even if the StrateSphere Companies did not fraudulently induce Kognetics into entering the APA and MSA, Kognetics is still entitled to the damages it suffered because of StrateSphere's material breaches of those contracts.  Further, StrateSphere's material breaches of these agreements void the noncompetition provisions contained in those agreements.

Ohio law relieves a party of liability for its breach of a contract if the other party materially breaches the contract first.  *Constellation NewEnergy, Inc. v. Carborundum Grinding Wheel Co.*, No. 2:15-cv-2880, 2017 WL 1021365, at *2 (S.D. Ohio 2017) (citation omitted).  "A 'material breach of contract' is a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform."  *Id.* (additional citation omitted).

**1.      Kognetics Performed Its Obligations Under the APA and MSA, Including the Immediate Execution of a Bill of Sale That Gave Ownership, Custody, and Control of the Software to the StrateSphere Companies.**

Pursuant to the APA and MSA, Kognetics executed a Bill of Sale for the Software to the StrateSphere Companies on the day of closing, August 22, 2018.  In doing so, Kognetics gave the StrateSphere Companies ownership, custody, and control of the Software.  Kognetics then continued to update, service, and sell the Software, as required by the MSA.  Thus, Kognetics fulfilled its contractual obligations under the APA and MSA.

### 2. The StrateSphere Companies Committed the First Material Breaches of the APA and MSA.

*Q. Invoices were submitted yes? A. Yes. Q. They were not paid in full? A. They were not paid in full.*

> –Farwana 30(b)(6) Dep. 148:15–19

Although Kognetics had performed all of its obligations under the APA and MSA, the StrateSphere Companies committed the first material breaches of the APA and MSA just weeks after the companies had closed on those agreements when the StrateSphere Companies failed to make the required capital contributions under the APA, and then did not pay a single MSA invoice in full. The StrateSphere Companies' own documents reflect these initial breaches. (Exs. K, L, M). *See supra* at 10–11.

Specifically, the evidence shows Caiazza told Farwana that StrateSphere owed $296,111 to Kognetics LLC to be in compliance with the APA and MSA in ***December 2018***. (*See* Ex. J). Likewise, StrateSphere failed to make the required royalty payments to Kognetics, which, to date, total $300,000 in missed payments. (Thukral Decl. at ¶ 21). StrateSphere's own financial documents acknowledge these debts to Kognetics. (Ex. K). Farwana himself acknowledged that Kognetics, Inc. was owed "$100,000 for Royalty Year 2019 and $50,000 as of January 31, 2020." (Ex. L).

Just as it failed to make good on any of its promises under the APA, StrateSphere likewise consistently underpaid Kognetics under the MSA by more than $539,000 in services and $295,000 in reimbursable costs. (Thukral Decl. at ¶ 22). Moreover, it is undisputed that StrateSphere owes these exact amounts to Kognetics, as StrateSphere and Kognetics worked together in December 2019 to reconcile precisely what StrateSphere owed. (*Id.*). In this reconciliation, StrateSphere extensively reviewed the supporting documentation for Kognetics' invoices to StrateSphere. (*Id.*). Despite knowing exactly how much it owes Kognetics,

StrateSphere still—nearly two and a half years later—has not paid Kognetics for the services that were indisputably provided to StrateSphere. (Vaid Decl. at ¶ 21).

## C.     StrateSphere Breached the Employment Agreements of Thukral and Vaid.

Similar to StrateSphere's material breaches of the APA and MSA, StrateSphere also breached the Employment Agreements that it entered with Thukral and Vaid. In particular, while StrateSphere was breaching the APA and MSA, StrateSphere also attempted to poach employees of the company that Kognetics used to help maintain, update, and service the Software under the MSA, knowing that those employees were subject to non-compete agreements and that taking those employees would substantially disrupt Kognetics' ability to continue to provide services under the MSA. (Vaid Decl. at ¶¶ 28–30). When Thukral and Vaid objected to StrateSphere's behavior, StrateSphere retaliated by reducing their salaries, failing to pay approximately $25,000 to both Thukral and Vaid, and then unilaterally terminating their Employment Agreements without basis.

## D.     Kognetics Owns All Enhancements and Upgrades to the Software, Rendering StrateSphere's First Supplement to the Second Amended Complaint Meritless.

In StrateSphere's First Supplement to its Second Amended Complaint StrateSphere added or modified seven of its claims in its Second Amended Complaint, including: (1) Count I, Breach of the APA; (2) Count II, Breach of the Operating Agreement; (3) Count IV, Breach of Employment Contract against Thukral; (4) Count V, Breach of Employment Contract against Rajeev Vaid; (5) Count VIII, Conversion; (6) Count IX, Declaratory Judgment regarding retention of "the Assets or Software following closing" on the APA; (7) Count XII, Misappropriation of Trade Secrets. These claims are based on StrateSphere's allegations that "[u]pon information and belief, following the termination of the MSA, Defendants improperly retained a copy of the Software (and/or other Assets), and that "[u]pon information and belief,

21

[Kognetics] used that information and/or otherwise used Plaintiffs' Software (and/or other Assets) to create, in whole or in part, their supposedly new software and/or artificial intelligence platform." (First Supplement to Their Second Amended Complaint, "the Supplement" (Doc. 79), filed Nov. 4, 2021).

As to StrateSphere's first claim that Kognetics "improperly retained a copy of the Software," this claim is false as a matter of law. Following the execution of the APA, Kognetics had the specific right to retain/use the Software according to the MSA. Specifically, under the terms of the MSA, Kognetics agreed to provide StrateSphere with certain services, including custom software development, support, and other services related to the Artificial Intelligence Platform. (*See* Ex. I at the first Whereas clause; *id.* § 1.1.5 (defining "Services")). That means that StrateSphere agreed that Kognetics would have the Software and would provide "development, support, and other related services" related to the Software—a contractual obligation and fact known by all.

Further, under the terms of the MSA, Kognetics was to provide services as set out in Annexure A. (*Id.* at § 2.) StrateSphere was then obligated to pay Kognetics for its services. (*Id.* at § 7.) So long as Kognetics was paid in full, StrateSphere would receive all intellectual property rights in the deliverables created by Kognetics under the MSA. (*Id.* at § 10.1.) If Kognetics was not paid, however, then Kognetics would retain the intellectual property rights in the deliverables created by the MSA. (*Id.*) Importantly, the MSA explicitly states that it "forms the complete and exclusive agreement between the Parties in relation to the Services. All previous agreements, correspondence, and understandings related to the subject of this Agreement are superseded by this Agreement . . . ." (*Id.* at § 12.2).

Therefore, the MSA controls whether Kognetics has a right to possess the Software, and clearly it does, as it is undisputed that StrateSphere has not made full payments under the MSA. (Farwana 30(b)(6) Dep. 148:15–19).  Thus, it is incorrect to allege that Kognetics has no right to possess the Software, and summary judgment must be entered in Kognetics', Thukral's and Vaid's favor on all supplemental claims.

## CONCLUSION

For these reasons above, Thukral and Vaid are entitled to summary judgment on their unjust enrichment claims against the StrateSphere Companies.  Moreover, Kognetics is entitled to summary judgment on its fraudulent inducement claim against the StrateSphere Companies. Alternatively, if the Court does not enter summary judgment on the fraudulent inducement claim and finds that the APA and MSA are valid, then Kognetics is entitled to summary judgment on its breach of contract claims.  Finally, Kognetics, Vaid, and Thukral are entitled to summary judgment on StrateSphere's First Supplement to the Second Amended Complaint.

Date: May 16, 2022

Respectfully submitted,

 /s/ Shawn J. Organ
Shawn J. Organ (0042052)
   *Trial Attorney*
Kirsten R. Fraser (0093951)
Connor A. Organ (0097995)
**Organ Law LLP**
1330 Dublin Road
Columbus, Ohio  43215
614.481.0900
614.481.0904 (f)
sjorgan@organlegal.com
kfraser@organlegal.com
corgan@organlegal.com

*Attorneys for Defendants-Counterclaimants Kognetics, Inc., Inderpreet Thukral, and Rajeev Vaid.*

23

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 16, 2022, the foregoing was electronically

filed with the Clerk of Court using the CM/ECF system and was served on all counsel of record.


 /s/ Shawn J. Organ
*Attorney for Defendants-Counterclaimants*
*Kognetics Inc., Inderpreet Thukral, and*
*Rajeev Vaid*