## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

STRATESPHERE LLC, *et al.*,

      Plaintiffs / Counterclaim Defendants,

v.

KOGNETICS INC, *et al*.,

      Defendants / Counterclaim Plaintiffs.

Case No. 2:20-cv-2972

Judge Michael H. Watson

Magistrate Judge Chelsey M. Vascura

## DEFENDANTS/COUNTERCLAIM PLAINTIFFS' BRIEF IN OPPOSITION TO PLAINTIFFS/COUNTERCLAIM DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.    INTRODUCTION

There are eleven claims and fifteen counterclaims in this dispute.  They all arise out of Counterclaim Defendants StrateSphere LLC, Kognetics Holding Company LLC, and Kognetics LLC's (collectively, "StrateSphere") desire to own the Kognetics Software (the "Software") and attendant licensing deals.  This dispute's resolution, then, is actually very straightforward despite the myriad of claims and allegations.  The primary issue before the Court is whether the fraudulently induced deal precludes StrateSphere's claims in its Partial Motion for Summary Judgment ("Mot."), including: whether the Software was ever delivered to StrateSphere (it was); whether Counterclaim Plaintiffs Kognetics, Inc., Inderpreet Thukral, or Rajeev Vaid improperly competed with StrateSphere (they did not); whether StrateSphere met their own obligations under the deal documents (they did not); and whether Kognetics owns the current version of the Software (it does).  If StrateSphere did fraudulently induce Kognetics, StrateSphere's claims do not require any analysis at all.

There is no genuine dispute of material fact regarding Kognetics' fraudulent inducement

claim.  In exchange for a majority interest in the Software, StrateSphere offered a 10%

ownership stake in StrateSphere LLC to Kognetics.  The undisputed evidence shows that in

July 2018, just one month before the Asset Purchase Agreement's ("APA") execution,

StrateSphere-founder Tariq Farwana directly represented to Kognetics that StrateSphere LLC

was worth $30 million to $50 million—setting Kognetics' 10% stake at $3 to $5 million.

Farwana's valuation is wholly untethered to reality, and Farwana even admits the valuation is

pure fiction.  That this valuation was fraudulent is bolstered by StrateSphere having repurchased

a different member's 3% interest in late-2018 for only $100,000.  In that stock repurchase

transaction, StrateSphere LLC valued itself at a mere $2,821,330—reducing its valuation to

Kognetics just months earlier by more than $47 million.  And this December valuation was *after*

StrateSphere had acquired the interest in the Kognetics Software and all of Kognetics' clients.

By drastically overstating its own value in July 2018, StrateSphere fraudulently induced

Kognetics to enter the APA and transfer the highly valuable Software to StrateSphere.

    In its Motion, StrateSphere does not challenge these facts, but instead argues that

Kognetics' fraudulent inducement claim is barred as a matter of law by the terms of the APA.

Therefore, both parties agree that the Court can decide the fraudulent inducement claim as a

matter of law.  And StrateSphere is wrong on the law.  The APA does not reference

StrateSphere's value anywhere, which is fatal to StrateSphere's argument that the APA's merger

clause bars Kognetics' claim.  Accordingly, the Court can decide as a matter of law that the APA

was fraudulently induced, and enter summary judgment in Kognetics' favor on all eleven claims

in StrateSphere's Second Amended Complaint, and on six of Kognetics' counterclaims.[1]

---

[1]    Out of an abundance of caution, Counterclaim Plaintiffs address each claim on which
StrateSphere seeks summary judgment and demonstrates why the record does not support
StrateSphere's allegations.  So as not to burden the Court with unnecessary repetition, Kognetics

## II. ARGUMENT

### A. StrateSphere Fraudulently Induced Kognetics into Signing the APA By Intentionally Misrepresenting StrateSphere's Value.

The Court can find as a matter of law, based on the undisputed record, that StrateSphere fraudulently induced Kognetics into signing the APA. StrateSphere makes two arguments in support of its motion for summary judgment on Kognetics' Second Amended Counterclaim Count II. First, StrateSphere claims the terms of the APA preclude Kognetics from establishing justifiable reliance. Here, StrateSphere gets the law wrong: the APA is silent about value, and so the terms of the APA cannot preclude reliance on Farwana's claim that StrateSphere was worth $30 to $50 million, and thus the parol evidence rule does not bar Farwana's claims.

Second, StrateSphere argues that Kognetics has not proven that StrateSphere's $30 to $50 million valuation was false. Here, StrateSphere ignores Farwana's own admissions regarding the valuation he represented to Kognetics, the purchase price of StrateSphere's stock just a few months after the close of the APA, and StrateSphere's books and records, which were not shared with Kognetics until: (a) Kognetics subpoenaed these records directly from StrateSphere's accountants in late-2021, and (b) the Court ordered StrateSphere to produce financial records in December 2021. Thus, the Court should grant summary judgment on Kognetics' fraudulent inducement claim and deny StrateSphere's motion.

### 1. Kognetics Justifiably Relied on StrateSphere's Claim that the Company Was Worth $50 Million.

Under Ohio law, a fraudulent inducement claim requires showing that: (1) the defendant made a representation; (2) the representation was material to the transaction; (3) the defendant

---

respectfully refers the Court to Counterclaim Plaintiffs' Motion for Partial Summary Judgment, (Doc. 143), which contains a detailed background fact section that supports the arguments Counterclaim Plaintiffs make herein.

made the representation either knowing it was false or with such utter disregard for the truth or falsity that one may infer that it was knowingly false; (4) the defendant intended to mislead the plaintiff into relying on the representation; (5) the plaintiff justifiably relied on the defendant's representation; and (6) the plaintiff's reliance on the defendant's representation proximately cause the plaintiff's injury. *Volbers-Klarich v. Middletown Mgmt., Inc.*, 125 Ohio St.3d 494, 501, 2010-Ohio-2057, 929 N.E.3d 434, ¶ 27. Reliance is justifiable when the representation "does not appear unreasonable on its face" and "if under the circumstances … there is no apparent reason to doubt the veracity of the representation." *Lepera v. Fuson*, 83 Ohio App. 3d 17, 26, 613 N.E.2d 1060, 1065 (Ohio 1992).

### a. Kognetics Did Not Disclaim Reliance on Farwana's Fraudulent Representations in the APA.

StrateSphere argues that Kognetics cannot bring a fraudulent inducement claim because buried deep in the APA, in the middle of the APA's merger clause, a single sentence reads: "There are no representations, promises, warranties, covenants, or undertakings other than those expressly set forth in or provided for in this Agreement or the Related Agreements." (Mot. Ex. 1, (Doc. 140-6) APA at § 11.09). According to StrateSphere, this sentence precludes Kognetics from bringing *any* fraudulent inducement claim as it relates to the APA.

If StrateSphere's position were correct, any fraudster could "perpetrate a fraud with immunity, if he simply has the foresight to include a merger clause in the agreement. Such, of course, is not the law." *Sabo v. Delman*, 3 N.Y.2d 155, 161, 143 N.E.2d 906, 909 (1957); *see also Hodell-Natco Indust., Inc. v. SAP America, Inc.*, No. 1:08-cv-02755, 2010 WL 6765522, at *12 (N.D. Ohio Sept. 2, 2010) ("Fraud cannot be merged"); *Walter v. Jones*, No. CA 760, 1982 WL 5547, at *1 (5th Dist. Nov. 9, 1982) (noting it is "well settled in all English speaking jurisdictions" that "a party who perpetrates an intentional fraud by spoken word cannot 'hide

behind' written contract provisions which attempt either to provide that such representations don't exist, or 'don't count' … .").

Likewise, under Ohio law, "the presence of a [liability] disclaimer does not necessarily shield a defendant from liability or mean that a plaintiff will not be able to determine justifiable reliance … . Courts have long held that general disclaimers … do not shield [parties] who knowingly make false statements." *Navistar, Inc. v. Dutchmaid Logistics, Inc.*, 2021-Ohio-1425, 171 N.E.3d 851, ¶ 50 (Ohio 2021) (internal citations omitted). Here, Farwana knowingly made false statements regarding StrateSphere's value to induce Kognetics' assent to the APA. (*See infra* at 9–11). His tortious actions are not absolved by the general boilerplate liability disclaimer in the merger clause.

Nevertheless, in support of its position, StrateSphere relies on cases that are distinguishable here. Those cases involved *explicit* disclaimers of the *particular* representations that form the basis of the fraudulent inducement claims—very different from the very general disclaimer in the APA. Take, for example, *Axios, Inc v. Thinkware, Inc.*, Case No. 1:15-CV-379, 2015 WL 5029227 (S.D. Ohio Aug. 26, 2015). There, the fraudulent inducement claim was based on alleged misrepresentations that the software at issue was suitable for the plaintiff's needs. *Id.* at *6. The software license, however, contained an explicit disclaimer that specifically required the plaintiff to ensure the software would function properly and explicitly nullified particular prior assurances:

> It is the intent and agreement of [defendant] and Customer that Customer make its own independent determination, prior to the execution of this Agreement, of the ability of the Software to meet the needs and intended uses by the Customer. **Customer acknowledges and represents that prior to the execution of this Agreement, Customer has had the opportunity to review the Software and has independently determined that the Software satisfies the Customer's needs and intended uses.** [Defendant] makes no warranties nor representations that the Software will satisfy the Customer's needs and intended uses, *and any prior*

> *communications or correspondence by [defendant] or any of its agents, employees, consultants [sic] that the Software will satisfy the Customer's needs and intended uses are null and void.*

*Id.* (emphasis in original).  The Court held that, because the alleged fraud was "directly contradicted" by a signed writing, no fraud claim on that specific basis could go forward.  *Id.* Notably, here, there is no contract language that states "the value of StrateSphere is $30-$50 million, and Kognetics has had an opportunity to evaluate StrateSphere's financial records." Thus, *Axios* is inapplicable.

Similarly, in *Rodgers v. Sipes*, 2012-Ohio-3070 (3rd Dist. App. 2012), a real estate contract explicitly stated that the purchaser bought the property "in its present physical condition after examination and inspection by Purchaser" and that the purchaser was "relying solely upon such examination and inspection" regarding the property's condition.  *Id.* at ¶ 30.  The Court held that this explicit and specific language regarding the condition of the house precluded a fraud claim that relied on the separate, prior representations about the condition of the property. *Id.* at ¶ 40.

The same is true for *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 7 F. Supp.2d 954 (N.D. Ohio 1998).  There, the buyer argued Goodyear had induced it into the contract through fraudulent representations about the quality and performance of the product. The contract included a limited liability disclaimer, and "[s]ignificantly, it also disclaimed reliance when it declared that '[n]o representative has authority to make any representation, promise, or agreement, except as stated herein."  *Id.* at 963.  The Court found that such a specific reliance disclaimer meant that the buyer "had fair warning as to the reliability of any representation external to the terms."  *Id.*

No such specificity exists here. As StrateSphere itself emphasizes, the APA "does ***not*** contain any representation regarding the 'value' of StrateSphere." (Mot. at 17). Thus, there is no express writing that specifically contradicts the fraud at issue here: namely, the value of StrateSphere. Likewise, there is no specific reliance disclaimer regarding the subject of value either. Accordingly, the disclaimer at APA § 11.09 does not bar Kognetics' fraudulent inducement claim against StrateSphere. *See Navistar*, 171 N.E.3d at 20–21 (finding general disclaimer did not immunize deliberate misrepresentations where the misrepresentations were not reflected in any written agreement between the parties).

   **b.**   **The Parol Evidence Rule Does Not Bar Kognetics' Fraudulent Inducement Claim.**

In a related argument, StrateSphere asserts Kognetics' fraudulent inducement claim is barred by the parol evidence rule. (Mot. at 18, n. 23). The Ohio Supreme Court has ruled, "the parol evidence rule does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement," and, "the presence of an integration provision does not vitiate the principle that parol evidence is admissible to prove fraud." *Galmish v. Cicchini*, 2000-Ohio-7, 90 Ohio St. 3d 22, 28, 734 N.E.2d 782, 789–90 (Ohio 2000). While it is true that the parol evidence rule may bar some fraudulent inducement claims, that principle only applies where the inducement is *directly contradicted* in an integrated writing. *See Raze Int'l, Inc. v. SE Equip. Co.*, 2016-Ohio-5700, 69 N.E.3d 1274, 1284, ¶ 29 (7th Dist. Ct. App. 2016) (finding parol evidence rule did not bar fraudulent inducement claim where representations were not specifically disclaimed in written agreement).

Here, Kognetics does not rely on any evidence that contradicts the APA. Instead, independent of the terms of the APA, Kognetics introduces undisputed evidence of StrateSphere's false representations to Kognetics that StrateSphere was worth $30 to

$50 million. StateSphere's patently false representations came to light during discovery, and only after Kognetics subpoenaed StateSphere's accounting records and discovered there was no way StateSphere was ever worth $30 million, let alone $50 million. Farwana has since admitted as much. *See infra* at 9–11. As StateSphere acknowledges, there is no provision in the APA that discusses the company's value or makes any specific representation regarding that value. Accordingly, Farwana's statements that StateSphere was worth $30 to $50 million—the basis for the fraudulent inducement claim—are not barred by the parol evidence rule.

*Raze International* is instructive. There, the executed contract stood silent as to the specific issue of warranty. 69 N.E.3d at 18. The plaintiff argued that the defendant had made oral representations that it would warrant the product sold. These representations were not barred by the parol evidence rule, even though there was a written contract, because the written contract did not contain specific terms regarding warranties. *Id.* So too here—the APA is silent about value. As such, the parol evidence rule does not bar StateSphere false representations regarding value.

   **c. StateSphere's Argument that Thukral and Vaid "Had All the Tools Necessary to Value StateSphere" Assumes Facts Not In Evidence.**

StateSphere makes the throwaway argument that Kognetics' claim that they justifiably relied on a valuation of StateSphere is "patently absurd" because they had "all the tools necessary to value StateSphere" "at their fingertips." (Mot. at 18). It is true that Thukral and Vaid have experience valuing companies. (*Id.*). It is not true, however, that the Software had the ability to make business valuations. And nothing in the deposition testimony that StateSphere cites to indicates as much. (*See* 30(b)(6) Dep. of I. Thukral (Doc. 99-4) at 52–55, Feb. 7, 2022, "30(b)(6) Thukral Dep." (describing that the Software's database generally can contain

information regarding a company's financials, funding, location, executive team, and how that information is uploaded into the Software's database)).  Nor is there evidence that the Software contained StrateSphere's financials, or that Thukral and Vaid had the information necessary to make a valuation of StrateSphere.  So, while Thukral and Vaid may have had the knowhow to value companies, they lacked StrateSphere's financial information necessary to determine its value.

Indeed, the record is clear that Kognetics had no access to any of StrateSphere's financial information until Kognetics subpoenaed StrateSphere's accountant in late-2021.  Kognetics even brought a claim against StrateSphere for violating Ohio Rev. Code § 1705.22(A)(1) for failing to provide information regarding the status of the business and financial condition of the company.  (Kognetics' Second Am. Countercl., Count X).[2]  This, of course, reflects Farwana's pattern and practice of withholding StrateSphere's financial information from partners.  (Dep. of A. Saxena at 19:10–20:19).  StrateSphere admits that its books and records were only provided through discovery.  (Mot. at 27).  Without that key information, Kognetics lacked the ability to value StrateSphere.  Instead, Kognetics had to rely on Farwana's word—and that reliance was justifiable under the circumstances.  (*See* Mot. for Partial Summ. J. at 16–18 (Doc. 143)).

### 2. Farwana Has Admitted That StrateSphere Was Not Worth $30 To 50 Million.

StrateSphere argues that Kognetics "makes no effort" to prove that StrateSphere was worth less than $30 to $50 million.  (Mot. at 18).  This argument ignores Farwana's testimony,

---

[2]       StrateSphere moves for summary judgment on this counterclaim, arguing that the claim is moot.  It is true that the Court did order StrateSphere to respond to Kognetics' information request in December 2021, and that StrateSphere did produce documents in response.  However, Kognetics remains a member of StrateSphere, LLC and KLLC, and the threat of StrateSphere again withholding documents remains.  As such, the claim is not yet moot as it is capable of repetition.  Accordingly, the motion must be denied.

the purchase price of StrateSphere's stock just a few months after the close of the APA, and StrateSphere's books and records.

By StrateSphere's own admission, the $30 to $50 million valuation was not based on StrateSphere's revenue, EBITDA, or comparable businesses. (30(b)(6) Farwana Dep. at 96:10–97:2). And Farwana testified that even he does not take the $30 to $50 million valuation of StrateSphere seriously, as he values his family's majority stake in StrateSphere at "a million dollars, $2 million." (*Id.* at 112:6–15). By Farwana's own testimony, then, StrateSphere's total value was significantly lower than his $30 to 50 million representation to Kognetics in July 2018.

Further, as learned in discovery, in December 2018, StrateSphere entered into a separate, subsequent share repurchase in which Farwana represented that StrateSphere's value ranged from $1,410,556 to $2,821,330. (Mot. for Partial Summ. J., Ex. F (Doc. 143-6), T. Farwana Email to A. Saxena). Specifically, when former employee Atul Saxena sought to sell his 3.5447% interest in StrateSphere back to the company, Farwana—without Kognetics' input—told Saxena, "Based on the company's liquidity and risks associated with recent events in KSA, we are prepared to offer you $50,000 to $100,000 for your shares in StrateSphere." (*Id.*). This is far below the purported $30 to $50 million valuation StrateSphere claimed in July 2018.

Finally, as for StrateSphere's argument that StrateSphere was in fact worth $30 to $50 million, that argument is belied by StrateSphere's own books and records. Without citing any authority, StrateSphere argues that it was worth $32 million in 2018 by multiplying StrateSphere's 2018 "revenue" by six, and then adding the estimated value of the Kognetics business to that revenue. (Mot. at 19).[3] This entire argument should be disregarded by the Court

---

[3]     "Revenue" is not even the correct metric. Business valuations are done, in part, by multiplying EBITDA (earnings before interest, taxes, depreciation, and amortization) by an industry-specific multiplier—not "revenue." This is because a revenue amount, without

as unreliable, inadmissible conjecture that cannot support a summary judgment motion.  For one, StrateSphere's reference to FactSet's proposed purchase price for the Kognetics business in 2019—one year after the APA was executed—is wholly irrelevant to StrateSphere's value in the summer of 2018.  For another, even if StrateSphere's novel business valuation method was reliable and admissible, it still fails to show that StrateSphere was $30 to$50 million in 2018.  That is, by StrateSphere's own calculations, StrateSphere was worth $20.4 million based on its revenue.  *Id.* To make up the nearly $12-million difference, StrateSphere adds the value of the Software—the asset purchased.  *Id.*  Yet, on the balance sheet, the Software was valued at $5.193 million in 2018, not $12 million.  (Ex. A, KHC Balance Sheet as of Dec. 31, 2018.)  Thus, even relying on StrateSphere business valuation methodology that has no legal or logical support, StrateSphere was worth, at most, $25.5 million, below the $30 –million promise and well below the $50 million value that StrateSphere claimed to be worth.[4]

Because StrateSphere's valuation lacks any merit, there is no genuine dispute that StrateSphere was never worth $30 to $50 million.  Accordingly, that representation was false.  Therefore, not only should StrateSphere's motion for summary judgment on Kognetics' fraudulent inducement claim be denied, judgment on this claim should be entered in Kognetics' favor as a matter of law.[5]

---

factoring in expenses to generate the revenue is meaningless because expenses that exceed revenue put earnings at zero.

[4]     It is worthwhile noting that StrateSphere is not the owner of the Software—KHC is.  This is yet another flaw in StrateSphere's already baseless method of business valuation.

[5]     StrateSphere moves for summary judgment on Kognetics' pre-APA copyright infringement claim by asserting that Kognetics cannot maintain its fraudulent inducement claim against StrateSphere.  Because fraudulent inducement can be decided by the Court as a matter of law, the Court must deny StrateSphere's motion for summary judgment as it relates to Kognetics' Second Amended Counterclaim Count VI.

Because Kognetics' fraudulent inducement claim is dispositive of all claims arising out of and relating to the APA, the Court need not consider the balance of StrateSphere's Motion, all of which arises from obligations and duties set forth in the APA.  Out of an abundance of caution, however, Kognetics addresses StrateSphere's remaining arguments.

> **B.**     **Kognetics, Thukral, and Vaid Complied With All Their Contractual Obligations While StrateSphere Committed the First Breach of the APA.**

StrateSphere seeks summary judgment on Counts I and III of its Second Amended Complaint and on Count I of Kognetics' Second Amended Counterclaims, which all relate to alleged breaches of the APA.  Given that StrateSphere fraudulently induced Kognetics into signing the APA, it cannot sustain any breach of contract claim against Kognetics.  Even without the fraud, however, StrateSphere is still not entitled to summary judgment because StrateSphere committed the first breach of the APA, and because Kognetics performed each of its obligations under the APA.

> **1.**     **StrateSphere Breached the APA First By Failing to Make Timely Capital Contributions, Failing to Raise Any Money for the Software, And Failing to Make A Single Royalty Payment, Even Though Kognetics Performed All of Its Obligations Under the APA.**

StrateSphere argues it is excused from each and every one of its obligations under the APA because, according to StrateSphere, Kognetics was in breach of the APA "on day one." (Mot. at 21).  The record does not support StrateSphere's argument, which highlights StrateSphere's fundamental misunderstanding of the structure of the entire deal.  That is, StrateSphere's argument is premised on the idea that the Software, its source code, and related documentation were not delivered to StrateSphere at closing, but rather kept by Thukral and Vaid for Kognetics.  But the Software, the source code, the documentation, and all other listed assets were delivered to StrateSphere at closing.  It is undisputed that the day the deal closed,

Thukral and Vaid became StrateSphere executives tasked with managing the Software business. Thus, by and through Thukral and Vaid—StrateSphere executives—StrateSphere gained possession of all those things.

Farwana testified that the "whole design" of the APA involved "relying on two executives [Thukral and Vaid] that are StrateSphere executives who are paid to . . . build the Kognetics capabilities and continue to scale it." (Farwana 30(b)(6) Dep. at 54:12–20). He elaborated that StrateSphere hired Thukral and Vaid "to man an asset that [StrateSphere] purchased" from Thukral and Vaid. (*Id.* at 65:8–66:1). Thus, according to StrateSphere, "their payment, essentially, [was] part of the deal." (*Id.* at 54:16–17). And until StrateSphere terminated Thukral and Vaid in April 2020, they directed all work related to the Software. (*Id.* at 72:3–15). It is no wonder, then, that without the Software business to manage, "there was no reason … to have Inder and Rajeev in StrateSphere." (*Id.* at 54:15–16).

Under Thukral and Vaid's direction and supervision, at closing, Kognetics conveyed to StrateSphere a Bill of Sale transferring all defined assets from Kognetics to the StrateSphere companies. (Mot. Ex. 1, (Doc. 140-6) APA at 66–69). Thus, all of the assets listed in the APA Schedule 1.01(c) were included in the Software in August 2018. (Thukral 30(b)(6) Dep. at 106:21–24). In doing so, Kognetics gave StrateSphere possession, custody, and control of the Software—a right that StrateSphere demonstrated conclusively when it exercised in April 2020 the power to unilaterally shut down the Software, including customer access to the Software. (Mot. for Partial Summ. J., Ex. B, (Doc. 143-2) Vaid Decl. ¶¶ 17, 25, 27). In fact, at closing in August 2018, Kognetics set up a password repository for all components of the Software that contained the keys to the kingdom, so to speak, and gave access to that repository to whomever asked at StrateSphere. (Thukral 30(b)(6) Dep. 128:14–129:15). Monthly subscription revenue

for the Software was booked in KLLC's account. (Vaid Decl. at ¶ 18). And, under Thukral and

Vaid's supervision as StrateSphere executives, Kognetics continued to maintain and update the

Software, as well as perform additional tasks for StrateSphere as required under the MSA. (*Id.*

at ¶¶ 18–20).

In contrast, StrateSphere did not perform its own obligations under the APA. Throughout

2018 and 2019, StrateSphere repeatedly underpaid the promised capital contributions, and failed

to raise any equity or debt capital as contractually obligated. (Vaid Decl. at ¶ 22).

StrateSphere's failure is captured in an email Caiazza sent to Farwana, telling Farwana that

StrateSphere owes $296,111 to Kognetics to be in compliance with the APA and Master Services

Agreement. (Mot. for Partial Summ. J., Ex. J, (Doc. 143-10) Email from D. Caiazza to

T. Farwana), Dec. 31, 2018.) StrateSphere's debt to Kognetics has only grown since.

Likewise, StrateSphere failed to make the required royalty payments to Kognetics, which,

to date, total $300,000 in missed payments. (Mot. for Partial Summ. J., Ex. A, (Doc No. 143-1),

Thukral Decl. at ¶ 21). StrateSphere's own financial documents prepared in late-2019 and early-

2020 acknowledge these debts to Kognetics. Specifically, KHC's October 31, 2019 Balance

Sheet shows a royalty obligation to Kognetics of $400,000. (*See* Mot. for Partial Summ. J.,

Ex. K, (Doc. 143-11) KHC Balance Sheet as of Oct. 31, 2019). By October 31, 2019, that

liability should have been reduced by $100,000, if the royalties had been paid, but it was not.

Further, in a document signed by Farwana, the StrateSphere Companies agreed that Kognetics,

Inc. was owed "$100,000 for Royalty Year 2019 and $50,000 as of January 31, 2020." (Mot. for

Partial Summ. J., Ex. L, (Doc. 143-12) Omnibus Restructuring Agreement). StrateSphere only

claimed to have made royalty payments after Thukral and Vaid rejected the Omnibus

Restructuring Agreement in March 2020. The payments StrateSphere now claims as royalty

payments were not made from KHC, as required by the APA, nor were they made on the dates required by the APA (January 31 and July 31, annually).  The evidence shows that StrateSphere has simply after-the-fact identified two $50,000 payments made to Kognetics under the MSA and now claims those are royalty payments in an attempt to avoid liability under the APA and push off early APA breaches.  The Court should reject that attempt.

> **2.**     **Even After StrateSphere Breached the APA (and the MSA), Kognetics Completed a Knowledge Transfer to StrateSphere Providing All Code, Documentation, and Know-How Regarding the Software.**

Next, StrateSphere argues that Kognetics breached the APA by failing to deliver a fully functioning version of the Software.  (Mot. at 11).  This assertion is not supported by the evidence.  Not only did StrateSphere receive possession, custody, and control of the fully functioning Software closing in 2018, a year later, in the Autumn of 2019, StrateSphere instructed Kognetics to begin training new StrateSphere employees on how to operate and update the Software.  (Thukral 30(b)(6) Dep. at 130:1–136:24).  Kognetics provided this training even though StrateSphere was in breach of the APA and the MSA, meaning Kognetics actually owned the version of the Software that was in operation in 2019, not StrateSphere.  (Mot. for Partial Summ. J. at 21–23 (Doc. 143)).

In training StrateSphere on the Software, Kognetics shared with the new StrateSphere employees full access to the repositories where all source code for the Software was stored, a description of each element of the Software, details about whether those elements were compiled automatically or entered into the Software's database manually, a link to the specific source code for each element of the Software, and a diagram that demonstrated the full development process for the Software.  (Dep. of Hetal Shah, Vol. II, 113:2–115:11, 116:20–117:4, 123:3–14).  Thus, StrateSphere cannot genuinely dispute that Kognetics delivered to it a fully functioning version

of the Software.  In reality, the reason why StrateSphere's version of the Software is not "fully functioning" is because StrateSphere unilaterally shut down the Software and cut off Kognetics in April 2020, thus eliminating its own capabilities to manually generate, curate, and input the signals and momentum data.  (Dep. of B. Warnick, Mar. 15, 2022 at 90:19–91:4, 94:11–105:18; *see also* Exhibit B, Email from H. Shah to A. Singh, *et al.*, Dec. 6, 2019).  In essence, StrateSphere cut off its nose to spite its own face.

In sum, StrateSphere is not entitled to summary judgment in its favor on Counts I and III of its Second Amended Complaint, nor is StrateSphere entitled to summary judgment in its favor on Count I of Kognetics' Second Amended Counterclaims, because StrateSphere committed the first material breach of the APA, and because Kognetics complied with all of its obligations—and then some—under the APA.

### C. Kognetics, Thukral, and Vaid Did Not Compete with StrateSphere in Violation of the APA, the Employment Agreements, or the Operating Agreement.

StrateSphere alleges Kognetics, Thukral, and Vaid breached the APA, their Employment Agreements and the KLLC Operating Agreement by improperly competing.  StrateSphere made these same arguments before in its Motion to Extend Preliminary Injunction and Motion for Show Cause, both of which the Court rejected as meritless, and thus refused to extend the preliminary injunction and mooted the show cause motion.  In the context of summary judgment, again, Kognetics' fraudulent inducement claim resolves each of these alleged breaches in Kognetics' favor as a matter of law, and the Court need not wade into the meritless allegations posed by StrateSphere.  Nothing has changed.  If the Court were to review the record again, the Court would still find that there has been no improper competition.

16

StateSphere alleges that Kognetics, Thukral, and Vaid engaged in improper competition between 2018 and April 2020 by using marketing material and the Kognetics name to "sell the Software on behalf of Boston Analytics" by negotiating employment contracts with FactSet—a potential acquirer of the Software. (Mot. at 10–11). StateSphere alleges Kognetics, Thukral, and Vaid engaged in improper competition after April 2020, by directly servicing clients and requesting direct compensation for a period of a few weeks in April 2020, soliciting StateSphere's customers, and marketing and providing "the same services to customers that KLLC had provided through the Software." (*Id*. at 12–13).

StateSphere's claims ignore a key fact at the heart of the deal between StateSphere and Kognetics: that Vaid and Thukral were employed as StateSphere executives tasked with managing the Software and its attendant business from August 2018 to April 2020. (*See supra* at 12–13). To put it simply, it was their job to market the Software to drive subscriptions and to raise funds for the Software. Therefore, StateSphere's claim that Kognetics, Thukral, or Vaid were improperly competing by marketing the Software to drive subscriptions (*i.e.*, revenue) for the Software (which was paid to KLLC), is, quite simply, nonsensical. Similarly, StateSphere's claim that Thukral and Vaid engaged in self-dealing when they explored potential employment options with FactSet had that acquisition gone through also overlooks StateSphere's testimony that, without the Software business to manage, "there was no reason … to have Inder and Rajeev in StateSphere." (Farwana 30(b)(6) Dep. at 54:15–16). Of course Thukral and Vaid would follow the Software. They were the "know how" that needed to be in place to "serve their new owner, the asset owner and employer" and such employment would naturally be part of any deal. (*Id.* at 65:8–16).

Regarding the brief period between April 2020 and the TRO's entry on May 4, 2020,

there was no improper competition. In truth, due to StrateSphere's actions in 2019, by early-2020, Kognetics' hand was forced: debts were mounting and contractual payments from StrateSphere were never coming. To survive, Kognetics was forced to engage in self-help to stay afloat and protect the Software (which inured to the sole benefit of KLLC), and so Kognetics asked customers for direct payment. (Thukral Decl. Aug. 2021, ¶¶ 26–28 (Doc. 143-1)). Indeed, self-help was the only reason why Kognetics reached out to customers regarding the services being provided by Kognetics, which was not receiving contractual payments from StrateSphere. (*Id.* at ¶ 28).

Self-help is not competition. *See Black's Law Dictionary* 322 (9th Ed. 2009) (defining "competition" as "the struggle for commercial advantage"). Kognetics was not seeking an improper commercial advantage against StrateSphere when it asked customers for direct payment—it was seeking payment that was not forthcoming from StrateSphere for services rendered. Rather than gaining competitive advantage over StrateSphere, Kognetics collected money directly from customers for services it had actually provided, which ultimately benefited StrateSphere. (Thukral Decl., ¶ 28). If Kognetics could not pay the vendors or employees who were servicing StrateSphere's customers, then those vendors or employees would stop working, service would suffer, and consequently StrateSphere would suffer. (*Id.* ¶ 27.) Unlike StrateSphere, all of Kognetics' actions were in the best interest of the joint business (KLLC), and to preserve the Software's reputation.

After May 2020, when the Court issued a stipulated injunction, Boston Analytics did not sell software, subscriptions to software, or any other similar type of subscription service. (Shah Dep. Vol. II at 155:4–156:3). Even the former Kognetics/Boston Analytics consultants who defected to StrateSphere both stated that the consulting services provided by Boston Analytics

was completely different from the Software's services.  (Dep. of A. Malaviya at 45:2–14, Feb. 10, 2022; Dep. of R. Parwan at 25:5–10, Feb. 11, 2022).

Again, StrateSphere's arguments regarding Boston Analytics' consulting company show that StrateSphere is totally unknowing regarding both the Software's functionality and its components.  The Software "was very targeted on one problem … which is M&A prediction. Who can buy who or what are the strategic gaps of the company."  (Shah Dep. Vol. II at 161:9–19).  To arrive at an answer to that specific question, the Software was made up of data that included market maps, identification of potential competitors, information regarding product offerings, business locations and descriptions, etc.  (Dep. of G. Kshretty, Feb. 21, 2022 at 100–102.)  And the data that was in the Software was limited to the technology media and telecommunications space, or "TMT" space.  (*Id.* at 101:9–13).  It is true that Boston Analytics' consulting business utilized some of those inputs in consulting engagements—but it did not provide the same output—that is M&A prediction.  Both cookies and bread use flour and salt as ingredients, but their finished products are not the same, nor are they interchangeable.  The same is true of Boston Analytics' consulting service as compared to the Software.

Accordingly, the record clearly establishes that neither Kognetics, Thukral, or Vaid engaged in any improper competition.  Rather, they operated for the direct benefit of StrateSphere, KHC (the entity that owned the Software), KLLC, and StrateSphere's members—of which Farwana was a majority owner.  The same cannot be said of Farwana or StrateSphere's conduct.  Thus, there is no factual basis to support StrateSphere's claims, as they are all predicated on the theory of improper competition, which lacks merit.

**1.     None of the Activities Alleged by StrateSphere and Clarified Above Violated the APA.**

The Non-Competition Clause of the APA reads, in relevant part, as follows:

> For a period equal to three (3) years following the Closing (the "Restricted Period"), no Seller nor the Seller Group nor any of their Affiliates shall directly or indirectly engage in, own, manage, operate, join, control, as partner, shareholder, consultant, manager, agent or otherwise, any individual, corporation, partnership, firm, other company, business organization, activity, entity or Person that distributes, provides, markets and/or sells one or more Competing Products.

(Mot. Ex. 1 (Doc. No. 140-6) at § 9.02). "Competing Products" is defined in that same section as "any product or service which performs functions similar to or in substitution for the Software." As discussed above, Kognetics, Thukral, and Vaid have never distributed, marketed, or sold a "Competing Product." There was no competition during the period between the APA's closing and April 2020—when Kognetics, Thukral, and Vaid were instead in the business of marketing and selling the Software itself—to the benefit of StrateSphere. And there was no competition during the period between April 2020 and the expiration of the APA's non-competition clause in August 2021 because no "Competing Product" was distributed, marketed, or sold. Accordingly, Kognetics is entitled to summary judgment on Counts I and III in StrateSphere's Second Amended Complaint.

**2.     None of the Activities Alleged by StrateSphere and Clarified Above Violated the Employment Agreements.**

Like the APA, the Employment Agreements of Thukral and Vaid prevent Thukral and Vaid from associating with an organization that "distributes, provides, markets and/or sells one or more *Competing Products*" for a period of two years following the termination of their employment. (Employment Agreement at ¶ 10(5)). Again, neither Thukral nor Vaid associated with an organization that distributed, provided, marketed, or sold one or more Competing

Products during the two years after StrateSphere terminated them.   As such, Thukral and Vaid never breached their respective Employment Agreements.

Plus, StrateSphere's failures to fully pay Thukral and Vaid preclude StrateSphere's employment agreement breach claims against Thukral or Vaid.  (*See* Mot. for Partial Summ. J. at 21).  StrateSphere argues that it set Thukral and Vaid's salary at $10,000 per month for the entirety of their employment.  Thukral testified, however, that "at a minimum, the agreed salary was $15,000" per month in 2020.  (Thukral Dep. 46:7-17).  Because StrateSphere failed to fully pay Thukral and Vaid, StrateSphere committed the first breach and cannot enforce the restrictive covenant.

Accordingly, the Court should enter summary judgment in Thukral and Vaid's favor on StrateSphere's Second Amended Complaint's Counts IV and V and on Thukral and Vaid's Counterclaims I and II.

### 3. None of the Activities Alleged by StrateSphere and Clarified Above Violated the KLLC Operating Agreement.

StrateSphere is not entitled to summary judgment on its claims that relate to the Kognetics LLC Operating Agreement (Counts II and IX of the Second Amended Complaint).  The Operating Agreement restricts Kognetics, Inc. to holding the Class B Units in KLLC, holding the Class A memberships in StrateSphere LLC, and employing coders or developers with connections to the Software or KLLC's other business activities.  (Mot. Ex. 6, Operating Agreement at 8.03 (Doc. 140-6)).  There is no evidence that Kognetics, Inc. violated this provision when it continued to provide customer access to the Software in April 2020.  That action was explicitly in the interest of the Software and KLLC.  Because the action supported the activities of KLLC, it is not a violation of the Operating Agreement.  As such, summary judgment should be entered in favor of Kognetics, Inc. on StrateSphere's Counts II and IX.

**4.     StrateSphere's Unfair Competition Claim Fails Because There Was No Intent To Deceive In Any of Kognetics, Thukral's, or Vaid's Dealings.**

StrateSphere cannot sustain an unfair competition claim against Kognetics, Thukral, or Vaid, because none ever intended to deceive StrateSphere.  "Unfair competition ordinarily consists of representations by one person, for the purpose of deceiving the public, that his goods are those of another. … The concept of unfair competition may also extend to unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another."  *Water Mgmt., Inc. v. Stayanchi*, 15 Ohio St.3d 83, 85, 472 N.E.2d 715 (Ohio 1984).  As explained in Kognetics' Surreply in Opposition to the Motion to Extend Preliminary Injunction, the documents StrateSphere cites do not reflect any nefarious conduct on the part of Kognetics, Thukral, or Vaid.  Primarily, those documents evidence ambiguous language choices and some cut-and-paste errors.  (Ex. 1 to Mot. for Leave to File Surreply, (Doc. No. 75-1) Thukral Decl. ¶¶ 11–13, 16-18, Sept. 3, 2021).  Mr. Shah admitted as much in his deposition when he stated that Boston Analytics repurposes old PowerPoint templates, some of which contained old slides.  (Shah Dep. Vol. II at 156:22–12).  He also clarified that many of those slides contain generic word choices such as "platform," "NLPs," "algorithms," "taxonomies," "signals," and the like.  (*Id.* at 157:13–158:19).  Because there was no bad intent, StrateSphere's motion for summary judgment as to Count VI of its Second Amended Complaint must be denied.

**D.     StrateSphere's Motion for Summary Judgment Regarding Kognetics' Tortious Interference Claim Should Be Denied Because It Misapplies the Law.**

StrateSphere moves for summary judgment on Kognetics' tortious interference claim (Count VII), related to Kognetics' business relationship with an entity located in India called

Pythhos.  Pythhos provided services to Kognetics in relation to the Software pursuant to a master services agreement.  Critically, StrateSphere is not a party to the MSA between Kognetics and Pythhos, nor does StrateSphere have any rights under the MSA between Kognetics and Pythhos.

StrateSphere correctly states, "it is well established than an action for tortious interference may only lie against an outside party to the contract or prospective business relationship." *Lundeen v. Smith-Hoke*, 2015-Ohio-5086, ¶ 42 (10th Dist. 2015).  Despite this straightforward blackletter law, StrateSphere, relying on *dicta*, claims that because it is the "source of the business relationship" between Kognetics and StrateSphere, Kognetics cannot bring a tortious interference claim against it as a matter of law.  This is not correct.

*Lundeen* cites *Pasqualetti v. Kia Motors Am., Inc*., 663 F. Supp. 2d 586, 602 (N.D. Ohio 2009), for the proposition that tortious interference does not exist where the defendant was the source of the business opportunity allegedly interfered with.  *Lundeen*, 2015-Ohio-5086, at ¶ 42.  But the facts in *Pasqualetti* are readily distinguishable here.  In particular, the contract at issue in *Pasqualetti* was a franchise contract, under which the franchisor had the explicit right to assent to the contract at issue.  663 F. Supp.2d at 602.  Here, StrateSphere had no such right—thus, StrateSphere was not the "source of the business opportunity."  Accordingly, Kognetics' tortious interference claim against StrateSphere is not barred as a matter of law, and summary judgment in favor of StrateSphere should be denied.

## III.    CONCLUSION

For the reasons stated herein, StrateSphere's Motion for Summary Judgment should be denied in total.

23

Date: June 6, 2022                              Respectfully submitted,


                                                 /s/ Shawn J. Organ
                                                Shawn J. Organ (0042052)
                                                  *Trial Attorney*
                                                Kirsten R. Fraser (0093951)
                                                Connor Organ (0097995)
                                                **ORGAN LAW LLP**
                                                1330 Dublin Road
                                                Columbus, Ohio  43215
                                                614.481.0900
                                                614.481.0904 (f)
                                                sjorgan@organlegal.com
                                                kfraser@organlegal.com
                                                corgan@organlegal.com

                                                *Attorneys for Defendants/Counterclaim*
                                                *Plaintiffs Kognetics, Inc., Inderpreet Thukral,*
                                                *and Rajeev Vaid.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 6, 2022, the foregoing was electronically

filed with the Clerk of Court using the CM/ECF system and was served on all counsel of record.


_/s/ Shawn J. Organ_____
*Attorney for Defendant / Counterclaim*
*Plaintiff Kognetics Inc.*